# EXHIBIT 2

1       UNITED STATES BANKRUPTCY COURT
        DISTRICT OF DELAWARE
2

3            . Chapter 11
 IN RE:         .
4            . Case No. 20-10343 (LSS)
 BOY SCOUTS OF AMERICA AND  .
5 DELAWARE BSA, LLC,    .
            . Courtroom No. 2
6            . 824 North Market Street
            . Wilmington, Delaware 19801
7            .
        Debtors. . August 30, 2021
8 . . . . . . . . . . . . . . . . . 2:00 P.M.

9     TRANSCRIPT OF TELEPHONIC OMNIBUS HEARING
    BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10      UNITED STATES BANKRUPTCY JUDGE

11 TELEPHONIC APPEARANCES:
12
 For the Debtor:   Andrew R. Remming, Esquire
13          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
          1201 North Market Street, 16th Floor
14          Wilmington, Delaware 19899

15          - and -

16          Jessica C. Lauria, Esquire
          WHITE & CASE LLP
17          1221 Avenue of the Americas
          New York, New York 10020
18
19
 Audio Operator:   Brandon J. McCarthy, ECRO
20
 Transcription Company: Reliable
21          1007 N. Orange Street
          Wilmington, Delaware 19801
22          (302)654-8080
23          Email: gmatthews@reliable-co.com

24 Proceedings recorded by electronic sound recording; transcript
 produced by transcription service.
25

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For the Debtors:          Michael C. Andolina, Esquire
                               Matthew E. Linder, Esquire
 3                             Laura E. Baccash, Esquire
                               Blair M. Warner, Esquire
 4                             WHITE & CASE LLP
                               111 South Wacker Drive
 5                             Chicago, Illinois 60606

 6
     For Century:             Daniel Shamah, Esquire
 7                            O'MELVENY & MYERS LLP
                              Times Square Tower
 8                            7 Times Square
                              New York, New York 10036
 9
                               - and -
10
                              Mary Beth Forshaw, Esquire
11                            SIMPSON THACHER & BARTLETT LLP
                              425 Lexington Avenue
12                            New York, New York 10017

13
     For the Coalition of     Eric Goodman, Esquire
14   Abused Scouts:           BROWN RUDNICK LLP
                              601 Thirteenth Street NW, Suite 600
15                            Washington, DC 20005

16   For the Committee of     Kirk Pasich, Esquire
     Tort Claimants:          PASICH LLP
17                            10880 Wilshire Boulevard
                              Suite 2000
18                            Los Angeles, California 90024

19
     For the FCR:             Robert Brady, Esquire
20                            YOUNG CONAWAY STARGATT & TAYLOR LLP
                              Rodney Square
21                            1000 North King Street
                              Wilmington, Delaware 19801
22

23

24

25
```

1 | <u>MATTERS GOING FORWARD</u>:

2 | 1. Joint Letter to the Honorable Judge Laurie Silverstein from
3 | the Official Committee of Tort Claimants, the Coalition of
| Abused Scouts for Justice and the Future Claimants'
4 | Representative Regarding Discovery (D.I. 6102, filed 8/20/21)

5 | 2. [SEALED] Hartford and Century's Motion for an Order (I)
| Authorizing Certain Rule 2004 Discovery and (II) Granting
6 | Leave from Local Rule 3007-1(f) to Permit the Filing of
| Substantive Omnibus Objections (D.I. 1971, Filed 1/22/21)

7 |
8 |     **Ruling:  41**

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1      (Proceedings commence at 2:04 p.m.)

2           THE COURT:  Good afternoon, counsel.  This is Judge

3   Silverstein.  We're here in Boy Scouts of America, Bankruptcy

4   Case No. 20-10343, for some discovery issues.

5           I will turn it over to the debtor to start with;

6   although, this was initiated by a request, a joint request,

7   from the official committee of tort claimants, the coalition

8   and the FCR.

9           MR. REMMING:  Good afternoon, Your Honor.  Andrew

10  Remming, Morris Nichols.  Its good to see you.

11          THE COURT:  Good afternoon.

12          MR. REMMING:  Good afternoon.  You are correct, we

13  are here today for a handful of discovery matters that were

14  not initiated by the debtor.  Before we dive into those, with

15  the court's permission, I will turn it over to Jessica Lauria

16  for some opening remarks.

17          THE COURT:  Ms. Lauria?

18          MS. LAURIA:  Thank you, Your Honor.  Jessica

19  Lauria, White & Case, for BSA.

20          I will be very brief, Your Honor.  We just thought

21  it would make sense to give you a status update before today's

22  proceedings commence.  We thank you very much for the prompt

23  ruling with respect to the RSA.  The parties have been

24  digesting that.  You will undoubtedly have noticed that we

25  have not filed any amendments to the RSA, nor have we

1  requested that the court enter an order approving the RSA with

2  the two modifications that were noted in Your Honor's ruling.

3  That, quite frankly, Your Honor, is because as you noted in

4  your ruling the transaction contemplated by the RSA and the

5  April Hartford settlement are mutually exclusive.

6          Hartford asserted, in its papers in connection with

7  the RSA, that it may have a sizeable administrative expense

8  priority claim and while the debtors and other parties, as I

9  understand it, dispute that we have to take that assertion

10  seriously particularly because to the extent Hartford were to

11  have an administrative priority claim that would sit in front

12  of all of our general unsecured creditors, both abuse

13  survivors and non-abuse general unsecured creditors.

14          So we are evaluating right now, Your Honor, the

15  best approach in light of Your Honor's ruling and in light of

16  what may need to occur procedurally on the Hartford fronts.

17  We will get back to you, I think, in the next couple of days,

18  but just wanted to make sure that we address the fact that we

19  understand we haven't come back to the court for the RSA

20  order.

21          All of that being said, Your Honor, we have

22  continued to have mediation sessions including in-person

23  mediation sessions and have had some very productive sessions

24  with insurers, with chartered organizations and with

25  representatives for survivor constituencies.  So we are

1  cautiously optimistic that in the next couple of days we will

2  be back, at least, on the docket with some news to report.

3        That is all have for today, Your Honor.  Unless you

4  have any questions I would hand the podium back over to Mr.

5  Remming to get the agenda started.

6        THE COURT:  Thank you.  No, I don't have any

7  questions.  I appreciate the update.

8        MR. REMMING:  Thank you, Your Honor.  Again, for

9  the record, Andrew Remming, Morris Nichols Arsht & Tunnell,

10 for the debtors.

11       The first item that we listed on the agenda was

12 filed by the TCC, the coalition and the FCR.  I don't know if

13 Your Honor had a preference for where we start, but that is

14 the first item on the agenda that letter.

15       THE COURT:  That's fine.

16       MR. PASICH:  Your Honor, this is Kirk Pasich for

17 the official committee of tort claimants.  If I may, I think

18 the starting point for this discussion about our discovery is

19 to focus on, really, the purpose of it and what we are

20 seeking, and why we are before you.

21       As Century made clear in its last letter to the

22 court this goes back to a 1996 transaction by which INA's

23 assets reportedly were transferred to Century and its

24 liabilities.  And as a result Century is the one that is here;

25 although, INA issued the policies.

 1          Now the INA policies at issue commenced in or about

 2   1951 and on through most of the life span of the Boy Scouts.

 3   One thing that makes these policies different from policies

 4   typically issued today is that most of them have no aggregate

 5   limits. The policies in the 50's, 60's and 70's the chunk of

 6   those have no aggregate limits meaning that they are uncapped.

 7   As long as there is an occurrence that triggers coverage in

 8   the policy period they have to respond to their limits.

 9          Now I am sure that Your Honor is aware of the TDP

10   that has been discussed.  It has been the subject of some

11   debate, but if we assume for a moment that the values that are

12   set forth in the TDP were accurate, and I'm not speaking out

13   about allegations of fraud or those sorts of things, that is a

14   separate issue, but if we were to look at the majors of

15   liability and the TDP, and we were to evaluate the INA

16   policies, and we were to make various conservative assumptions

17   in favor of INA, and by conservative assumptions I mean, for

18   example, we assume that each survivor constitutes a single

19   occurrence even though the law in a number of states would say

20   each abuse is an occurrence.  And when you have a policy that

21   applies per occurrences, obviously, that is materially

22   important factors to calculate the number of occurrences.

23          If we gave the INA and Century the benefit of that

24   doubt, and we took the narrow, sort of, trigger theories, by

25   which I mean what policies apply, so we said it's only the

1    first year of abuse, it is not each year of abuse, it is not

2    the duration that entries are suffered, and we're aware of

3    medical evidence that injuries continue like post- traumatic

4    stress syndrome they can continue for decades after an episode

5    of abuse.

6         If we ignore all of that and we give Century and

7    INA the benefit of the doubt, and we look at the number of

8    survivor claims where the first abuse was in their policy

9    period you're looking at almost 16,000 claims.  And if you

10   take values that are tiered based on the level of abuse, the

11   severity of abuse, you would value those claims as being

12   somewhere between just under $6 billion to a total value in

13   excess of $22 billion.

14        Now we're not saying that Century should pay that

15   because if you take into account the years of the Century

16   policies and give them the benefit of the doubt on the number

17   of occurrences, and do those other things you come up with a

18   potential liability range of about $4.4 billion to about $11.6

19   billion for those INA policies.

20        So we have been hearing claims of poverty.  We know

21   that Century is in run-off.  We know that this transaction

22   that went back to 1996 basically attempted to separate Century

23   from INA.  So if that transaction were legitimate and it stood

24   up there would be one key question for this court and for us

25   to evaluate in assessing what is the right contribution from

1  Century to any settlement, what can Century pay.

2           Now to do that we have to look at Century's

3  financial condition and we posed one very simple interrogatory

4  to Century that asked identify the maximum amount that Century

5  can pay for any Century settlement.  Pretty straight forward

6  question.  They are the ones that know their financial

7  condition.  They are the ones that know the reserve.  They are

8  the ones that know what the agreements are with INA and Chubb

9  because let's be clear: under the plan that was approved in

10  Pennsylvania in 1996 and amended thereafter there is an

11  evergreen cash-flow that comes down from INA Financial, which

12  is a Chubb Company, into Century and that cash-flow is based

13  on dividends that are paid to INA Financial by Chubb.  They

14  require that a minimum of 10 percent of those dividends be set

15  aside to be available to fund Century's obligations to its

16  policy holders.

17           So we know there is an evergreen fund.  We know

18  that in the last 10 to 15 years literally hundreds of millions

19  of dollars has been placed into Century from Chubb.  We know

20  that from Chubb's own financial statements and there is no

21  dispute about that.  So when we look at Century and we ask

22  that interrogatory we're asking for Century to tell us, hey,

23  how much can you pay for these liabilities?  Century's

24  response boiled down to its simplest point after going through

25  pages of objections is we will meet and confer with you.

1          So we asked Century to produce documents that

2   reflected its financial condition and eventually it produced

3   six boxes of documents that showed up at our offices in Los

4   Angeles, no cover sheet.  To some extent about half of them

5   were documents in the public record that we already have

6   access to and the other half largely consisted of

7   communications back and forth among the parties in this

8   proceeding including the discover we propounded on Century.

9          So we saw nothing new that wasn't available in the

10  public record. So, for example, we don't know what the

11  reserves are that Century has set aside for the Boy Scout

12  claims.  We don't know if Century increased those reserves as

13  we believe they were obligated to do as the claims mounted.

14  We don't know how much is available in these various funding

15  mechanisms to Century that come down from Chubb.  We don't

16  know any of that.

17          So one piece of information that we're really

18  looking for is Chubb or Century to explain to us, to show us

19  what it is capable of paying.  Now we're not willing to take

20  Century's word on that, nor do we actually have a statement

21  from Century to us as to what it financially is capable of

22  paying to resolve these claims.

23          So when it comes down to evaluating the plan, when

24  it comes down to assessing settlement, all of those features,

25  we don't know what Century can pay.  We do know there is a

1    Chubb backstop.  We do know from Chubb's annual reports filed

2    earlier this year that Chubb is having a good year and it had

3    a good year last year, pandemic notwithstanding.  We do know

4    that Chubb seems to believe that Century is going to be around

5    for quite some time and expects it to be around for quite some

6    time.  So we are not sure how to balance that with what

7    appears to be a claim that Century has an inability to pay a

8    substantial amount of money.

9         So at the simplest point on this half of the issue

10    we simply want Century to show us some documents that tell us

11    what it really is able to pay on these transactions; these

12    settlements, these claims.  Now we are not asking Century to

13    say what it is prepared to pay or --

14         THE COURT:  Well let me ask you, I just want to

15    make sure I understand, what theory is it based on, this

16    request -- that wasn't English.  What is the basis of this

17    request that you could ask an opposing party what they're

18    capable of paying?  What rule does that come from?  What

19    theory is that based on?  I am not sure I understand.

20         I understand why you want the information.  I am

21    trying to understand why you are entitled to it.

22         MR. PASICH:  Well, Your Honor, I think when we're

23    looking at evaluating assets of the estate, which is one of

24    the things we're looking at here, and, obviously, a key asset

25    of the estate is these INA policies and the value of those

1   policies, and we're assessing that in the context of a

2   proposed plan.  There are proceedings that were stayed,

3   obviously, between the BSA and Century, among others, and

4   there was a proceeding initiated, an adversary proceeding,

5   here that has also been stayed.

6           So we're trying to do this to accommodate the BSA's

7   desire to get a plan in place as soon as it reasonably can.

8   We have heard what they have said about that.  We know there

9   is ongoing settlement discussions. We know there's offers

10  made, some of which we are aware of and some of which the TCC

11  is not aware of.  But as a representative of 84,000 abuse

12  survivors we clearly have a stake in this game.

13          So from a practical perspective we are saying show

14  us what you can pay.  You want us to believe you can pay a

15  certain amount of money and only that amount of money, so show

16  us what you can pay.  From a bankruptcy perspective you're

17  right, we are requesting certain information that we have done

18  in the form of interrogatories and production requests.  I am

19  aware of what Century said in its response letter where it

20  disagrees with our legal ability to get them which is why I

21  say we're looking at it from a practical perspective and a

22  legal perspective.

23          We do have a claim, as the claimants, in the value

24  of these policies.  These policies, like all insurance

25  policies, were set aside and designed to protect claimants,

1   not just the insured.  That is one of the purposes behind

2   insurance.  We do have in certain states some of our claimants

3   have the ability to make direct actions against Century and

4   pursuant to those rights they could assert claims for this

5   information from Century.

6          So I think we're looking at a combination of things

7   here that are at play, but I do think it's true; if this court

8   were to say and Century were to say we have no ability to

9   force Century to produce this information then we don't get

10  this information and then we don't have a basis because we

11  will continue to object to the plan unless Century is --

12         THE COURT:  But that is not the case.  In fact, the

13  RSA, and granted nobody has put that order in front of me, but

14  under the RSA the committee has signed off on the structure of

15  the plan.  And the plan, as I understand it, at the moment

16  does not have a settlement to evaluate with Century.  So to

17  say that you can't support a plan that's not true.  In fact,

18  it's not the situation here.  In fact, the committee has

19  supported a plan and had I not ruled the way I did you would

20  have been there.  So I don't understand that position.

21         MR. PASICH:  Let me see if I can explain it, Your

22  Honor, because your absolutely correct in terms of the TCC

23  supporting the RSA and signing under the RSA; no disagreement

24  there.  Whether that RSA takes effect or not I don't know.

25  Whether there is a plan that contemplates the RSA taking

1   effect that I can't tell you either.

2          We understand that the Boy Scouts are contemplating

3   filing a plan in the immediate future, but if the RSA doesn't

4   stand there is no approved plan.  If the RSA does stand you

5   are right, there isn't a settlement here that involves Century

6   per say, it goes off into the land where the trust is there

7   and then there's litigation and maybe were done.

8          I am trying to look at this from a practical

9   perspective whereas the BSA has represented to you there are

10  ongoing mediation sessions and we understand, although we're

11  not a party to certain of these settlement discussions, that

12  they're ongoing settlement discussions involving various

13  insurers who we suppose would include Century, but we don't

14  know that.  So --

15          THE COURT:  So do you want me to give the TCC and

16  advantage during mediation, is that what this is about?  I am

17  trying to, again, figure the legal basis.  I understand you

18  are coming from a practical perspective and from a practical

19  perspective we all love to have information from our

20  adversaries about all kinds of issues, but that is not the

21  standard.

22          So what I am hearing is inconsistent with where we

23  were in this case, at least, two weeks ago and it seems like

24  it's geared toward trying to get some advantage in the

25  mediation.

1    MR. PASICH:  Well, Your Honor, look, we left some

2  advantage in the mediation I suppose that's true, but what we

3  would really like to do is we don't want to be unreasonable

4  here in our responses to attempts to resolve BSA's liability

5  and to get a plan in place.

6    So what we do know is when we look at something

7  like Century, and INA and Chubb, and we look at their

8  financial statements and they tell us how much money they have

9  -- I mean if you're dealing with a company at the Chubb level

10  that made three and a half billion in net profit last year

11  alone, and we're evaluating this what I would say to Century

12  is if you really can't pay show us because we don't want to

13  make a demand that is unreasonable that has no chance of

14  working.  We want to make a reasonable demand based on ability

15  to pay and based on a transaction that still gives policy

16  holders the right to raise challenges to that transaction that

17  would theoretically isolate INA and Chubb from any financial

18  liability for Century.

19    So that is our position. It's not to gain an

20  advantage.  It's trying to be reasonable here to work towards

21  a resolution that benefits everybody.  We do not want to make

22  a demand for $8 billion if there's no chance that that is a

23  reasonable number in light of Century's ability to pay, and

24  whatever INA and Chubb's obligations may or may not be to

25  backstop financial obligations that Century has.  That is

1  really the thrust of this; not to gain an advantage at

2  mediation, but to be reasonable.

3         THE COURT:  Well the latter issue is a legal issue,

4  right?  The latter issue is what is the consequence or not of

5  that divisive transaction that happened in 1990 whatever.  So

6  that is a legal issue.  I understand that.  That is not going

7  to get litigated in front of me.

8         So that is an assessment that parties will have to

9  make based on their own review of the cases, and what has

10 happened, and maybe what has happened in other circumstances

11 where someone has used this Pennsylvania statute before, and

12 the effect of an insurance commissioner's decision, etc.  That

13 is a legal issue.

14        MR. PASICH:  That is a legal issue, Your Honor, and

15 I don't disagree with it.  Also it plays an important issue

16 here with respect to -- and this is where this ties into

17 Hartford.  And I know you haven't made a decision on Hartford,

18 and I'm not asking you to do any such thing today.  That is

19 way beyond my purview to ask you to do that today, but because

20 of the linkage between the Hartford settlement and Century in

21 evaluating all of this, looking at the challenges, Century's

22 ability to pay does become important.

23        One of the assets the Boy Scouts has under the

24 Pennsylvania Insurance Department's approval, under the

25 Pennsylvania Supreme Court's decision on that approval and

1    under the California Court of Appeals approval of that

2    decision there was an important carve-out here and that carve-

3    out was for policy holders.  The department in those two

4    courts recognized that a policy holder does have a right to

5    challenge the transaction.  That policy holder would be the

6    BSA.

7          So if there is a release to be had here of anything

8    involving Century it will be important to evaluate the value

9    of that right that the BSA has to go beyond whatever Century's

10   financial ability to  pay is.  Now if it turns out Century has

11   a sufficient financial ability to pay we may never have to

12   reach that issue, but if it doesn't we do reach that issue and

13   we know the transaction involved.

14         One of the ironies here is the transaction

15   challenge that was made in California was made by AIG and a

16   Chubb Company.  They challenged the transaction, they accused

17   the transaction of being fraudulent.  Now Chubb's tone has

18   changed because when INA bought Chubb then all of a sudden it

19   was in a different position because now the transaction that

20   Chubb was challenging Chubb was now a party to that

21   transaction.

22         We do know they mounted a challenge.  We do know

23   the California Court of Appeals recognized that challenge and

24   we do know one other thing that the California Court of

25   Appeals said that is relevant for our discussion today.  The

1  California Court of Appeals said that when INA and Century

2  wrote to their policy holders and they sent out letters

3  describing the transaction those letters didn't cut it.  They

4  didn't do what they were supposed to do to give fair notice to

5  the policy holders and, to use the words of the court, those

6  letters could be characterized as fraudulent.

7          Now that was a result that Chubb obtained.  That

8  result stayed on the books.  And the only reason that case

9  didn't go any farther was the voters in California passed an

10  initiative that changed the loss of -- the only people that

11  could mount that kind of challenge would be a policy holder,

12  not a competitor.  Well one thing that would be easy to do

13  here, from our perspective, to look at the validity of that

14  transaction, would be to say to Chubb, to Century, to INA,

15  look, the court told you, you needed to do a different letter.

16          So in the early 2000's did you, in fact, send the

17  required letter to the Boy Scouts of America making the

18  adequate and accurate disclosure that you were required to

19  make because if you did that that changes the tenner of the

20  discussion today.  If you didn't do it then all we have is a

21  court of appeal decision that's final, that Chubb obtained

22  that said the disclosure wasn't adequate and characterized the

23  disclosures as fraudulent.  That goes to the value of the

24  estate and it goes to the value of the BSA's rights to go

25  beyond Century and to get to INA.

1          That is why I said at the start, Your Honor, that

2   we have two pieces we are looking at here.  One is Century's

3   ability to pay and the other is, is INA obligated today,

4   notwithstanding that transaction, on the billions of dollars

5   of insurance that it provided to the BSA.  That is the

6   information we are requesting.  There could be a simple answer

7   to the latter, here is a letter that we can show you that was

8   sent to the BSA, and on the former there would be an answer on

9   what their financial ability to pay is.

10          THE COURT:  My guess is that letter wouldn't end

11  everything, but I guess here I'm still trying to figure out

12  the context.  The context we're in right now where you are

13  trying to get this information.  Perhaps there is another

14  context where it would be permissible, but the context we're

15  in right now is where I'm having some issue.

16          What is it related to?  What is the hook for it?

17  What is in front of me in a contested way that would permit

18  the TCC to obtain this information and that is where I still

19  haven't heard that hook, if you will.  How is it in front of

20  me -- how is properly in front of me in the context of where

21  we are right now which is nothing in the plan, as I understand

22  it, the latest plan that has been put in front of me, as I

23  understand it, or nothing in the RSA gives a release to

24  Century, gives a release to Chubb, gives a release to anybody

25  who was a part of that transaction.  So those claims will all

1    still exist even if I confirm a plan, at least, any of the

2    plans that have to date been put in front of me.

3              MR. PASICH:  Your Honor, perhaps I can try it this

4    way and offer two thoughts.  Number one, the RSA isn't going

5    to be operative in the current state.  So that wouldn't be the

6    governing document.  Number two, I think if we look at the

7    disclosure statements the TCC along with pretty much a bunch

8    of other folks, I think, a large number of firms have checked

9    into the disclosure statements, the statements provide

10   sufficient information.

11             So in order for the claimants to evaluate the

12   insurers' exposure and what they can pay this is information

13   that goes to that exact point.  So I don't think we can look

14   at the RSA at this point and I do think we look at the

15   disclosure statement and I do think we look at what objections

16   are likely to be filed to any plan that comes up.  To me those

17   things are the basis for this court to say the information

18   we're requesting should be produced.

19             THE COURT:  Okay.  Thank you.

20             MR. LUCAS:  Your Honor, this is John Lucas for the

21   TCC.  May I add just a couple of comments?

22             THE COURT:  No.  You're the same party.  No.  One

23   person.  Thank you.

24             MR. LUCAS:  Thank you, Your Honor.

25             MR. GOODMAN:  Your Honor?

1          THE COURT:  There were two other signatories to the

2   letter.  Does the FCR or the coalition have anything to add?

3          MR. GOODMAN:  Your Honor, this is Eric Goodman.

4   Can you hear me okay?

5          THE COURT:  Yes, Mr. Goodman.

6          MR. GOODMAN:  Thank you.  Good afternoon, Your

7   Honor.  Eric Goodman, Brown Rudnick, counsel for the

8   coalition.

9          In the interest of full disclosure I am not an

10  insurance attorney.  I am a bankruptcy attorney, former

11  bankruptcy clerk.  I wake up in the morning and I only think

12  about Section 1129 when it comes to these issues.  The

13  bankruptcy code to me is kind of the beginning and the end of

14  the day.

15         The discovery that we are seeking is critical for a

16  bankruptcy reason and it's critical for a bankruptcy reason

17  that is completely independent of the Hartford settlement.

18  This is a plan confirmation issue.  There are several

19  directions this case could go in; the information that we are

20  seeking and have been seeking for some time from Century and

21  Chubb is relevant no matter which path we travel.

22         The debtors could file another plan.  In fact, I

23  expect that they will file another plan.  There are ways that

24  this case could go.  The first is, and I hope this is the

25  case, that the debtors plan is accepted, after the vote, by

1   the survivors and other creditors in this case.  If that is,

2   in fact, what happens we will see litigation over the

3   channeling injunction and the non-consensual releases that are

4   contained in the plan.

5          Under the Master Mortgage factors and this court's

6   own decision in Millennium a fair question will be whether the

7   survivors are receiving a substantial recovery.  What the INA

8   insurance rights are worth bear on that question.  The INA

9   insurance rights may be worth billions, as you just heard from

10  Mr. Pasich, or they may be worth substantially less than that.

11  Right now we don't know.  It depends on what Century can

12  afford to pay and who is liable under the INA policies.  That

13  is why we need discovery.

14         The second path, and I hope this doesn't happen,

15  but it could, is the debtors plan would be voted down.  The

16  debtors could then ask the court to confirm the toggle plan

17  and that would put us before Section 1129(b), unfair

18  discrimination, and Section 1129(a)(7), best interest of

19  creditors.  Those statutes would then be front and center.

20         Both of those tests concern themselves with the

21  assets being set aside to pay dissenting creditors.  The value

22  of the INA insurance rights would be critical to that

23  analysis.  Absent the settlement with Century there is no path

24  out of this case that doesn't not involve the value of the INA

25  policies.  That is the relevancy of the information we are

1  seeking.

2          THE COURT:  Isn't that -- aren't the value of the

3  policies the same regardless of whether this is a 7 or an 11?

4  How is that -- I don't understand that argument and maybe I

5  don't need to for today, but I don't understand that argument.

6  The value of the policies, the litigation, the claims against

7  Century, Chubb and INA, unless there is a settlement of them

8  how is -- how does it matter for the best interest of

9  creditors test.  They are the same.

10          MR. GOODMAN:  So two points, Your Honor, and I

11  anticipated this question.  So on the best interest of

12  creditors test, and I don't know that I want to go too far

13  into the weeds on this issue, but it depends on the <u>Fuller</u>

14  <u>Austin</u> in the trust distribution procedures.  To make the

15  answer, I think, even more clear recall under the plan, the

16  debtors plan, under both the toggle and the global resolution

17  plan the general unsecured creditors are receiving recovery

18  close to 95 percent.

19          In a cram-down situation, again the insurance

20  rights from the Boy Scouts would be contributed to the trust,

21  you would need to know the value of those assets, among other

22  things, to know if the plan was unconfirmable on the grounds

23  that it was unfairly discriminatory.  So even if you, sort of,

24  put aside the --

25          THE COURT:  Vis-à-vis who?  Vis-à-vis who?  Oh, the

1  general unsecureds?

2          MR. GOODMAN:  Yes.

3          THE COURT:  Maybe.  Okay.  Maybe.

4          MR. GOODMAN:  There are a number of creditors in

5  this case who are receiving close to 100 percent payment under

6  the plan.  You would have a situation where the general

7  unsecured creditors would be in the 75 to 95 percent range, I

8  believe this is according to the debtors' disclosure

9  statement.  You would be in a situation where the survivors, I

10  think, would be in the 1 to 3 percent range.  Again, the asset

11  values in the settlement trust would turn, in part, upon the

12  value of the INA policy rights that would be assigned.

13          So that is the issue that you would run into if you

14  were in the cram-down world.  And, again, I hope that we are

15  not in the cram-down world, but we could be.  So, again, the

16  discovery that we served on Century and Chubb it was served in

17  connection with the debtors plan in the disclosure statement.

18  The INA insurance rights from our perspective are the crown

19  jewels in this case, potentially the most valuable assets that

20  the debtors have, or it could be a lump of coal, the least

21  valuable assets.

22          In terms of the coverage obligations and exposure

23  Chubb is a major player in this case and we need to know if

24  the amount owed by Century or Chubb are impaired.  I think of

25  it in just basic GAAP accounting terms.  If the Century

1  receivable is impaired because the obligor is insolvent then

2  you have to write it down and we don't want to be in a

3  position where we discover at plan confirmation that the INA

4  policies are impaired.

5         I would say that this is also a disclosure issue

6  almost as much as a plan confirmation issue. The disclosure

7  statement in its current form contains a range of potential

8  recoveries for survivors.  If the INA insurance rights are

9  significantly impaired those estimates may be incorrect.  It's

10  a foundation question.  Every plan that has been proposed has

11  the INA insurance rights going to the settlement trust.

12         If the disclosure statement is going to provide

13  estimates regarding potential ranges of recovery for survivors

14  we need to have a sense of what those assets are worth or, at

15  least, have a ball park -- know what even ball park we're in

16  and right now we don't know what ball park Century and Chubb

17  are in because they won't give us the information we have been

18  requesting for months and months.

19         We have been facing an iron curtain of secrecy

20  which is extremely frustrating given that we're in a Chapter

21  11 proceeding that is supposed to involve transparency.  And I

22  would also add, from a discovery standpoint, these really

23  should be readily identifiable documents.  We don't want a

24  million emails.  Century and Chubb should be able to produce

25  this information in a matter of days and in electronic format

1  rather than boxes of documents.  To be clear --

2       THE COURT:  Well they have what they have and since

3  it dates back it might not be in electronic form, but I

4  actually don't even have the discovery in front of me.  Nobody

5  has put it in front of me.  It wasn't attached to the letters.

6  So I don't have it.

7       MR. GOODMAN:  I believe the discovery requests were

8  attached to the letters, Your Honor.

9       THE COURT:  Not the letters I am seeing.

10       MR. GOODMAN:  I can provide the court with that

11  docket entry later on, but I know that we did file the first

12  letter and they were attached.  We are happy to provide that

13  information, Your Honor.

14       You know, to be clear, the information that we want

15  and need has not been produced.  Our requests are not moot.

16  If anything I think they're more critical now than they were

17  back in April.  Again, it's not just a Hartford settlement

18  issue although, obviously, the Hartford issue is important,

19  but this issue really predates the Hartford settlement.  The

20  Hartford settlement put a highlighter on this one, but it's

21  something that has been on our minds from a bankruptcy

22  standpoint for a very long time.

23       The last point, Your Honor, I just want to note

24  that we don't really have this issue with respect to any other

25  insurer in this case.  This is really a unique issue when it

1   comes to Century and Chubb and with this point.  The court may

2   have recalled or heard at the last hearing Mr. Stang said

3   something that I think does bear repeating here; Century has

4   said that it does not -- I'm sorry, I'm quoting from the

5   transcript from Mr. Stang,

6           "Century has said that it doesn't have the ability

7   to pay what we believe is a fair settlement."

8           You know, that sort of brings front and center

9   these issues and it brings it front and center from my

10  standpoint from just purely bankruptcy reasons.

11          THE COURT:  Thank you.

12          MR. GOODMAN:  I don't have anything further, Your

13  Honor.

14          THE COURT:  Thank you, Mr. Goodman.

15          Does the FCR have anything to add?

16          MR. BRADY:  Your Honor, Robert Brady for the FCR.

17  No, we would adopt the arguments of counsel for the TCC and

18  the coalition.

19          THE COURT:  Thank you.  Okay.  Let me hear from

20  Century and whoever else is going to respond.

21          MR. SHAMAH:  Thank you, Your Honor.  Daniel Shamah,

22  O'Melveny & Myers, on behalf of Century.

23          Can you hear me okay, Judge?

24          THE COURT:  I can.

25          MR. SHAMAH:  Thank you.

1        And, Your Honor, with me is Mary Beth Forshaw from

2   Simpson Thatcher.  She's counsel to Chubb in this matter.

3        And I'm quite glad she's on the line, Judge --

4   she's going to follow me -- but I'm glad she's on the line,

5   because she's an insurance lawyer, and 95 percent of what I

6   just heard was just a coverage argument and not a bankruptcy

7   argument, other than a couple points Mr. Goodman made.  And,

8   candidly, I'm not an insurance lawyer, but I heard a lot about

9   reserves and old transactions, none of which is before you.

10       With respect to the bankruptcy points that were

11  made, I'll be very brief because I think, Your Honor, you're

12  right on in terms of the somewhat odd circumstances that we

13  find ourselves in, because contextually, everything I've heard

14  were either things that haven't happened yet or things that

15  are old and stale.

16       So, we heard about, if there's a Century release

17  and if there's a Century settlement and if there's a plan and

18  maybe it's a cram-down plan and maybe it's not a cram-down

19  plan.  None of that is before you.  None of that has been teed

20  up for your approval.  None of that is, you know, you have no

21  context with which to evaluate any of this if we're talking

22  about hypothetical deals and hypothetical plans that have yet

23  to be filed in the future.

24       We've also heard a little bit today about toggle

25  plans that have been superceded and nobody is going forward

1  with those as we sit here today and a Hartford settlement that

2  the debtors have repudiated, and Ms. Lauria said expressly at

3  the front end, is very much in flux and is mutually exclusive

4  with the deal that's on the table.

5          So, in terms of the context of the bankruptcy, from

6  what I can glean from the letters -- and I don't believe, Mr.

7  Goodman, any of the discovery requests were submitted -- but

8  setting that aside, from what I can glean from the letters,

9  there are three bankruptcy-related arguments that they're

10 making.

11         The first is the Hartford settlement, which I think

12 Your Honor knows is very much in flux; it's tied to one

13 particular provision of that agreement, the most-favored

14 nations provision that affects how much Hartford may pay,

15 depending on what maybe Century would pay in a hypothetical

16 settlement that's not before Your Honor.  I view this as a

17 replay of the evidentiary arguments that we had at the RSA

18 hearing.  We're not a party to that agreement.  We didn't

19 negotiate anything with that agreement, as all.  I don't see

20 how discovery of Century, in connection with the settlement

21 agreement that is not up for Your Honor's approval in any way,

22 is appropriate.

23         The second is they didn't mention it, so perhaps

24 they've abandoned it, is the estimation motion.  Your Honor,

25 that motion is fully briefed, so I don't see how discovery in

1  connection with the estimation motion makes any sense, and in

2  any event, Your Honor, that concerns the debtors' liabilities,

3  nothing to do with Century and Chubb and INA and any of these

4  other parties.

5        And so that brings us, I think, Your Honor, to the

6  main argument, which is somehow plan confirmation.  And I

7  don't think they can put the toothpaste back in the tube, that

8  they supported the plan that's currently on file.  They

9  withdrew their objections to the disclosure statement, in

10  connection with the signing of the RSA.  And so all of these

11  arguments from Mr. Pasich and Mr. Goodman about needing to

12  evaluate the disclosure statement and assess the

13  confirmability of the plan, frankly, are disingenuous.

14        This is all about getting a leg up in the mediation

15  to the negotiations.  It has nothing to do with the plan that

16  is in front of Your Honor.

17        They signed this RSA knowing that there were

18  potentially issues around Century, given the 1996 transaction.

19  They accepted that.  That was part of the deal.  They did not

20  condition anything in the RSA on a settlement with Century.

21        Now, Ms. Forshaw is going to talk a little bit more

22  about the 1996 transaction and she's also going to talk a

23  little bit about what we produced and how, you know, candidly,

24  it satisfies entirely questions that they have actually asked

25  both, us in conversations as well as questions they've raised

1  today at the hearing.

2          But with respect to confirmation, I thought it was

3  telling and interesting that they didn't cite one single case

4  in any of their letters, indicating at all that this is at all

5  relevant to confirmation.  The policies are what they are.

6  The 1996 is what it is.  It has a legal effect that may be

7  litigated at some point down the line.  Maybe it won't be.  We

8  don't know.

9          But whether the Court confirms the plan is entirely

10  a separate matter completely.

11          They talked about potential recoveries of

12  claimants.  Recoveries of claimants are contingent on a host

13  of factors.  There's something like 20 to 30 pages of risk

14  disclosures in the disclosure statement, many of which relate

15  to insurance-coverage issues.  It also relates to the amounts

16  of claims that ultimately be allowed.  It also relates to the

17  expenses of the trust.  There are innumerable consideration

18  that can go into claimant recoveries.  That does not open the

19  door to discovery that -- into transactions that are 25 years

20  old.

21          And lastly, Your Honor, I do want to point out the

22  timing of a lot of this.  This is old and stale discovery.

23  This was served back in April, two plans and a Hartford

24  settlement ago.  You know, the circumstances have obviously

25  significantly changes in the intervening time period.  They

1  have raised these issues during mediation, expressly for the

2  purpose of getting an advantage in mediation.

3          I think Your Honor's instinct was exactly right

4  during the opening colloquy.  This is about getting additional

5  information.  If we can reach a settlement, that's great;

6  nobody would be happier, obviously.  But it's not appropriate

7  to use discovery and, particularly, tee these issues up before

8  Your Honor at particularly sensitive junctures in this case,

9  during the RSA hearing and immediately thereafter, simply to

10 gain an advantage.

11         And with that, Your Honor, unless you have

12 questions on the bankruptcy side, I was going to turn it over

13 to Ms. Forshaw, as Chubb's counsel to address the 1996

14 transaction.

15         THE COURT:  No, I don't have any questions.

16         MR. SHAMAH:  Thank you, Your Honor.

17         THE COURT:  Ms. Forshaw?

18         Thank you.

19         MS. FORSHAW:  Can you hear me, Your Honor?

20         THE COURT:  Yes.

21         MS. FORSHAW:  Great.

22         Mary Beth Forshaw from Simpson Thatcher, for Chubb

23 Group Holdings.  Combined, Your Honor, the claimants served

24 Century and its five-step removed affiliate, Chubb Group

25 Holdings, with 84 requests for production of documents, 13

1    interrogatories, and 11 requests for admission.

2          These discovery requests largely related to yet-to-

3    be-decided coverage issues, including which insurer would have

4    to pay the unadjudicated coverage to the Boy Scouts, in light

5    of a 1996 restructuring that you heard about from      Mr.

6    Pasich.  Century and Chubb objected to the request (audio

7    interference) to anything that was pending before the Court

8    and also expressing concern about the burdens associated with

9    collecting documents that date back to 1996.

10          Despite these well-founded objections, Chubb and

11   Century, nevertheless, produced eight boxes of documents.  The

12   documents that were produced including 10 years' worth of

13   financial statements relating to Chubb, a 330-page, detailed

14   annual statement of Century as of 12-30-2020, that was filed

15   with its regulator, the Pennsylvania Department of Insurance,

16   the eight approval orders, relating to the 1996 transaction,

17   and various disclosures relating to the 1996 transaction that

18   describe what happened in 1996.

19          Claimants' letters are a little bit different than

20   some of the things they expressed today, but what they

21   basically say is, that's not enough.  We need more information

22   about the financial condition of Century and Chubb, and,

23   second, we want additional documents relating to the approval

24   of the transaction in 1996 and the documentation that the

25   parties signed 25 years ago.

1       These requests should be denied (audio

2   interference), frankly, because the claimants have already

3   been provided with sufficient information to answer their

4   questions about the financial wherewithal of Century and Chubb

5   and the 1996 restructuring.

6       They want to know whether Century has enough money

7   to pay under the insurance policies or pursuant to a

8   settlement enter into with the Boy Scouts, and if Century

9   doesn't have enough money, does Chubb have sufficient funds to

10  chip in.  These issues have no connection to anything pending

11  before the Court, as my colleague from O'Melveny & Myers just

12  said, the disclosure statement indicates that the plan that's

13  on the table is based on an assumption that there might be no

14  or limited insurance recoveries.

15      And more to the point, the coverage obligations

16  under the Century policies are disputed.  We firmly disagree

17  with the assertions that Mr. Pasich made about the potential

18  coverage available under the policies.  He ignores the pending

19  coverage disputes between the parties.  He ignores key

20  provisions of the agreements, the insurance agreements.  He

21  ignores that there's a lot of case law that says per-person

22  and per-occurrence limits can be applied in this context, such

23  that Century (audio interference) here.  That's an argument

24  that will likely be preserved for another day.

25      The coverage issues aren't adjudicated and aren't

1  going to be adjudicated in this court.  Whether Century can or

2  can't meet its obligations for these unadjudicated liabilities

3  is not before you.  And even more remote is the question as to

4  whether if Century can't meet its obligations for these

5  unadjudicated liabilities that will sorted out someday in the

6  future, whether Chubb or anybody else has to step in and pay

7  anything.

8           We cited in our letter to you, two cases that stand

9  for the proposition that discovery of about ability to pay is

10  generally disfavored.  Federal Rule of Civil Procedure, Rule

11  26 says that such discovery, or it's been interpreted to say

12  that such discovery is inappropriate.

13           That basic rule should be applied with more force

14  here, where the question of insurer liability isn't even

15  before the Court.  In any event, to go back to what I said at

16  the beginning, we don't even understand why they're even

17  bringing up this information or this request about our

18  financial wherewithal.

19           We produced 10 years of Chubb financial statements.

20  They have a 330-page financial statement of Century given to

21  its regulator.  They don't need more.  They should take the

22  time to read the documents they have and make whatever

23  assessment they want to make.  They're certainly not entitled

24  to more.

25           To move quickly on to the restructuring

1   transaction, let me start by saying that as a preliminary

2   matter for the record, Chubb/Century categorically disagrees

3   that anything that happened in 1996 was inappropriate or

4   fraudulent in any way.  We have provided you, Your Honor, with

5   a 65-page opinion approving the 1996 transaction.  The 1996

6   transaction was the subject of a very public process, a three-

7   day hearing.  It was approved by eight regulators.  The 65-

8   page decision from the Pennsylvania Department of Insurance

9   notes that CCI, which merged with Century Indemnity Company,

10  was backed up by billions of dollars, upon the restructuring

11  being completed.  It had experienced management staff.  It

12  operated for the past 25 years, pursuant to the supervision of

13  the Pennsylvania Department of Insurance.  It's filed

14  quarterly statements as to its activities over those 25 years.

15          The notion that anything, any steps taken by

16  Century or Chubb, since it's been part of Century and Chubb

17  have been associated, was inappropriate is just completely out

18  of bounds.  Thousands of claims have been paid over the past

19  25 years.

20          For 25 years, Century has honored all of its

21  obligations (audio interference) for information about the

22  restructuring that occurred 25 years ago is a complete fishing

23  expedition.  They say, for example, that we should produce the

24  exhibits referenced in the 65-page Pennsylvania Department of

25  Insurance decision.  Well, those exhibits that are referenced,

1  just to be clear, were not attachments to the decision.  Those

2  200-plus exhibits that are referenced were the hearing record,

3  the regulatory hearing record from that three-day hearing,

4  back to 1996.

5        Century doesn't have a copy of the March hearing

6  record dating back to 1996.  The notion that the company

7  should be tasked with sorting through ancient documents and

8  trying to figure out which of them were exhibits that are

9  referenced in the Department of Insurance order is absurd.  We

10 shouldn't be ordered to reconstruct the record.

11       Also, the idea that they need to see the record

12 underlying the 65-page decision actually makes no sense.  The

13 decision says what it says, Your Honor.  There's no

14 interpretive dispute pending before you or, frankly, anybody

15 else, about what that decision means.  If there were such an

16 interpretive dispute, it wouldn't be pending in the Boy Scouts

17 bankruptcy action.  There's no reason, no hook, no connection

18 why Your Honor should order Century to produce the exhibits or

19 try to reconstruct the exhibits.

20       The letters also say they want the transactional

21 documents from the original 1996 transaction and they say they

22 want those documents for two reasons.  First, they want them

23 to, quote, figure out for themselves how policies were

24 allocated by operation of law in the restructuring.

25       Well, Your Honor, they have information that tells

1  them that; it's paragraphs 30 to 35 of the 65-page order that

2  we've given them.  It details how policies were allocated by

3  operation of law.  There's no need for us to produce

4  irrelevant transactional documents and, frankly, the idea that

5  the issue of, you know, who owes what under which policies, is

6  something that is pending before Your Honor is absurd; again,

7  that's an issue that someday will be sorted out in a coverage

8  dispute, but not a dispute before Your Honor and certainly not

9  one that's before us here today.

10          They also claim that they want to look at the

11  transactional documents to try to figure out if there was a

12  fraud or whether they have some ability to challenge the

13  restructuring.  Again, this is a 25-year-old transaction.  I

14  think they're going to be hard-pressed to find any basis to

15  challenge the 25-year-old transaction that resulted in the

16  operation of an insurance company that's been overseen closely

17  by the Department of Insurance for 25 years.

18          Even if they could comfortable together such a

19  claim, that claim, again, is a claim that would be part and

20  parcel or follow any coverage proceeding that took place and

21  certainly nothing that's going to be litigated before Your

22  Honor.

23          THE COURT:  Let me ask you, Ms. Forshaw, I'm

24  looking at the 65-page opinion and there seems to be multiple

25  paragraphs that address INA policy holders --

1          MS. FORSHAW:  Uh-huh.

2          THE COURT:  -- in the 230s.

3          MS. FORSHAW:  Paragraph 230s?

4          THE COURT:  Yeah.  And it starts, well, 232, 233

5     and on --

6          MS. FORSHAW:  Uh-huh.

7          THE COURT:  -- talk about the fact that INA policy

8     holders are not required to consent under Pennsylvania law to

9     what's happening, that they don't have approval power over

10    this, and that -- and approval of a plan of division does not

11    foreclose creditors, including policy holders, from pursuing

12    any remedy at law, which may be available to them.

13         Now, I take your point that this is 25 years old.

14    This divisive transaction happened a long time ago.  Perhaps

15    Century has been meeting all of its obligations since that

16    point in time, and so nobody's had to go back after INA, but

17    I'm not -- I didn't read this whole thing in detail, but it

18    strikes me that there could be -- that nothing is precluded,

19    let's put it that way, that this approval by the Pennsylvania

20    Commission or Department of Insurance says, it doesn't

21    foreclose creditors from pursuing any remedy they may have at

22    law, what that remedy may be.

23         MS. FORSHAW:  It says what it says, Your Honor.

24         Our view is it's too late.  Well, we have a lot of

25    defenses to such claims.  It's too late.  There certainly is

1  no claim that is ripe at this point, since there is no

2  adjudicated liability owed to the Boy Scouts; that's another

3  problem with their argument.

4           I will tell you that Mr. Pasich cited the <u>Ayco</u>

5  case.  I think he got the facts wrong.  The Court of Appeals

6  did not make any sort of final finding; all it found is that a

7  bunch of insurance companies that challenged the transaction

8  had stated a claim that reversed a decision on a motion to

9  dismiss, sent the proceeding back.  Ultimately, the Trial

10 Court in that case found that the claimants there had not met

11 their burden in establishing any sort of fraud in connection

12 with (audio interference) the plaintiffs there didn't actually

13 have any standing to challenge the restructuring.

14          Ultimately, shortly thereafter, another California

15 case came down and we cited it in our letter; it's called

16 <u>Yarway</u>.  And <u>Yarway</u> found that, in fact, Century was the legal

17 successor to the liabilities of INA, in connection with the

18 allocation of policies that were undertaken in connection with

19 the restructuring transaction.

20          So, Your Honor, someday will we litigate with these

21 folks what that paragraph means in the 65-page order?  Someday

22 will there be a dispute within the context of coverage as to

23 what is INA's role, what is Century's role?

24          Maybe.  But that's not now.  And they are not

25 entitled to, in our view, anymore discovery than they've

 1  already received.  We've been quite generous in what we've

 2  given them to try to resolve these discovery requests, which

 3  we thought were irrelevant and overbroad right from the start.

 4  We've given them outlines of the restructuring.  We've given

 5  them financial information.  We should not be called upon to

 6  go back and sort of through old files and try to find

 7  documents from 1996 and have to produce more.

 8          These are side issues that have nothing to do, no

 9  connection with anything before Your Honor, and we would ask

10  you to deny their request to receive further discovery.  Thank

11  you.

12          THE COURT:  Thank you.

13          Okay.  Well, this discussion actually kind of

14  highlights one of the reasons I wanted to have a more general

15  discovery discussion today to try to figure out where we are

16  and how plan-related discovery is going to proceed and when it

17  might proceed.

18          As for this particular request at this time and in

19  the way it's been framed to me, I'm not going to require, at

20  this time, any further information to be produced by Century

21  and Chubb.  It is untethered to any particular dispute that's

22  in front of me and it does seem to be motivated as, quite

23  frankly, candidly stated by counsel by just wanting to know

24  what Century, and perhaps Chubb, have an ability to pay

25  relevant to the mediation and settlement discussions, and I do

1  not consider that to be an appropriate basis upon which to

2  require adversaries to produce documents.

3          I don't have the document requests in front of me.

4  I don't think I missed them.  I'll apologize in advance if I

5  did.  But I don't have that in front of me.

6          There has been production made.  Quite frankly, I

7  don't see how the record of the proceeding, to the extent it

8  exists in some forum, is all that relevant to legal issues

9  about the effect of the 1996 transaction and its implications,

10  upon which I make no comment.

11          So, I'm denying it at this time.  Perhaps, it will

12  be appropriate at a future date -- I don't know -- in

13  connection with some discrete issue that's in front of me, but

14  I'm not going to require it in this context.

15          That brings me to old discovery issues, which were

16  in front of me by Hartford and Century, with respect to

17  discovery they wanted to take and Rule 2004 motions.  And this

18  was back in, I want to say February, when I heard -- February

19  17th -- when I held some evidentiary hearings with respect to

20  discovery that Century and Chubb wanted to take related to

21  proofs of claim that had been filed.

22          And, again, I was sort of waiting to see where

23  we're going to end up and what's going to be relevant and I'm

24  still not necessarily positive because I don't know what plan

25  is going to be in front of me.  But let me go ahead and rule

1  with respect to those requests.

2          The first was a Rule 2004 request to take discovery

3  of individual claimants.  I believe this was Hartford's

4  motion, although, I think Century and Hartford were involved

5  in both; they were companion motions.  And the real relevant

6  testimony we had was from Dr. Denise Neumann Martin and she,

7  her declaration was admitted and she was also subject to

8  direct and cross-examination.  She was a managing director of

9  NERA Economic Consulting and she testified that she was

10  retained by Hartford to draw a sample of the sexual abuse

11  proofs of claim that could be examined further in discovery

12  and that would allow for statistically significant inferences

13  to be made about population parameters.

14          And she downloaded the survivor proofs of claim

15  forms from the claims agent's site.  She removed duplicates

16  and she generated seven samples by randomly selecting 200

17  proofs of claim in six different subpopulations and a seventh

18  sample of the 200 from the remaining proofs of claim.

19          Counsel chose the six subpopulations, which were

20  alleged abuse in 1971 to 1975; no scouting affiliation; no

21  abuser identification; no physical abuse alleged; whether they

22  sought counseling or not; and no impact alleged.

23          Dr. Martin is not a subject-matter expert in the

24  area and she was very clear that she wasn't.  And she wasn't

25  offered as one and she was very clear that she is not one.

1  She is a statistician who had been asked to design a proper

2  sample.  She testified that once provided with data and

3  assigned characteristics to look for, she would be able to

4  measure with statistical precision whether the subpopulation

5  shared those characteristics, within a margin of error between

6  4 and 7 percent.

7          In no event, however, would she offer an opinion on

8  whether claimants sharing those characteristics had filed

9  valid or fraudulent sexual survivor proofs of claim, which was

10  the exercise we were involved in.  At that time, and even now,

11  I'm denying the motion, because the record does not support a

12  conclusion that the requested discovery will yield meaningful

13  data and whether that data will permit the filing of omnibus

14  objections, which was the stated purpose.

15          I don't have any doubt that Dr. Martin created a

16  sample from which references that would carry statistically

17  significant weight, with respect to giving characteristics

18  could be drawn, but I had no evidence on the relevance of the

19  subpopulation's chosen by counsel or why these subpopulations

20  are worthy of examining or if that's the wrong question to

21  ask.

22          I have no evidence from Dr. Martin to explain why

23  the choice of subpopulations is important to the usefulness of

24  the exercise or is unimportant to the usefulness of the

25  exercise; in other words, why isn't it important to know why

1    these subpopulations were chosen and what they might relate

2    to.

3         Again, I'm skeptical that you could file omnibus

4    objections based on whatever might arise.  And if it was going

5    to be used with respect to estimating aggregate abuse claims,

6    then it should be done in the context of that.  We should have

7    discovery related to that and not sort of a one-off.

8         I will note, and I think I said this at one of the

9    previous hearings, that I had noted that one of the insurance

10   companies had also provided the declaration of David McKnight

11   from the Brattle Group, formerly of NERA, with respect to a

12   separate motion, and he suggests what I just said in my

13   ruling, which is that -- oh, this was with respect to the

14   debtors' motion to estimate; it's at Docket 3859-1 -- where he

15   says:

16        "The debtors have not defined what information or

17   statistics they hope to estimate from the proposed interests

18   and assume, without support, that a sample of less than .5

19   percent of the claims is large enough to make reliable

20   estimations for the universe of claims.  The debtors have not

21   indicated by stratifying the claims by a statute of

22   limitations and the number of times the alleged abusers appear

23   in the proofs of claim will aid in claims estimation.

24        Well-designed sampling methodologies will involve

25   defining the population from which the random sample will be

1  drawn, identifying the statistics or characteristics that will

2  be estimated by the random sample, and choosing a targeted

3  range of uncertainty in the estimates."

4          So, I think he supports what I'm saying, which is

5  that I have no basis to know that six subpopulations chosen by

6  counsel will result in any characteristics that will be

7  helpful in evaluating anything that's in front of me, or

8  certainly generalizing, with respect to proofs of claim.  So,

9  I'm denying it at this time.

10         There was a second request to take depositions of

11 law firms and/or aggregators.  And with respect to that, I'm

12 going to permit the depositions of the aggregators that were

13 listed in the particular motion.  I think the evidence that

14 was submitted raises concerns about how some of these claims

15 were generated and the recent declaration there Mr. Kosnoff

16 adds to that concern.  So, at this time, I'm going to permit

17 that discovery.

18         I think that that discovery could be relevant to

19 voting and I think we need to get that underway, regardless of

20 the plan that's in front of me.  So, we'll start with the

21 aggregators.

22         I'm not aware of any other discovery disputes that

23 are outstanding, but if there are any, I would like that

24 brought to attention of chambers so I can rule on it.  And I

25 would ask the parties at the appropriate time, and assuming

1  that I don't have consensus, which, of course, I'm still

2  encouraging, to think about how discovery is going to be

3  conducted to promptly get us to a confirmation hearing.  It's

4  not too early to give that thought.

5           That's all I have on discovery.  Does anyone have

6  any questions on what I've ruled?

7       (No verbal response)

8           THE COURT:  Okay.  There was one other matter that

9  I raised, and we reached out to Ms. Veghte -- I don't know if

10 she's on the line today or not.

11      (No verbal response)

12          THE COURT:  Okay.  There was a notice of withdrawal

13 filed at Docket Number 5891, notice of withdrawal as counsel

14 for claimant number SA-59066.

15          Our rules, as I read them, does not permit counsel

16 to withdraw without permission from the Court.  This is from

17 an individual claimant and this needs to be addressed.  My

18 understanding is it may relate to Docket 5894, which was a

19 notice to the Court of abandonment by contracted counselors.

20          And I don't read this as consent by a client; I

21 read it as dissatisfaction with the response of, the

22 responsiveness of a claimant's counsel.  I make no comment on

23 the validity of it; I just recognize it for what it is.

24          But counsel should recognize that I'm not

25 recognizing this notice of withdrawal as a withdrawal.  You

 1  still have a client.  We'll contact Ms. Veghte, again, if

 2  she's not on the call.  I don't see her face.

 3          Okay.  I don't know if there are similar notices of

 4  withdrawal.  This is just one that I happened to see as I was

 5  looking for something else.  I don't troll the docket, so I

 6  don't know of everything that is filed, but I will say this,

 7  more generally, that is not a way to extricate oneself from

 8  representation of a client.

 9          That's all I have for today.

10          Is there anything that anyone else would like to

11  bring up?

12      (No verbal response)

13          THE COURT:  Okay.  Thank you.

14          I understand you're in mediation.  Keep mediating.

15          We're adjourned.

16          COUNSEL:  Thank you, Judge.

17      (Proceedings concluded at 3:21 p.m.)

18

19

20

21

22

23

24

25

1                            CERTIFICATE

2

3        We certify that the foregoing is a correct transcript

4   from the electronic sound recording of the proceedings in the

5   above-entitled matter.

6
    /s/Mary Zajaczkowski           August 30, 2021
7   Mary Zajaczkowski, CET**D-531

8   /s/William J. Garling          August 30, 2021
    William J. Garling, CE/T 543
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25