# EXHIBIT 3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) ENFORCING THE SOLICITATION PROCEDURES ORDER, (II) ENFORCING SECTION 1103 OF THE BANKRUPTCY CODE AGAINST THE TORT CLAIMANTS' COMMITTEE, AND (III) GRANTING RELATED RELIEF

Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), submit this motion (this "Motion"), pursuant to sections 105(a), 1103 and 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) enforcing the Solicitation Procedures Order (as defined below) as set forth herein, (ii) enforcing the terms of section 1103 of the Bankruptcy Code and requiring that any official email address of the Tort Claimants' Committee (the "TCC") be used only for official TCC business applicable to the survivor community and not for the benefit of individual state court counsel, and (iii) granting related relief. In support of this Motion, the Debtors submit the declaration of Blair M. Warner, an associate at White & Case LLP (the "Warner Declaration"), filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## PRELIMINARY STATEMENT AND RELEVANT BACKGROUND

1.      The Debtors, the Future Claimants' Representative (the "FCR"), the Coalition of Abused Scouts for Justice (the "Coalition"), and the other parties supporting the plan of reorganization spent much of the weekend attempting to investigate and mitigate the potentially disastrous effects of the TCC's brazen attempt to solicit votes to reject the plan in contravention of bankruptcy laws, rules of professional ethics, its duties to the survivor constituency as a whole, and this Court's orders.  None of the attorneys representing the Debtors or other plan supporters have ever encountered a more egregious solicitation violation by any party, much less a statutory committee appointed by the Office of the United States Trustee and charged with representing the interests of a class of survivors of sexual abuse.  The plan solicitation process in these cases is perhaps the most complex and sensitive solicitation of votes in mass-tort bankruptcy history, and the TCC's deliberate actions threaten to destroy the integrity of the voting process.  The Debtors are requesting that the Court take action quickly, as the Debtors' estates and creditors cannot afford the potentially irreversible damage caused by the TCC's misconduct.

2.      On Saturday, November 6, 2021, at 6:21 p.m. Eastern Time, attorneys Laura Baccash and Blair Warner of White & Case LLP received an urgent email from Omni Agent Solutions, the Court-appointed voting and solicitation agent in these chapter 11 cases (the "Solicitation Agent").  A true and correct copy of this email is attached to the Warner Declaration as **Exhibit 1**.  A survivor had just forwarded to the Solicitation Agent a screenshot of an email the survivor had received from the official creditor-facing email address of the TCC, BSASurvivors@pszjlaw.com.  The survivor and the Solicitation Agent were confused because what appeared to be an official communication from the TCC was instead an email signed by Timothy D. Kosnoff encouraging all survivors to vote against the plan and to contact him in

connection therewith.  The survivor in question is not a client of Mr. Kosnoff or "Abused in Scouting" ("AIS"), which is a cooperative of three law firms including Mr. Kosnoff's law firm, Kosnoff Law, PLLC ("Kosnoff Law").  The survivor is represented by separate counsel.

3.    Following receipt of this email, Jessica Lauria, Michael Andolina and Matthew Linder received two urgent emails from David Molton, counsel to the Coalition.  True and correct copies of these emails are attached to the Warner Declaration as **Exhibit 2**.  Mr. Molton had himself received the Kosnoff communication from the TCC's official email address.  Mr. Molton forwarded the communication to the Debtors, and it became apparent that the TCC email address reserved for official communications with survivors had been used to circulate an inflammatory, derogatory, false and misleading email (the "TCC/Kosnoff Email") and five-page letter (the "TCC/Kosnoff Letter" and, together with the TCC/Kosnoff Email, the "TCC/Kosnoff Communications") from Mr. Kosnoff urging survivors to vote to reject the Plan (as defined below).  Copies of the TCC/Kosnoff Communications are attached to the Warner Declaration as **Exhibit 3**.  The Debtors were informed Coalition counsel that the TCC's emails disseminating the TCC/Kosnoff Communications were sent to thousands of abuse survivors, many of whom were represented by counsel other than Mr. Kosnoff, and that the emails had already caused confusion among survivors.

4.    Mr. Kosnoff has been the subject of multiple hearings before this Court.  As the Court is aware, Mr. Kosnoff has been active on social media since the beginning of these chapter 11 cases.  The Court has previously characterized Mr. Kosnoff as having "poor judgment in how he expresses himself [and] how he views other professionals."  *See* Oct. 16, 2020 Hr'g Tr. at 12:23–13:2, Warner Decl. Ex. 4.

5.      Evidence provided to this Court has shown that Mr. Kosnoff:

- Has made derogatory statements about survivors, the mediators and counsel for
  the Debtors.  *See*, *e.g.*, D.I. 1285, Ex. 1 ("Andolina and the 3 Amigos need to
  get that message.  They are wasting their time talking to the TCC. . . . We are
  not going to do anything to help grease the gears for Stang and the dimwits
  including speeding up the insurance analysis.").

- Resigned from the Coalition, along with Mr. Van Arsdale, after the derogatory
  email referenced immediately above became public.  *See* Oct. 14, 2020 Hr'g
  Tr. (AM Session) at 33:4–5, Warner Decl. Ex. 5 ("[MR. MOLTON:] Your
  Honor, on September 29th, Kosnoff and Andrew Van Arsdale resigned from
  the Coalition."); Oct. 14, 2020 Hr'g Tr. (PM Session) at 23:18-24:2, Warner
  Decl. Ex. 6 ("[MR. MOLTON:] So dealing with what I call the second elephant
  in the room, the Kosnoff e-mail.  Listen, I'm not going to sit here and make up
  explanations for it, I wasn't there, I'm not going to make up excuses for it, I
  can't.  But I'm going to say, look what we've done and look who we are
  now.  Look at the firm representative [sic] who have joined us, all of whom
  have qualified bona fides in the mass tort bankruptcy world and in the mass tort
  world.").

- Has made demeaning statements about the Court and multiple attorneys
  associated with this case, including posting multiple photos of attorneys
  involved in the case.[2]

---

[2]     *See* Warner Decl. Exs. 7, 8, 9, 10, 11.  The photograph of Mr. Rothweiler set forth below in Mr. Kosnoff's tweet
was taken during the Disclosure Statement hearing held on Zoom on September 28, 2021.  It is a violation of the
Delaware District Court rules to record or photograph a hearing.  D. Del. L.R. 83.2 ("Broadcasting, televising,
recording or taking of photographs in connection with any judicial proceedings within the United States
Courthouse at Wilmington, Delaware, whether or not such judicial proceedings are actually in session, is
prohibited . . .").



**Kosnoff Law**
@SexAbuseAttys

Ok, how many of you cried at the end when Old Yeller had to be shot? How about this Old Yeller?  Vote No on the plan and put this rabid lawyer down.



8:17 PM · Nov 2, 2021 · Twitter for iPhone

**Kosnoff Law**
@SexAbuseAttys

Ken and the SHYSTERETTES tell you there will be billions more in settlements. Mediations in LA a week ago and not a penny. But Kenny and his mass tort mobster buddies had a nice boat ride on your dime. He's incompetent and untruthful. Save yourselves survivors, Vote NO!

3:40 PM · Oct 30, 2021 · Twitter for iPhone



**Kosnoff Law** @SexAbuseAttys · Sep 29
Biggest decision she made yesterday was keeping the $3500  election on the ballot. The BSA/Coalition/FCR ("the evil cabal") saw its ballot box stuffing scheme get stuffed up its...xxx. Lauria was noticeably crestfallen as no doubt was the entire cabal. No way to 2/3rds. It's over.

💬 2          ↺          ♡ 4          ⤴

**Kosnoff Law** @SexAbuseAttys · Sep 29
Rothweiler's "leave no survivor behind" remark caused me to simultaneously gag and laugh. To be accurate, he and his mass tort mobster cohorts of the Coalition intend to enrich themselves in order to leave ALL survivors behind. They are beneath contempt.

💬          ↺ 2          ♡ 4          ⤴





- Has taken actions that have led to threats against an attorney for one of the Debtors' insurers. *See*, *e.g.*, July 29, 2021 Hr'g Tr. at 32:14-20, Warner Decl. Ex. 12("[MR. SCHIAVONI:] My client they published pictures outside – Mr. Kosnoff published pictures outside his house of, you know, I think it would put us in danger. I personally have threats made against me, my identity, identifying information on the internet. I have gone to the mediators to complain and ask for some relief. I have been told, basically, that there is nothing anybody can do."); *see* Warner Decl. Ex. 13, 14.





- Expressly acknowledges that the TCC/Kosnoff Communications have caused confusion among survivors.  *See* Warner Decl. Ex. 15.



6.      Mr. Kosnoff's attacks have intensified in recent weeks and have included posting photos of individual lawyers and at least one lawyer's family to his Twitter account.[3]  Warner Decl. ¶ 19.

7.      When the Debtors learned of the TCC/Kosnoff Communications, the Debtors could not have imagined that the TCC would ever intentionally send a communication to thousands of survivors on behalf of a single attorney, let alone an attorney that has personally denigrated the

---

[3]     In recent weeks, Mr. Kosnoff has posted multiple pictures of Mr. Rothweiler, including a picture of Mr. Rothweiler and his wife.  To protect the privacy of this individual's family or any other professionals involved in the case whose families may have been published by Mr. Kosnoff, the Debtors have not included images of these posts in the Motion or the Warner Declaration but will file such images with the Court under seal if requested by the Court.

participants in this matter.  The Debtors took immediate action.  On Sunday morning, November 7, 2021, Debtors' counsel sent a letter by email to the TCC requesting confirmation as to whether the TCC/Kosnoff Communications were an unauthorized use of the TCC's email address and listserv or if they were intentionally distributed by the TCC and, if the latter, requesting all facts and circumstances surrounding the TCC's distribution of the TCC/Kosnoff Communications (the "Debtors' First November 7 Letter").  A true and correct copy of the Debtors' First November 7 Letter is attached to the Warner Declaration as **Exhibit 16**.

8.      On November 7, 2021 at 10:32 a.m. Eastern Time, Mr. Molton sent an email to Mr. Stang, copying Ms. Lauria, Mr. Andolina, and Mr. Linder, confirming that Mr. Stang had just advised Mr. Molton by telephone that the TCC had intentionally distributed the TCC/Kosnoff Communications to survivors from its official creditor-facing email address.  Approximately three hours later, the Debtors received an email response from Mr. Stang confirming that the TCC had intentionally distributed the TCC/Kosnoff Communications, but indicating that the "staff" of Pachulski Stang Ziehl & Jones, LLP ("PSZJ") had sent the distribution to the "entire listserv," purportedly in error, rather than only to AIS clients for whom Mr. Kosnoff serves as co-counsel (the "TCC's First Response Email").  Mr. Stang stated that the TCC would send a further communication to the abuse survivors not represented by AIS to disregard the communication.  A true and correct copy of the TCC's First Response Email is attached to the Warner Declaration as **Exhibit 17**.

9.      The Debtors understand that the Coalition requested that the TCC refrain from sending a corrective email until the Coalition could advise as to the substance of the communication.  Despite this request, the TCC sent a brief follow-up email from BSASurvivors@pszjlaw.com, apparently to certain recipients of the TCC/Kosnoff

Communications, indicating that the TCC/Kosnoff Communications were only intended for Mr. Kosnoff's AIS clients, and that parties other than AIS clients should disregard the email (the "TCC Purported Correction Email").  The Purported Correction Email did nothing to address the false and misleading content that had been supplied to and likely read by survivors.  A true and correct copy of the TCC Purported Correction Email is attached to the Warner Declaration as **Exhibit 18**.

10.     Also on November 7, after receiving the TCC's First Response Email and immediately prior to becoming aware of the TCC Purported Correction Email, Debtors' counsel sent a follow-up letter to the TCC (the "Debtors' Second November 7 Letter") asking the TCC to: (a) provide its list of email addresses that were sent the TCC/Kosnoff Communications and the list of the AIS clients that the TCC asserted were the intended recipients of the email; (b) indicate how the TCC determined which claimants were clients of Mr. Kosnoff; (c) provide a response as to why the email was sent by the TCC and not from Mr. Kosnoff directly to his clients; (d) explain why the communication was apparently sent in multiple tranches over the course of several hours, as the Debtors understood from Coalition counsel; (e) explain the TCC's intended actions to correct its communications made on behalf of one lawyer to survivors represented by other counsel; (f) respond whether PSZJ intends to charge its fees and expenses attributable to the distribution of the TCC/Kosnoff Communications and the remediation of such distribution to the Debtors' estates; and (g) produce all documents and communications relating to these issues.  A true and correct copy of the Debtors' Second November 7 Letter is attached to the Warner Declaration as **Exhibit 19**.

11.     During the evening of November 7, the Debtors received an email response from Mr. Stang on behalf of the TCC (the "TCC's Second Response Email") which revealed, among other things, the following:

- The TCC intentionally distributed the TCC/Kosnoff Communications to Mr. Kosnoff's AIS clients, and in fact had "offered Mr. Kosnoff the opportunity to send his email via BSASurvivor@pszjlaw.com . . . ."

- The technology that PSZJ staff had used to distribute the email purportedly resulted in the emails being sent out in tranches.

- Despite the Debtors' understanding that the Coalition had requested the TCC refrain from sending additional emails relating to the TCC/Kosnoff Communications, Mr. Stang directed that the TCC Purported Correction Email be sent to all parties other than AIS clients for whom Mr. Kosnoff serves as co-counsel.

- The TCC would not provide the details of the listserv.

- The TCC would not charge the Debtors' estates for distributing the TCC/Kosnoff Communications and the TCC Purported Correction Email.

A true and correct copy of the TCC's Second Response Email is attached to the Warner Declaration as **Exhibit 20**.

12.    On November 8, Debtors' counsel sent a further letter to the TCC (the "Debtors' November 8 Letter") demanding that the TCC take the following actions: (i) provide (a) its entire listserv of names and email addresses that were sent the TCC/Kosnoff Communication, (b) the list of the AIS clients that the TCC asserted were the intended recipients of the email, and (c) the list of all individuals who were sent the TCC Purported Correction Email; (ii) immediately send to the entire listserv a corrective email, in the form drafted by the Debtors and set forth in the Debtors' November 8 Letter; (iii) attach the authorized solicitation package letters from the Debtors and from the Coalition and the FCR to the corrective email drafted by the Debtors; (iv) agree to respond to the Debtors' forthcoming discovery by November 9, 2021 and complete production by November 12, 2021; (v) refrain from distributing, for the duration of the chapter 11 cases, communications from or on behalf of any state court counsel, including to parties on the listserv; and (vi) agree to provide prior notice to the Debtors of any substantive communications that the TCC intends to distribute to parties on the listserv at least forty-eight (48) hours in advance.  A

true and correct copy of the Debtors' November 8 Letter is attached to the Warner Declaration as **Exhibit 21**.

13.     On November 8, the Debtors served the TCC with interrogatories and requests for production regarding the transmittal of the TCC/Kosnoff Communications, copies of which are attached to the Warner Declaration as **Exhibits 22** and **23**.  The Debtors also served Kosnoff Law with requests for production, a copy of which is attached to the Warner Declaration as **Exhibit 24**. In particular, the Debtors asked the TCC to identify (a) who it intended to receive the TCC/Kosnoff Communications, (b) who actually received the TCC/Kosnoff Communications, and (c) what steps the TCC took (if any) to prevent the TCC/Kosnoff Communications from reaching parties represented by counsel other than Mr. Kosnoff, who serves as co-counsel to certain survivors with the other AIS firms.  The Debtors also asked what steps the TCC took to stop the TCC/Kosnoff Communications from being distributed to parties not represented by AIS after the TCC received notice of the improper distribution.

14.     Shortly after midnight Eastern Time on November 9, 2021, Debtors' counsel received a letter from Mr. Stang in response to the Debtors' November 8 Email (the "TCC's Third Response Letter"), which purported to provide two documents responsive to the Debtors' discovery requests.  The TCC proffered that its counsel sent a message on behalf of Mr. Kosnoff to approximately 12,895 AIS clients to whom he serves as co-counsel, and that Mr. Kosnoff himself provided the email addresses to the TCC (as defined in the TCC's Third Response Letter, the "Kosnoff List").  *See* TCC's Third Response Letter at 1.  Mr. Stang did not explain why the TCC distributed the TCC/Kosnoff Communications on Mr. Kosnoff''s behalf.  Mr. Stang also stated that PSZJ's "staff" sent the same communication, purportedly in error, to more than 7,500 email addresses, consisting of unrepresented abuse survivors, attorneys or firms that represent

survivors, and survivors that are represented by other counsel, including counsel who are providing the opposite advice from the TCC and Mr. Kosnoff with respect to the Plan (the "TCC List").  The Kosnoff List and the TCC List were attached to the email from Mr. Stang containing the TCC's Third Response Letter.  Other than the transmission of the Kosnoff List and the TCC List to the Debtors, the TCC refused to take the other actions requested in the Debtors' November 8 Letter. A true and correct copy of the TCC's Third Response Letter is attached to the Warner Declaration as **Exhibit 25**.

15.     In sum, in an intentional and illegal effort to solicit votes to reject the Debtors' plan of reorganization using statements that are either false or grossly misleading, as detailed herein, the TCC invited Mr. Kosnoff to co-opt the creditor-facing email address of the TCC.  As noted above, Mr. Kosnoff accepted the TCC's invitation and, *after providing the TCC with the names and email addresses of his own clients*, on November 6, 2021, with the imprimatur of a statutory committee appointed by the Office of the United States Trustee, the TCC emailed more than 20,000 individual abuse creditors a cover note and five-page letter from Mr. Kosnoff.  By sending the TCC/Kosnoff Communications to these survivors—more than one-third of which the TCC has conceded are represented by counsel *other* than Mr. Kosnoff—the TCC disregarded the best interests of survivors as a whole and deliberately undermined the Court-approved plan solicitation process in derogation of applicable bankruptcy laws, rules of professional ethics, and orders of the Court.

16.     During the five-day hearing to approve the Debtors' disclosure statement, the Court considered hundreds of pages of information about the plan that would be transmitted to voting creditors.  This information included the Debtors' and TCC's respective views of the plan and related settlements, potential recoveries for abuse creditors, and factors that could affect such

recoveries, as well as the risks that creditors should consider in casting their votes to accept or reject the plan. The TCC also obtained approval of a letter urging abuse survivors to reject the plan to be sent alongside countervailing letters from the Debtors, the FCR, and the Coalition urging survivors to accept the plan. All of the solicitation materials were subject to exacting scrutiny through voluminous briefing, lengthy oral argument, and extensive negotiations, and the TCC was the most active participant in this process. Now, five weeks after the disclosure statement was approved, the TCC has endorsed and broadly disseminated an inflammatory letter urging survivors to reject the plan based on false or misleading statements that find no support in the disclosure statement that the TCC had a prominent role in shaping. The Debtors have concluded that without the Court's swift intervention they cannot adequately remedy the potentially severe damage to the solicitation process and the confusion among survivors that could or already has resulted from the TCC's actions.

## STATUS OF THE CASES AND JURISDICTION

17.     The Debtors commenced these cases on February 18, 2020, and they continue to operate their non-profit organization and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases are being jointly administered for procedural purposes only pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

18.     On March 5, 2020, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the TCC and the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.

19.     On April 24, 2020, the Court appointed James L. Patton, Jr. as the representative of future abuse claimants pursuant to sections 105(a) and 1109(b) of the Bankruptcy Code.

20.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

21.     The statutory bases for the relief requested in this Motion are sections 105(a), 1103, and 1125 of the Bankruptcy Code.

## GENERAL BACKGROUND

### I.     Mr. Kosnoff's Involvement in the Chapter 11 Cases

22.     On August 9, 2021, AIS and Kosnoff Law each submitted a verified statement pursuant to Bankruptcy Rule 2019 [D.I. 5923, 5924] (the "AIS Verified Statement" and the "Kosnoff Verified Statement," respectively).  AIS described itself as a "cooperative effort by three law firms" to represent victims of child sexual abuse in connection with their participation in the BSA's programs on a co-counsel, contingency fee basis.  *See* AIS Verified Statement ¶¶ 1, 3.  The three law firms that formed this cooperative effort are Kosnoff Law, Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. ("Eisenberg Rothweiler"), and AVA Law Group, Inc. ("AVA Law Group").  *See id.* ¶ 1.  As described in the AIS Verified Statement, "neither AIS nor the Law Firms working together was ever formally organized into a legal entity, [and] there exist no

documents reflecting the formation and governance of AIS.  AIS has no board of directors, advisory board, officers, employees, steering committee or any other leadership or operating structure." *Id.* ¶ 5.  The AIS Verified Statement further states that each abuse survivor represented by AIS has employed the three firms under a signed engagement letter jointly with all three firms. *Id.* ¶ 10, Ex. B.

23.     The Kosnoff Verified Statement expands on the joint efforts of the AIS law firms, asserting that the firms worked together cooperatively for approximately eighteen months, from roughly March 2019 until September 2020.  Kosnoff Verified Statement ¶¶ 11, 16.  In September 2020, shortly after the formation of the Coalition of Abused Scouts for Justice (the "Coalition"), Kosnoff Law and AVA Law Group withdrew from the Coalition.  *Id.* ¶ 16.  As a result, abuse survivor clients of AIS are in a co-counsel relationship with firms both in and outside of the Coalition, and no such survivor client is represented by Kosnoff Law independent of Eisenberg Rothweiler and AVA Law Group.

## II.     Plan and Disclosure Statement

24.     On September 30, 2021, after five days of hearings, the Court entered the *Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [D.I. 6438] (the "Solicitation Procedures Order").

25.     On the same date, the Debtors filed the Court-approved solicitation versions of the *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6443] (the "Plan") and the *Amended Disclosure Statement for the*

*Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6445] (the "Disclosure Statement").[4]

26.     The Debtors understand that state court counsel representing more than 70% of abuse survivors support the Plan and are recommending to their clients that they vote in favor of the Plan.  *See*, *e.g.*, Coalition letter dated Sept. 30, 2021 [D.I. 6441-1] ("The Plan is currently supported by representatives of approximately 70,000 survivors.").

27.     Upon entry of the Solicitation Procedures Order, the Solicitation Agent commenced the distribution of solicitation packages to creditors in the voting classes.  As part of the approved solicitation package, in addition to letters from the Debtors, the FCR, the Coalition, and the Creditors' Committee recommending that creditors vote in favor of the Plan, the Solicitation Agent distributed a letter from the TCC recommending that abuse survivors vote to reject the Plan.  *See* D.I. 6365.

## RELIEF REQUESTED

28.     By this Motion, pursuant to sections 105(a), 1103, and 1125 of the Bankruptcy Code, the Debtors request entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, (i) enforcing the Solicitation Procedures Order as set forth herein, (ii) enforcing the terms of section 1103 of the Bankruptcy Code and requiring that any official email address of the TCC be used only for official TCC business applicable to the survivor community and not for the benefit of individual state court counsel, and (iii) granting related relief.

## BASIS FOR RELIEF

29.     The TCC's actions have injured the Debtors and potentially undermined the integrity of the votes on the Plan from survivors who received the TCC's distribution of the

---

[4]     Capitalized terms used but not otherwise defined in this Motion have the meanings ascribed to such terms in the Plan.

TCC/Kosnoff Communications.   Not only is much of the substance of the TCC/Kosnoff Communications either false or grossly misleading, but by distributing the TCC/Kosnoff Communications from the TCC's official creditor-facing email address (BSASurvivors@pszjlaw.com) and addressing the recipients of such email as a "Client of AIS," the TCC potentially caused survivors to vote to reject the Plan in contravention of their actual attorneys' advice.   Indeed, more than one-third of the survivors who apparently received the TCC/Kosnoff Communications are represented by counsel other than Mr. Kosnoff and AIS.   These survivors' counsel are recommending that their clients vote in favor of the Plan.   The TCC's refusal to take the Debtors' requested remedial actions, as set forth in the Debtors' November 8 Letter, and its contravention of applicable bankruptcy laws, rules of professional ethics, and orders of the Court supports the relief requested in this Motion.

30.     This Court has the inherent authority to enforce its own orders.   *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (recognizing that a bankruptcy court "plainly [has] jurisdiction to interpret and enforce its own prior order"); *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 325-26 (Bankr. D. Del. 1999) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379-80 (1994)).   Moreover, the Court has the power to control the form, content, and manner in which information regarding these bankruptcy proceedings—including critical information regarding solicitation—is transmitted in order to protect the integrity of the process and safeguard the due process rights of creditors.   *See, e.g.*, Solicitation Procedures Order (approving the form of ballot, notice, and other contents of the solicitation package); *see also In re Coral Petroleum, Inc.*, 249 B.R. 721, 729 (Bankr. S.D. Tex. 2000) ("[T]he  bankruptcy court has core jurisdiction over matters that are so central to the operation of the bankruptcy case that creditors reasonably rely on the integrity of the federal judicial process to protect them.") (citing *In re Southmark Corp.*, 163

F.3d 925, 931 (5th Cir. 1999)).  Consistent with the foregoing, the Court expressly retained "exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Solicitation Procedures Order."  Solicitation Procedures Order ¶ 44.

31.    Additionally, section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) ("[Section 105(a)] has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings." (internal citation omitted)); *In re VII Holdings Co.*, 362 B.R. 663, 668 (Bankr. D. Del. 2007) ("Section 105(a) bestows broad equitable powers on the Court.").

32.    Accordingly, this Court can order the TCC to remediate its distribution of the TCC/Kosnoff Communications and grant further relief as requested herein.

**I.     The Court has the Power to Prohibit Dissemination of False or Misleading Materials Used to Solicit Rejections of the Plan.**

33.    Section 1125(b) of the Bankruptcy Code does not prohibit the solicitation of votes to accept or reject a plan if, at the time of such solicitation, there is a court-approved disclosure statement that is transmitted to holders of claims or interests. *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 102 (3d Cir. 1988); *see In re Cal. Fid., Inc.*, 198 B.R. 567, 571 (B.A.P. 9th Cir. 1996); *In re Mirant Corp.*, 334 B.R. 787, 792 (Bankr. N.D. Tex. 2005); *In re Apex Oil Co.*, 111 B.R. 245, 249-50 (Bankr. E.D. Mo. 1990); *In re Temple Ret. Cmty., Inc.*, 80 B.R. 367, 368 (Bankr. W.D. Tex. 1987). Indeed, the proper solicitation of votes to accept or reject a plan constitutes speech protected under the First Amendment.  *In re Gulph Woods Corp.*, 83 B.R. 339, 343 (Bankr. E.D. Pa. 1988) (holding that restraint of all communications between creditors

regarding a proposed plan would likely violate the First Amendment and that there is a "delicate

balancing process between the principles of the first amendment and the purposes of § 1125(b) in

which a court must engage to assess the legality of a certain communication"); *In re Mirant Corp.*,

334 B.R. at 792 ("[A] prior restraint on speech – even commercial speech – would ordinarily be

offensive to the First Amendment of the Constitution.").  But the First Amendment's protections

are not unlimited. Specifically, "[m]isrepresentations of fact or law in a commercial context are

not entitled to First Amendment protection." *In re Mirant Corp.*, 334 B.R. at 792–93 (citing *Cent.*

*Hudson Gas & Elec. Corp. v. Pub. Serv. Commc'n*, 447 U.S. 557, 562–63 (1980)).[5]

34.     To be clear, the Debtors are not asking the Court to restrain the TCC from soliciting

votes in opposition to the Plan, as permitted under *Century Glove*.  Indeed, since the Solicitation

Procedures Order was approved, the TCC has launched an aggressive campaign to try to convince

survivors to vote against the Plan through five press releases, five town hall meetings held on a

weekly basis, and countless communications to survivors using the same official TCC email

address used to disseminate the TCC/Kosnoff Communications.

35.     Here, however, the TCC has facilitated the dissemination of legal advice from a

single state court lawyer to thousands of individuals who are not his clients and has thus endorsed

the use of false or misleading information to solicit rejections of the Plan.  The TCC/Kosnoff

---

[5]     Solicitation of rejections of a plan through the use of misleading or counterfactual materials is commercial speech not entitled to First Amendment protection and does not constitute good faith selection within the meaning of section 1125(e).  *In re Mirant Corp.*, 334 B.R. at 799–800; *In re Snyder*, 51 B.R. 432, 437 (Bankr. D. Utah 1985) (determining that unauthorized solicitation would include a specific request for official votes for or against a plan that contains "misrepresentations or deliberate falsehoods and misleading statements calculated to deceive parties entitled to vote"). Such speech may be subject to limitation. *In re Mirant Corp.*, 334 B.R. 787 (determining that solicitation materials contained information so misleading and false they warranted the exercise of the court's equitable powers to prevent further dissemination); *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Commc'n*, 447 U.S. at 566 ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading."); *U.S. v. DeFusco*, 930 F.2d 413, 415 (5th Cir. 1991) ("We agree with our colleagues of the Second Circuit that 'misleading commercial speech is beyond the protective reach of the First Amendment.") (citation omitted).

Communications contain improper statements under section 1125 of the Bankruptcy Code because they are replete with numerous false or misleading legal and factual statements that will confuse voters. The following table provides illustrative examples of the false or misleading statements in the TCC/Kosnoff Communications distributed by the TCC:

| False or Misleading Statement | Reason Statement Is False or Misleading |
|---|---|
| "It was wholly improper and possibly illegal for [Eisenberg Rothweiler] to solicit your vote on a ballot that is supposed to be neutral. Instead they used deceit to spew their patently false and misleading statements. There is a simple word for why lawyers do things like that: greed." TCC/Kosnoff Email. | The Debtors have been informed that the communication referenced in the TCC/Kosnoff Email was sent by Eisenberg Rothweiler to AIS clients for whom Mr. Rothweiler and Mr. Kosnoff serve as co-counsel. There is nothing improper or illegal about an attorney advising his clients in an attorney-client communication about the terms of the Plan, its effect on such clients' recoveries and opinions related to whether the Plan should be confirmed. |
| "Please stay current on what is happening by following me on Twitter @sexabuseattys." TCC/Kosnoff Email. | The TCC should not endorse the referral of survivors to the Twitter feed of a single state court court lawyer whose feed presents derogatory, false and misleading remarks about this Court, this proceeding, and those involved. Moreover, it is misleading to refer recipients to the Twitter feed of Mr. Kosnoff without reference to the Court-approved Disclosure Statement. |
| "Rejection of the Plan does not mean many more years of waiting. It means the BSA and the other entities will quickly come back to the negotiating table and finally be serious about fairly compensating survivors." TCC/Kosnoff Letter at 3–4. | This statement is inconsistent with the Court-approved Disclosure Statement, which states that if the Plan is rejected, the Debtors' possible alternatives include confirmation of a subsequent plan of reorganization, plan of liquidation or chapter 7 proceedings. Abuse survivors' recoveries under these scenarios are uncertain. *See* Disclosure Statement, Art. X.A.6. |
| "The Boy Scout's 'melting ice cube' defense is a hoax. The Boy Scouts hold hundreds of millions in cash and other assets that it designates as "restricted" and not available to pay you." TCC/Kosnoff Letter at 4. | This statement is inconsistent with the risk factors in the Disclosure Statement, which provide that the Debtors' failure to emerge from these chapter 11 cases in a timely manner could endanger the future of the BSA and, due to the continued accrual of professional fees, substantially reduce the BSA's contribution to the Settlement Trust as set forth in the chart in Article II.F of the Disclosure Statement. *See* Disclosure Statement, Art. X.A.34 & II.F. This statement is also inconsistent with the Court-approved Disclosure Statement, which states that the Debtors are projected to hold $111 |

| False or Misleading Statement | Reason Statement Is False or Misleading |
|---|---|
| | million of restricted investments and $22 million of restricted cash as of December 31, 2021. *See* Disclosure Statement, Ex. E-1. |
| "Eisenberg Rothweiler and the Coalition offered to settle with the Local Councils before undertaking any review of the claims or financial analysis of the Local Councils. In short, the Coalition blindly offered to settle for $600 million when the TCC demonstrated to the Coalition that the Local Councils had the ability to pay more than three times that amount without endangering their Scouting mission." TCC/Kosnoff Letter at 3. | This statement is inconsistent with the Court-approved Disclosure Statement, which states that there were numerous mediation sessions between the parties prior to entry into the settlement with the Local Councils. *See* Disclosure Statement, Art. II.A. It is misleading for an attorney who did not attend a single mediation session to make any statement about what was considered in such sessions. |
| "The face value of Hartford's insurance coverage for the year 1972 alone is more than $800 million. And yet, the Coalition and Eisenberg Rothweiler want you to vote for a plan that pays less than that amount without taking into account the thousands of other claims in the same year and the many other thousands in 1971, 1973, 1974, 1975, and all the other years Hartford provided insurance coverage." TCC/Kosnoff Letter at 2. | This statement is inconsistent with the Court-approved Disclosure Statement, which describes Hartford's insurance coverage.  The value of Hartford's insurance coverage for a given year is dependent on many factors, including the value of the claims that arose in those years.  Accordingly, a "face value" of over $800 million cannot be credibly presented as fact.  *See* Disclosure Statement, Art. III.F.1. |
| "The $250 million is not only far below the level of its culpability for abuse in TCJC wards, but it will only be distributed to survivors who have claims against the Mormon Church." TCC/Kosnoff Letter at 3. | This statement is inconsistent with the Court-approved Disclosure Statement, which states that the proportionate share of liability attributable to TCJC is disputed.  TCJC has significant and potentially meritorious defenses to Abuse Claims that could impede recoveries by holders of Abuse Claims. *See* Disclosure Statement, Art. V.S.4.a. |
| "The settlement trust expenses (which must be paid first) could be as high as 10%, which reduces the average payment per survivor to approximately $17,000. If some survivors are paid more, that means most of the other survivors will receive much less or nothing at all." TCC/Kosnoff Letter at 2. | There is no support in the Disclosure Statement for how the estimate of $17,000 was calculated, and although the Disclosure Statement estimates that Settlement Trust expenses could range from 6-10%, no dollar amount estimate of how an individual claimant's recovery may be affected by settlement trust expenses is included in the Disclosure Statement.  *See* Disclosure Statement, Arts. II.H; VII.A.19.

The characterization of the relative payments to survivors is also inconsistent with the Disclosure Statement. Such amounts will be determined based upon, among other things, estimates of the number, types, and amount of Abuse Claims, the value of the assets of the Settlement Trust, the liquidity of the Settlement Trust, the Settlement Trust's |

| False or Misleading Statement | Reason Statement Is False or Misleading |
|---|---|
| | expected future income and expenses, and other matters. *See* Disclosure Statement, Art. X.A.14. |
| "Those law firms came into the Boy Scout's bankruptcy case and have treated survivors like "inventories" for the sole purpose of collecting their contingency fee. While you and other survivors might not receive large or meaningful payments, the "mass tort" lawyers will because they will take a piece of your payment which under the current $1.854 billion settlement fund will total more than $425 million." TCC/Kosnoff Letter at 2. | The Disclosure Statement does not support this estimate of total attorneys' fees given that fee arrangements between counsel and their clients are not a matter of public record. The Debtors do not have any means of estimating the aggregate amount of attorneys' fees that may be payable by holders of Abuse Claims who receive compensation from the Settlement Trust. Accordingly, there is no basis for the estimate of "more than $425 million." Sept. 22, 2021 Disclosure Statement Hr'g Tr. 107:18–23, Warner Decl. Ex. 26 (Mr. Linder: "[T]here are attorneys' fees that will be payable by individual abuse claimants to their own, what we refer to as state court counsel. The debtors are not privy to those contractual arrangements so we don't have a basis to estimate what those might be so we don't have any disclosure on that point in [t]he disclosure statement."). |

## II.     Remedial Action Is Necessary.

36.     Since the TCC's dissemination of the TCC/Kosnoff Communications, the Debtors have learned both from the Solicitation Agent and from counsel to the Coalition that the TCC/Kosnoff Communications have caused significant confusion among survivors.  The TCC/Kosnoff Communications have resulted in a flood of inquiries from survivors to their respective state court counsel affiliated with the Coalition.  The Debtors are informed that survivors are confused about why they received an email from Mr. Kosnoff addressed to AIS clients from a source (BSASurvivors@pszjlaw.com) that distributes periodic updates about the status of the Debtors' bankruptcy case and not communications from individual state court counsel who do not represent them.  The Debtors are further informed that there have also been questions from survivors about who in fact is their counsel and whether Mr. Kosnoff represents them.  There may also be many survivors who have not contacted their counsel and will likely mistakenly rely

on the TCC/Kosnoff Communications as legal advice from their attorney and vote to reject the Plan. Finally, the Coalition has also informed the Debtors that they are seeing more votes against the Plan since the dissemination of the TCC/Kosnoff Communications. The outcome cannot be permitted.

> **A.**  **Allowing Kosnoff to Co-Opt the TCC Listserv Was Not in the Best Interests of Survivors.**

37.     Section 1102 of the Bankruptcy Code provides that, in a chapter 11 case, the U.S. Trustee appoints a committee of creditors holding unsecured claims and may appoint additional committees of creditors as the U.S. trustee deems appropriate. 11 U.S.C. § 1102(a). Pursuant to section 1102(b), such committee must consist of persons willing to serve who hold representative claims. *Id.* § 1102(b). "'The principal purpose of creditors' committees is not to advocate any particular creditor class's agenda, but rather to strike a proper balance between the parties such that an effective and viable reorganization of the debtor may be accomplished.'" *In re Res. Cap., LLC*, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012) (quoting *Mirant Americas Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of Enron Corp.,* 2003 WL 22327118, *6 (S.D.N.Y. Oct. 10, 2003)). An official committee need not be an exact replica of the creditor body, but rather must adequately represent various creditor types. *In re Dana Corp*., 344 B.R. 35, 39 (Bankr. S.D.N.Y. 2006).

38.     Section 1103(c) further sets forth some of the powers and duties that an official committee "may" exercise in a chapter 11 case; however, "[i]t is well settled that statutory unsecured creditors' committees owe a fiduciary duty to the entire class of creditors represented by such committee and are required to place the collective interest of the class they represent above their own personal stake in the bankruptcy case." *In re Res. Cap., LLC*, 480 B.R. at 559 (citing *In re Dana Corp*., 344 B.R. at 38).

39.     Moreover, "the members of a committee have a fiduciary duty to their constituents and are obligated to exercise those powers as necessary to protect the interests of those constituents." 7 Collier on Bankruptcy ¶ 1103.05 (16th ed. 2021); *see Shaw & Levine v. Gulf & W. Indus., Inc.* (*In re Bohack Corp.*), 607 F.2d 258, 262 n.4 (2d Cir. 1979) ("[T]he committee owes a fiduciary duty to the creditors, and must guide its actions so as to safeguard as much as possible the rights of minority as well as majority creditors."). Indeed, a member of a committee owes a fiduciary duty to the class the committee represents. Such duty is to the class as a whole and not to individual members of the class. *Westmoreland Human Opportunities, Inc. v. Walsh*, 246. F.3d 233, 256 (3d Cir. 2001) ("A committee member violates its fiduciary duty by pursuing a course of action that furthers its self-interest to the potential detriment of fellow committee members."); *In re Signature Apparel Grp. LLC*, 577 B.R. 54, 89 (Bankr. S.D.N.Y. 2017) (finding the members of an official committee owe a fiduciary duty to the constituents that the committee represents). The fiduciary duty includes duties of loyalty and honesty to the committee's constituency and to be without conflicts of interest that affect the committee member's discharge of its fiduciary duty. *In re Signature Apparel*, 577 B.R. at 89 ("Because of this fiduciary relationship with the unsecured class of creditors, [the committee member] was obligated to be honest, loyal, trustworthy and without conflicts of interest.").

40.     By sending the TCC/Kosnoff Communications from the TCC's official email address to survivors, the TCC endorsed their contents. Given that the TCC/Kosnoff Letter is replete with blatant falsehoods and misleading statements that are plainly inconsistent with the Court-approved Disclosure Statement, the TCC's decision to send the TCC/Kosnoff Communications to a wide array of individual survivors was not in the best interests of survivors as a whole. The Debtors will be conducting a thorough investigation into the circumstances

surrounding the TCC's decision to send the TCC/Kosnoff Communications.  In the meantime, the Court should order the remedial actions requested herein to safeguard the integrity of the solicitation process.

> **B.**    **The TCC's Dissemination of the TCC/Kosnoff Communications to Survivors Represented by Counsel Other than Mr. Kosnoff and AIS Without the Consent of Such Counsel Violated Rules of Professional Ethics.**

41.    Communication with creditors regarding the Plan is "analogous to communicating with an adverse party regarding settlement.  In each case, the ethical canons require the prior consent from the communicant's attorney." *In re Snyder*, 51 B.R. 432, 438 (Bankr. D. Utah 1985); *In re Grand Union Co.*, 204 B.R. 864, 877 (Bankr. D. Del. 1997) ("Authorizing direct contact with the claimant contradicts prevailing ethical standards that require dealings with counsel where an opposing party is known to be represented, unless counsel consents or the communication is authorized by law. The ethical rule is meant 'to prevent lawyers from taking advantage of uncounselled [sic] lay persons and to preserve the integrity of the lawyer-client relationship.' . . . . The rule is designed to shield opposing parties not only from an attorney's approaches which are intentionally improper, but from approaches which are well-intended but misguided.") (quoting *Graham v. United States*, 96 F.3d 446 (9th Cir. 1996)); *Friendly Fin. Discount Corp. v. Tucker (In re Tucker)*, No. 99031069, 2000 U.S. App. LEXIS 40240, at *7-8 (5th Cir. June 28, 2000) (affirming lower courts' decisions to impose sanctions on attorneys who engaged in ex parte negotiations with a debtor represented by an attorney, without obtaining that attorney's permission); *see also* Del. Law. Prof. Conduct 4.2 ("In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.").

42.     Here, because the TCC/Kosnoff Communications were sent to survivors who are not represented by Mr. Kosnoff and AIS without the consent of such separate counsel, the TCC violated applicable rules of professional ethics.  Regardless of any purported error on the part of the TCC or PSZJ "staff," adequate remedial action must be taken to apprise survivors of the error. The TCC Purported Correction Email was inadequate because it failed to advise survivors that they should consult with their actual attorneys regarding their respective decisions on whether to accept or reject the Plan.  It also failed to mention that the advice of survivors' actual attorneys could be different from the views of the TCC and Mr. Kosnoff.  For these reasons, the Debtors have proposed a more appropriate corrective email that the TCC should be required to send to all recipients of the TCC/Kosnoff Communications.  This corrective email is set forth in paragraph 44, *infra*.

**C.     The Following Remediation Is Necessary to Mitigate the Damage Caused by the TCC's Actions and Preserve the Integrity of the Solicitation Process.**

43.     In order to remedy the injury caused by the TCC's blatant disregard of the rules of professional ethics, the Bankruptcy Code, and the Solicitation Procedures Order, certain of the Solicitation Procedures should be supplemented to guard against any future actions by the TCC that could further compromise the integrity of the solicitation process.  Specifically, the Debtors are requesting that the following provisions be included in any order granting this Motion:

(a)     The TCC shall refrain from distributing, for the entirety of the chapter 11 cases, any and all communications from or on behalf of any state court counsel, including to parties on its official listserv;

(b)     Any official email address of the TCC shall be used only for official TCC business applicable to the survivor community and not for the benefit of individual state court counsel; and

(c)     The TCC shall give prior notice to the Debtors of any substantive communications that it intends to distribute to parties on the listserv at least 48 hours prior to distribution.

If, upon 48 hours' notice to the Debtors (the "Notice Period"), the Debtors dispute any of the proposed communications, and the Debtors and the TCC are unable to agree to revised communications, the Debtors may seek an expedited hearing with the Court to resolve such disagreement. In that event, the TCC shall not oppose the request for expedited consideration provided that any such hearing is held on not less than 24 hours' notice to the TCC; provided further that, if a hearing to consider any appropriate relief in connection with any communications (as may be held on an expedited basis) is requested by the Debtors to be heard within the Notice Period but is scheduled for a later date by the Court, the communication at issue shall not be distributed until the hearing concludes. In the event of any dispute regarding the terms of such communications, the Debtors and the TCC reserve any and all rights under the Bankruptcy Code or applicable law.

44.    Additionally, to remedy the confusion caused by the distribution of the TCC/Kosnoff Communications to survivors who were not clients of Mr. Kosnoff, a more detailed corrective email should be sent from the TCC clarifying the mistake, repudiating the portions of the TCC/Kosnoff Communications that are misleading or false, including those statements that attack another attorney in these chapter 11 cases. The email should attach the letters approved by this Court in connection with the Disclosure Statement from the Debtors, the FCR, and the Coalition. The corrective email should state as follows:

To all concerned:

My firm sent an email from Mr. Kosnoff to all individuals on this listserv on November 6, 2021. We urge each of you to disregard its contents, which included false and misleading statements that are inconsistent with the Court-approved Disclosure Statement. Many of you have counsel who represent your interests and who have very different opinions as to how you should vote on the Boy Scouts' plan of reorganization.    In fact, we understand that counsel representing a majority of the survivors in these cases support the plan and are urging their clients to vote "YES" on the plan. We are not trying to interfere with the advice that you are receiving from your own counsel, and if you have questions on how to vote on the plan, we strongly encourage you to seek advice from your counsel. If you would like to change your vote on the Boy Scouts' plan, you must submit a new ballot on or prior to the Voting Deadline of December 14, 2021 at 4:00 p.m. (Eastern Time).

Furthermore, the TCC does not agree with and affirmatively rejects any and all statements made about the Eisenberg Rothweiler law firm in the letter from Mr. Kosnoff that was attached to the email sent to you. The TCC regrets any suggestion that its counsel endorsed the distribution of such statements. Finally, please see the attached letters from the Debtors, FCR and Coalition of Abused Scouts for Justice.

45. Without the foregoing relief, the harm caused by the TCC's actions and any future similar actions (including further distribution of communications from state court counsel, from which the TCC has refused to refrain) will damage the Debtors' carefully coordinated solicitation efforts and potentially delay or derail the Debtors' emergence from chapter 11.

## **RESERVATION OF RIGHTS**

46. As noted herein, the TCC's dissemination of the TCC/Kosnoff Communications is a serious violation of bankruptcy laws, rules of professional ethics, and the Solicitation Procedures Order. The Debtors will be continuing to conduct a thorough investigation into this matter. As such investigation proceeds, new facts may come to light that require or warrant further action by the Debtors. Nothing contained in this Motion is intended or should be construed as a waiver or limitation of the Debtors' or any other party in interest's rights to demand that the TCC take further corrective measures or to seek further relief from the Court, including legal or equitable remedies for the TCC's actions and the harm caused by such actions.

## **NOTICE**

47. Notice of this Motion will be provided to (i) the U.S. Trustee; (ii) counsel to the TCC; (iii) counsel to the Creditors' Committee; (iv) counsel to the FCR; (v) counsel to the AHCLC; (vi) counsel to the Coalition; (vii) counsel to JPM; (viii) the County Commission of Fayette County (West Virginia), as issuer of those certain Commercial Development Revenue Bonds (Arrow WV Project), Series 2010A, 2010B and 2012; and (ix) any party that has requested

notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested herein, no other or further notice need be given.

## **<u>CONCLUSION</u>**

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, granting the relief requested in this Motion and such other and any further relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:  November 9, 2021
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Paige N. Topper*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@morrisnichols.com
           aremming@ morrisnichols.com
           ptopper@morrisnichols.com

– and –

**WHITE & CASE LLP**
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
           mlinder@whitecase.com
           laura.baccash@whitecase.com
           blair.warner@whitecase.com

ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>                   Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Objection Deadline**:<br>On or before the Hearing<br><br>**Hearing Date**:<br>TBD |

### NOTICE OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) ENFORCING THE SOLICITATION PROCEDURES ORDER, (II) ENFORCING SECTION 1103 OF THE BANKRUPTCY CODE AGAINST THE TORT CLAIMANTS' COMMITTEE, AND (III) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that, on November 9, 2021, Boy Scouts of America and Delaware BSA, LLC, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed the *Debtors' Emergency Motion for Entry of an Order (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against the Tort Claimants' Committee, and (III) Granting Related Relief* (the "Motion") with the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, any responses or objections to the Motion must be in writing, filed with the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, and served upon and received by the undersigned attorneys for the Debtors on or before the hearing.

**PLEASE TAKE FURTHER NOTICE** that, if any objections to the Motion are received, the Motion and such objections shall be considered at a hearing via videoconference before The Honorable Laurie Selber Silverstein of the United States Bankruptcy Court for the District of Delaware on a date to be determined.

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

Dated: November 9, 2021
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Paige N. Topper*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@morrisnichols.com
            aremming@morrisnichols.com
            ptopper@morrisnichols.com

– and –

**WHITE & CASE LLP**
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email:  mandolina@whitecase.com
            mlinder@whitecase.com
            laura.baccash@whitecase.com
            blair.warner@whitecase.com

*ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION*

**<u>Exhibit A</u>**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. D.I.** ____ |

### ORDER (I) ENFORCING THE SOLICITATION PROCEDURES ORDER, (II) ENFORCING SECTION 1103 OF THE BANKRUPTCY CODE AGAINST THE TORT CLAIMANTS' COMMITTEE, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the Debtors for entry of an order (this "Order"), pursuant to sections 105(a), 1103, and 1125 of the Bankruptcy Code (i) enforcing the Solicitation Procedures Order as set forth herein, (ii) enforcing the terms of section 1103 of the Bankruptcy Code and requiring that any official email address of the Tort Claimants' Committee (the "TCC") be used only for official TCC business applicable to the survivor community and not for the benefit of individual state court counsel, and (iii) granting related relief; and upon the Warner Declaration filed in support of the Motion; and this Court having jurisdiction to consider the Motion in accordance with 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Debtors having consented to entry of a final order by this Court under Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this District is proper

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and opportunity for a hearing

on the Motion having been given and no other or further notice being necessary; and upon the

record herein; and all objections, if any, to the Motion having been withdrawn, resolved or

overruled; and the relief requested in the Motion being in the best interests of the Debtors' estates,

their creditors and other parties in interest; and the Court having determined that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED as set forth herein.

2.    The Solicitation Procedures Order that was entered by this Court on September 30,

2021 remains in full force and effect, and this Order serves to supplement and work in conjunction

with the existing Solicitation Procedures Order.

3.    The Solicitation Procedures Order is hereby supplemented to provide as follows:

(a)    The TCC shall refrain from distributing, for the entirety of the chapter 11
cases, any and all communications from or on behalf of any state court
counsel, including to parties on its official listserv;

(b)    Any official email address of the TCC shall be used only for official TCC
business applicable to the survivor community and not for the benefit of
individual state court counsel; and

(c)    The TCC shall give prior notice to the Debtors of any substantive
communications that it intends to distribute to parties on the listserv at least
48 hours prior to distribution.

If, upon 48 hours' notice to the Debtors (the "Notice Period"), the Debtors
dispute any of the proposed communications, and the Debtors and the TCC
are unable to agree to revised communications, the Debtors may seek an
expedited hearing with the Court to resolve such disagreement. In that
event, the TCC shall not oppose the request for expedited consideration
provided that any such hearing is held on not less than 24 hours' notice to
the Tort TCC; provided further that, if a hearing to consider any appropriate
relief in connection with any communications (as may be held on an
expedited basis) is requested by the Debtors to be heard within the Notice
Period but is scheduled for a later date by the Court, the communication at
issue shall not be distributed until the hearing concludes. In the event of any

dispute regarding the terms of such communications, the Debtors and the TCC reserve any and all rights under the Bankruptcy Code or applicable law.

4.      The TCC shall send a corrective email clarifying the mistake and stating that the TCC does not endorse the sections of the TCC/Kosnoff Letter that are misleading or false, including those statements that attack another attorney in these chapter 11 cases.  The email shall attach the letters approved by this Court in connection with the Disclosure Statement from the Debtors, the Coalition, and the FCR.  Such corrective email shall state substantially the following:

> To all concerned:
>
> My firm sent an email from Mr. Kosnoff to all individuals on this listserv on November 6, 2021.  We urge each of you to disregard its contents, which included false and misleading statements that are inconsistent with the Court-approved Disclosure Statement. Many of you have counsel who represent your interests and who have very different opinions as to how you should vote on the Boy Scouts' plan of reorganization.  In fact, we understand that counsel representing a majority of the survivors in these cases support the plan and are urging their clients to vote "YES" on the plan.  We are not trying to interfere with the advice that you are receiving from your own counsel, and if you have questions on how to vote on the plan, we strongly encourage you to seek advice from your counsel. If you would like to change your vote on the Boy Scouts' plan, you must submit a new ballot on or prior to the Voting Deadline of December 14, 2021 at 4:00 p.m. (Eastern Time).
>
> Furthermore, the TCC does not agree with and affirmatively rejects any and all statements made about the Eisenberg Rothweiler law firm in the letter from Mr. Kosnoff that was attached to the email sent to you.  The TCC regrets any suggestion that its counsel endorsed the distribution of such statements.  Finally, please see the attached letters from the Debtors, FCR and Coalition of Abused Scouts for Justice.

5.      Notwithstanding anything to the contrary in the Motion or this Order, the Debtors on behalf of themselves and their estates retain all rights to seek any further and other applicable legal or equitable remedies for the TCC's actions and the harm caused by those actions, and the Debtors' failure to request any such relief in the Motion or the omission of any such relief from

this Order shall not preclude the Debtors or any other party from later seeking such relief in accordance with applicable law and rules.

6.      The Debtors are authorized to take all action necessary to effectuate the relief granted in this Order in accordance with the Motion.

7.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Re: D.I. 7118** |

## DECLARATION OF BLAIR M. WARNER IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) ENFORCING THE SOLICITATION PROCEDURES ORDER, (II) ENFORCING SECTION 1103 OF THE BANKRUPTCY CODE AGAINST THE TORT CLAIMANTS' COMMITTEE, AND (III) GRANTING RELATED RELIEF

I, Blair M. Warner, being duly sworn, hereby declare as follows:

1. I am an associate of the law firm White & Case LLP ("White & Case") based in its office located at 111 S. Wacker Drive, Chicago, Illinois 60606. White & Case is lead restructuring counsel to the Debtors.

2. I submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion For Entry of an Order (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against the Tort Claimants' Committee, and (III) Granting Related Relief* (the "Motion"), filed concurrently herewith.[2]

3. Except as otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein. If called upon to testify, I would competently testify to the facts set forth herein.

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

4.    Attached as **Exhibit 1** hereto is a true and correct copy of an email I received from Omni Agent Solutions on November 6, 2021.

5.    Attached as **Exhibit 2** hereto are true and correct copies of the emails from David Molton, counsel to the Coalition, to Jessica Lauria, Michael Andolina and Matthew Linder, dated November 6, 2021.

6.    Attached as **Exhibit 3** hereto is a true and correct copy of the TCC/Kosnoff Communications, dated November 7, 2021.

7.    Attached as **Exhibit 4** hereto is a true and correct copy of an excerpt from the October 16, 2020 hearing transcript.

8.    Attached as **Exhibit 5** hereto is a true and correct copy of an excerpt from the October 14, 2020 morning session hearing transcript.

9.    Attached as **Exhibit 6** hereto is a true and correct copy of an excerpt from the October 14, 2020 afternoon session hearing transcript.

10.    Attached as **Exhibit 7** hereto is a true and correct copy of a post from the twitter account "@SexAbuseAttys" with the username "Kosnoff Law," posted on November 2, 2021. Kosnoff Law (@SexAbuseAttys), TWITTER (Nov. 2, 2021, 8:17 PM), *available at* https://twitter.com/SexAbuseAttys/status/1455690609604194304?s=20.

11.    Attached as **Exhibit 8** hereto is a true and correct copy of a post from the twitter account "@SexAbuseAttys" with the username "Kosnoff Law," posted on October 30, 2021. Kosnoff Law (@SexAbuseAttys), TWITTER (Oct. 30, 2021, 3:40 PM), *available at* https://twitter.com/SexAbuseAttys/status/1454533563215269889?s=20.

12.    Attached as **Exhibit 9** hereto is a true and correct copy of two posts from the twitter account "@SexAbuseAttys" with the username "Kosnoff Law," posted on September 29, 2021.

Kosnoff Law (@SexAbuseAttys), TWITTER (Sept. 29, 2021, 10:19 AM and 10:06 AM), *available at* https://twitter.com/SexAbuseAttys/status/1443218931787833344?s=20, https://twitter.com/SexAbuseAttys/status/1443215633978572801.

13.     Attached as **<u>Exhibit 10</u>** hereto is a true and correct copy of a post from the twitter account "@SexAbuseAttys" with the username "Kosnoff Law," posted on September 15, 2021. Kosnoff Law (@SexAbuseAttys), TWITTER (Sept. 15, 2021, 12:47 AM), *available at* https://twitter.com/SexAbuseAttys/status/1438001440115494915?s=20.

14.     Attached as **<u>Exhibit 11</u>** hereto is a true and correct copy of a post from the twitter account "@SexAbuseAttys" with the username "Kosnoff Law," posted on July 25, 2021.  Kosnoff Law (@SexAbuseAttys), TWITTER (July 25, 2021, 11:35 PM), *available at* https://twitter.com/SexAbuseAttys/status/1419501663237251077?s=20.

15.     Attached as **<u>Exhibit 12</u>** hereto is a true and correct copy of an excerpt from the July 29, 2021 hearing transcript.

16.     Attached as **<u>Exhibit 13</u>** hereto is a true and correct copy of a post from the twitter account "@SexAbuseAttys" with the username "Kosnoff Law," posted on September 7, 2021. Kosnoff Law (@SexAbuseAttys), TWITTER (Sept. 7, 2021, 8:57 PM), *available at* https://twitter.com/SexAbuseAttys/status/1435406841891082240?s=20.

17.     Attached as **<u>Exhibit 14</u>** hereto is a true and correct copy of a post from the twitter account "@SexAbuseAttys" with the username "Kosnoff Law," posted on January 26, 2021. Kosnoff Law (@SexAbuseAttys), TWITTER (Jan. 26, 2021, 8:37 PM), *available at* https://twitter.com/SexAbuseAttys/status/1354257071944855555?s=20.

18.     Attached as **<u>Exhibit 15</u>** hereto is a true and correct copy of a post from the twitter account "@SexAbuseAttys" with the username "Kosnoff Law," posted on November 8, 2021.

3

Kosnoff Law (@SexAbuseAttys), TWITTER (Nov. 8, 2021, 12:12 PM), *available at* https://twitter.com/SexAbuseAttys/status/1457773076804866057?s=20.

19.     In recent weeks, Kosnoff Law has posted multiple pictures of Mr. Rothweiler on Twitter.  A recent post from the Twitter account "@SexAbuseAttys" with the username "Kosnoff Law" included a picture of Mr. Kenneth Rothweiler with a family member.  The Debtors have not included images of this post in this Declaration in order to protect these individuals' privacy, but will file copies of these posts under seal if requested by the Court.

20.     Attached as **Exhibit 16** hereto is a true and correct copy of the Debtors' First November 7 Letter, dated November 7, 2021.

21.     Attached as **Exhibit 17** hereto is a true and correct copy of the TCC's First Response Email, dated November 7, 2021.

22.     Attached as **Exhibit 18** hereto is a true and correct copy of the TCC Purported Correction Email, dated November 7, 2021.

23.     Attached as **Exhibit 19** hereto is a true and correct copy of the Debtors' Second November 7 Letter, dated November 7, 2021.

24.     Attached as **Exhibit 20** hereto is a true and correct copy of the TCC's Second Response Email, dated November 7, 2021.

25.     Attached as **Exhibit 21** hereto is a true and correct copy of the Debtors' November 8 Letter, dated November 8, 2021.

26.     Attached as **Exhibit 22** hereto is a true and correct copy of the interrogatories served by the Debtors on the TCC regarding the transmittal of the TCC/Kosnoff Communications, dated November 8, 2021.

27.     Attached as **<u>Exhibit 23</u>** hereto is a true and correct copy of the requests for production served by the Debtors on the TCC regarding the transmittal of the TCC/Kosnoff Communications, dated November 8, 2021.

28.     Attached as **<u>Exhibit 24</u>** hereto is a true and correct copy of the requests for production served by the Debtors on Kosnoff Law regarding the transmittal of the TCC/Kosnoff Communications, dated November 8, 2021.

29.     Attached as **<u>Exhibit 25</u>** hereto is a true and correct copy of the TCC's Third Response Letter, dated November 8, 2021.

30.     Attached as **<u>Exhibit 26</u>** hereto is a true and correct copy of an excerpt from the September 22, 2021 hearing transcript.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information and belief.


Dated:  November 9, 2021
          Chicago, Illinois          */s/ Blair M. Warner*
                                      Blair M. Warner
                                      Associate
                                      WHITE & CASE LLP

## EXHIBIT 1

**November 6, 2021 Email**

**Warner, Blair**

---

| | |
|---|---|
| **From:** | Max Meisler <mmeisler@OmniAgnt.com> |
| **Sent:** | Saturday, November 6, 2021 5:21 PM |
| **To:** | Warner, Blair; Baccash, Laura |
| **Cc:** | Katie Nownes; Jeriad Paul |
| **Subject:** | FW:  [External] BSA - Notice of October 21, 2021 Virtual Town Hall |
| **Attachments:** | AIS Communication_Omni Recd 11.06.2021_███████.pdf |

Blair & Laura,

Bringing this to your attention, the survivor below just forwarded the attached screenshot of an email received from Kosnoff. From our records, ████████ is not represented by AIS—his attorneys, based on the proofs of claim, are ████
██████████████████████████

AIS did not assert that they represent the claimant during the directive process, and did not receive a Ballot for him, so seemingly this email was not solely sent to clients of AIS.

**Max J. Meisler**
**Consultant | Securities & Solicitation Services**
**Omni Agent Solutions**
5955 De Soto Avenue, Suite 100
Woodland Hills, CA 91367
Phone: (818) 906-8300 x178
Email: mmeisler@omniagnt.com



---

**From:** █████████  <█████████████████>
**Sent:** Saturday, November 6, 2021 2:09 PM
**To:** BSAballots@omniagnt.com
**Subject:** Re: [External] BSA - Notice of October 21, 2021 Virtual Town Hall

I mean received

On Sat, Nov 6, 2021, 5:08 PM █████████ <█████████████████> wrote:

I just reduced my received this

On Thu, Nov 4, 2021, 7:49 PM BSAballots@omniagnt.com <bsaballots@omniagnt.com> wrote:

████████

Please see below the information you requested:

Claim # ▮▮▮▮

Ballot ID#: ▮▮▮▮

For any additional questions, please contact the restructuring hotline at 866-907-BSA1 (2721) or email BSAballots@omniagnt.com.

Omni Agent Solutions

5955 De Soto Ave., Suite 100

Woodland Hills, CA 91367

**From:** ▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, October 21, 2021 3:17 PM
**To:** BSA Survivors <BSASurvivors@pszjlaw.com>
**Subject:** Re: BSA - Notice of October 21, 2021 Virtual Town Hall

<mark>Good afternoon, im trying to send my ballot in. Can you tell me my claim number.. and the ID i need to use.  It says top left corner but i dont see either</mark>

On Wed, Oct 20, 2021, 2:45 PM BSA Survivors <BSASurvivors@pszjlaw.com> wrote:

Please see the attached pdf of the Notice of October 21, 2021 Virtual Town Hall.

Thursday, October 21, 2021 at 8:00 p.m. (Eastern Time)

Zoom link: https://pszjlaw.zoom.us/j/82272826295 (no registration required) or
Phone number: 888-788-0099 (Toll Free), Webinar ID: 822 7282 6295.

For information about the Boy Scout's bankruptcy case go to www.pszjlaw.com/bsa<http://www.pszjlaw.com/bsa> or www.TCCBSA.com<http://www.TCCBSA.com>.

If you have questions that are not answered by the info on the TCC's website, please email us at BSASurvivors@pszjlaw.com<mailto:BSASurvivors@pszjlaw.com>.

The information contained in this communication and its attachment(s) is intended only for the use of the individual to whom it is addressed and may contain information that is privileged, confidential, or exempt from disclosure. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender and delete the communication without retaining any copies.

The information contained in this communication and its attachment(s) is intended only for the use of the individual to whom it is addressed and may contain information that is privileged, confidential, or exempt from disclosure. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender and delete the communication without retaining any copies.

5:08

Case 20-10343-LSS   Doc 7119-1   Filed 11/10/21   Page 5 of 5
Case 1:21-mc-00011-SPW-TJC   Document 10-3   Filed 11/15/21   Page 49 of 188

# Boy Scouts - Message from Tim Kosnoff - Co-Counsel to AIS Survivors ☆ > Inbox

**BSA Survivors** 4:12 PM
to me ⌄

Dear Clients of AIS:

Today the e-Ballot went out to you a few minutes ago from Eisenberg Rothweiler. I was not expecting it to be sent by that firm. I was not given an opportunity to review it and the reason is because that firm knew I would have objected to its form and content. It was wholly improper and possibly illegal for them to solicit your vote on a ballot that is supposed to be neutral. Instead they used deceit to spew their patently false and misleading statements. There is a simple word for why lawyers do things like that: greed.

Please find my October 19, 2021 letter urging you to REJECT the Plan. I ask you respectfully to read my letter again. If you do, I am confident you will reach the same conclusions I did.

Please stay current on what is happening by following me on Twitter @sexabuseattys. Please feel free to call me or email me with any questions you may have. My email is tim@kosnoff.com<mailto:tim@kosnoff.com>. My cell number is 425-830-8201. I respectfully urge you to listen to the lawyer that listens to you and returns your phone calls.

Thank you.

Timothy Kosnoff

TIMOTHY D. KOSNOFF

**<u>EXHIBIT 2</u>**

**Emails from David Molton dated November 6, 2021**

| | |
|---|---|
| **From:** | Molton, David J. <DMolton@brownrudnick.com> |
| **Sent:** | Saturday, November 6, 2021 8:51 PM |
| **To:** | Lauria (Boelter), Jessica; Andolina, Michael; Linder, Matthew |
| **Subject:** | Fwd: BSA |
| **Attachments:** | Boy Scouts - Message from Tim Kosnoff - Co-Counsel to AIS Survivors |

FYI.

David J. Molton
Brown Rudnick LLP
7 Times Square
New York, NY.  10036
Office:  212-209-4822
Cell:     646-853-5408

Begin forwarded message:

> **From:** "Molton, David J." <DMolton@brownrudnick.com>
> **Date:** November 6, 2021 at 6:05:22 PM EDT
> **To:** jstang@pszjlaw.com
> **Cc:** jlucas@pszjlaw.com, "Axelrod, Tristan G." <TAxelrod@brownrudnick.com>, "Goodman, Eric R." <EGoodman@brownrudnick.com>
> **Subject: BSA**
>
> Jim:
>
> I just tried to call you.
>
> Please see the attached letter from Tim Kosnoff that was circulated to the entire TCC BSA list serve over your firm's email address.
>
> How did this happen?? Did you or anyone on your team authorize this??
>
> The TCC is a fiduciary for all survivors. It is an incredible and unconscionable breach of that duty for one counsel to appropriate and utilize the TCC's list serve for his own purposes and send a letter that may reach clients he claims he represents, and certainly and improperly reaches survivors who you know are represented by other lawyers. Further, how is it possibly appropriate for the TCC to effectuate communications from an outside counsel to its own clients?
>
> That you have allowed your own communications vehicle to be hijacked by a person whose

1

credibility you have spent much of the last year attacking is, of itself, shocking.

Please explain immediately how this happened. We insist that you take immediate steps now to remedy this. Please explain now how you intend to do so.

The Coalition reserves all rights.


David J. Molton
Brown Rudnick LLP
7 Times Square
New York, NY.  10036
Office:  212-209-4822
Cell:    646-853-5408


**********************************************************************************

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Brown Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy or distribution.

To the extent Brown Rudnick is a "controller" of the "personal data" (as each term is defined in the European General Data Protection Regulation (EU/2016/679) or in the UK's Data Protection Act 2018) you have provided to us in this and other communications between us, please see our privacy statement and summary here which sets out details of the controller, the personal data we have collected, the purposes for which we use it (including any legitimate interests on which we rely), the persons to whom we may transfer the data and when and how we intend to transfer it outside the European Economic Area.

**********************************************************************************

| | |
|---|---|
| **From:** | BSA Survivors <BSASurvivors@pszjlaw.com> |
| **Sent:** | Saturday, November 6, 2021 3:16 PM |
| **To:** | ▮▮▮▮▮▮▮ |
| **Subject:** | Boy Scouts - Message from Tim Kosnoff - Co-Counsel to AIS Survivors |
| **Attachments:** | TK-letter-to-clients.pdf |

Dear Clients of AIS:

Today the e-Ballot went out to you a few minutes ago from Eisenberg Rothweiler. I was not expecting it to be sent by that firm. I was not given an opportunity to review it and the reason is because that firm knew I would have objected to its form and content. It was wholly improper and possibly illegal for them to solicit your vote on a ballot that is supposed to be neutral. Instead they used deceit to spew their patently false and misleading statements. There is a simple word for why lawyers do things like that:  greed.

Please find my October 19, 2021 letter urging you to REJECT the Plan. I ask you respectfully to read my letter again. If you do, I am confident you will reach the same conclusions I did.

Please stay current on what is happening by following me on Twitter @sexabuseattys. Please feel free to call me or email me with any questions you may have. My email is tim@kosnoff.com<mailto:tim@kosnoff.com>. My cell number is 425-830-8201. I respectfully urge you to listen to the lawyer that listens to you and returns your phone calls.

Thank you.

Timothy Kosnoff


TIMOTHY D. KOSNOFF
Licensed Attorney

U.S. Mailing address:

1321 Upland Drive
PMB 4685
Houston, TX 77043
USA

Direct: 425-837-9690
Main:    206-257-3590
Fax:    206-837-9690
Toll free:  855-LAW4CSA

tim@kosnoff.com<mailto:tim@kosnoff.com>

**KOSNOFF LAW PLLC.**

A PROFESSIONAL SERVICE CORPORATION

7001 Seaview Ave N.W.

SEATTLE, WASHINGTON 98117

**TELEPHONE: (425) 837-9690**

Mail Forwarding Service: 1321 Upland Drive, PMB 4685, Houston, TX 77043

**Timothy D. Kosnoff**
Direct: 425-830-8201

E-mail: tim@kosnoff.com

## KOSNOFF LAW RECOMMENDS THAT ABUSED IN SCOUTING CLIENTS <u>VOTE TO REJECT</u> THE BOY SCOUT PLAN

Dear Clients,

I am the founder of a movement known informally as Abused in Scouting. I have represented child abuse survivors in civil litigation since 1996. I have successfully litigated in state courts on behalf of men abused as scouts in courts throughout the country and have tried seven child sexual abuse civil jury trials, five to verdict. In short, no attorney in the country has more experience in representing victims like you than I have.

My firm recruited Eisenberg Rothweiler law firm and AVA law firm in 2019 to join me in an effort to reach out to men abused as boys in the Boy Scouts of America when I learned that the BSA intended to permanently extinguish the legal rights of men abused in scouting for over a century. We are co-counsel for all of you.

The Boy Scouts' bankruptcy case has reached an important juncture. You need to decide whether to vote for or against the Boy Scouts' reorganization plan that would define your rights going forward. As your attorneys, it is our job to give you the best advice we can based on our experience and a true and accurate explanation of the facts. But this decision is yours to make.

My advice to you is the **opposite** of the advice that the Eisenberg Rothweiler law firm has given you. **I strongly urge you to VOTE NO**. Let me explain why I fervently disagree with my co-counsel and the group of six law firms that supports the Boy Scout's plan and calls itself the Coalition. The reasons for my disagreement with them are numerous and are based on my analysis of the objective facts and my decades of experience in exactly this kind of case.

A U.S. Senator once said, "You are entitled to your own opinions, but you are not entitled to your own facts." The supporters of the BSA Plan are telling you their opinions. But those opinions are not supported by the facts or the truth. Here are the facts and the conclusions I have drawn from them after considering how the BSA Plan will affect you.

**KOSNOFF LAW**

October 18, 2021
Page 2

- **The BSA Plan will not compensate survivors fairly**.

    While $1.854 billion is an enormous amount of money, the number of sexual abuse claims filed in the Boy Scout's case sadly makes $1.854 billion a very small amount of money. The settlement trust expenses (which must be paid first) could be as high as 10%, which reduces the average payment per survivor to approximately $17,000. If some survivors are paid more, that means most of the other survivors will receive much less or nothing at all. Under your engagement letter with AIS, your payment will be reduced by 40% to pay for the attorneys' share of the payment.

- **Why are the numbers so low**?

    There are law firms that do not specialize in this type of work who borrowed millions of dollars from Wall Street hedge funds to run TV ad campaigns and finance the cost of their collection of claims from survivors. These are the same firms you see running ads for other injury cases like asbestos, opioids, vaginal mesh, baby powder talc, etc. Those law firms came into the Boy Scout's bankruptcy case and have treated survivors like "inventories" for the sole purpose of collecting their contingency fee. While you and other survivors might not receive large or meaningful payments, the "mass tort" lawyers will because they will take a piece of your payment which under the current $1.854 billion settlement fund will total more than $425 million.

    The Boy Scouts, Local Councils, and Hartford Insurance Company ("Hartford") negotiated with the "mass tort" lawyers instead of the Official Tort Claimants' Committee (the "TCC") because the "mass tort" lawyers were willing to accept much less as compensation for your claims.

- **Why was the Hartford Insurance settlement a cheap deal?**

    Hartford, the only settling insurer to date, has agreed to pay $787 million to settle with all of you.  That amount is a tiny fraction of the coverage it is contractually obligated to pay. For example, let's consider only penetration claims in states where the statute of limitations is not a barrier to recover.  The face value of Hartford's insurance coverage for the year 1972 *alone* is more than $800 million.  And yet, the Coalition and Eisenberg Rothweiler want you to vote for a plan that pays less than that amount without taking into account the thousands of other claims in the same year and the many other thousands in 1971, 1973, 1974, 1975, and all the other years Hartford provided insurance coverage.

    Making matters even worse, the $787 million dollar settlement would not be dedicated to the specific survivor claims that trigger Hartford's policies.  Instead, the $787 million will be used to pay all survivors even if their claims did not trigger a Hartford policy.

**KOSNOFF LAW**

October 18, 2021
Page 3

After all is said and done, the Hartford settlement would only yield approximately $8,500 per survivor after accounting for trust expenses and overhead.  I cannot support a plan that is so generous to an insurance company and provides such a meager recovery for all of you.  I urge you to reject it.

- **The BSA Plan cuts a cheap deal with the BSA local councils which are legally separate entities in exchange for complete legal immunity from separate claims you have against the local council in which you were abused.**

Eisenberg Rothweiler and the Coalition offered to settle with the Local Councils before undertaking any review of the claims or financial analysis of the Local Councils. In short, the Coalition blindly offered to settle for $600 million when the TCC demonstrated to the Coalition that the Local Councils had the ability to pay more than three times that amount without endangering their Scouting mission.

I find the Coalition's agreement (and Eisenberg Rothweiler's support of it) to be outrageous.  The Plan releases the Local Councils from responsibility for the harm they caused you and requires them to pay far less than they can afford.

- **The Chartered Organizations that founded and ran your troop, including churches, schools, civic organizations, YMCA, etc. are getting a release for free for all claims after 1975 for not objecting to the Plan.**

Under the terms of BSA's Plan, Chartered Organizations do not pay a cent, but nevertheless receive broad releases for more than 40 years of sexual abuse claims (1976-2020). Instead, Chartered Organizations receive a release of their sexual abuse liability in exchange for a transfer of their interests in insurance policies purchased by the BSA and Local Councils.  You might ask how that can possibly be fair to you.  It cannot be and, in fact, is terribly unfair to you.

- **BSA's Plan includes a $250 million settlement with the Mormon Church (TCJC) which had direct involvement in every aspect of the Scouting program for 100 years. The $250 million settlement is tiny in comparison to the Church's legal exposure and its available assets which are in the billions of dollars.**

The $250 million is not only far below the level of its culpability for abuse in TCJC wards, but it will only be distributed to survivors who have claims against the Mormon Church. Therefore, most of you will not benefit at all from this arrangement.

- **Rejection of the Plan does not mean many more years of waiting. It means the BSA and the other entities will quickly come back to the negotiating table and finally be serious**

**KOSNOFF LAW**

October 18, 2021
Page 4

**about fairly compensating survivors. A YES vote would likely mean years of appeals and probable rejection of the Plan by a higher court.**

The Boy Scout's "melting ice cube" defense is a hoax. The Boy Scouts hold hundreds of millions in cash and other assets that it designates as "restricted" and not available to pay you. It is hard to understand how that money is not available to pay you when the money was made available to provide the framework that led to your sexual abuse. In the end, the Boy Scouts are ready and willing to cut any deal they can, because they will be protected by a bankruptcy discharge while your claims will be left to the "mass tort" lawyers to take their share then leave you with crumbs.

•    **There are grave *legal* problems with the BSA Plan even assuming it does receive the required two-thirds of the survivors' votes.  Those problems will delay this case for years. That is why it is critical that each and every one of you vote and that you vote NO**.

Under the BSA Plan, the Boy Scouts and the Coalition are trying to remove the insurance companies' contractual rights.  It is unclear if that effort will be successful, but it is sure to delay payments to survivors,  because the insurance companies will surely keep the case tied up in appeals and many years of litigation over their rights and obligations to provide any coverage.

Insurance coverage issues create other huge legal problem with the BSA Plan.  For example, the insurance companies will dispute they have to provide coverage to sexual abuse claims. The bankruptcy judge has acknowledged that she will not determine insurance coverage issues. Under the Plan, the Trust Distribution Procedures provides for the appointment of a Settlement Trustee who would evaluate all the survivor claims and make awards that would be legally binding on the insurance companies to pay. There is absolutely no legal support that would permit this and **ample law that says it cannot be done.**  The insurance companies will appeal this and stretch your claims out for years to come.

•    The TCC is made up of 9 survivors of scout leader abuse, just like you. They have served tirelessly for 20 months. They are not paid for their service. They have a fiduciary duty to all the survivors to advocate for your best interests. The TCC urges survivors to **REJECT** the BSA Plan. There is nothing in it for them except the pride that comes from doing their best for you.

•    **The TCC was shut out of the backrooms where these cheap, foolhardy deals were cut by the Coalition and Eisenberg Rothweiler.**

The TCC has its own Plan. For many months, it has been forbidden by the court to file its own Plan or to even talk about it until now. The TCC has the legal right to file its own bankruptcy plan starting next week. I don't know what it contains or if I will eventually support it but I want

**KOSNOFF LAW**

October 18, 2021
Page 5


to see it, because the BSA Plan is a disaster for all survivors. We can only go up from here. But first survivors must send a resounding message to all the players that the BSA Plan is a big fat **<u>NO!</u>**

<u>**CONCLUSION**</u>

Your claims deserve fair compensation paid by those who are responsible for your pain and anguish.  The Boy Scouts, Local Councils and Chartered Organizations are at fault and have the resources to compensate you adequately.  The insurance companies have contractual obligations and the resources to live up to their contracts.  The BSA Plan shortchanges you and lets responsible parties off the hook.  That Plan compensates mass tort lawyers and paper pushers without adequately providing for you.

The BSA Plan is unacceptable.  I urge you, therefore, to vote NO on the BSA Plan.

As always, please feel free to contact me at any time with your questions and comments. Thank you for the honor of representing you.

Very truly yours,

TIMOTHY D. KOSNOFF

| | |
|---|---|
| **From:** | Molton, David J. <DMolton@brownrudnick.com> |
| **Sent:** | Saturday, November 6, 2021 8:52 PM |
| **To:** | Lauria (Boelter), Jessica; Andolina Michael; Linder, Matthew |
| **Subject:** | Fwd: Boy Scouts - Message from Tim Kosnoff - Co-Counsel to AIS Survivors |
| **Attachments:** | TK-letter-to-clients.pdf |

FYI. We need to discuss ASAP

David J. Molton
Brown Rudnick LLP
7 Times Square
New York, NY.  10036
Office:  212-209-4822
Cell:    646-853-5408

Begin forwarded message:

> **From:** "Molton, David J." <DMolton@brownrudnick.com>
> **Date:** November 6, 2021 at 7:11:58 PM EDT
> **To:** jstang@pszjlaw.com, Kortmann Lucas <lucas.kortmann@resor.nl>
> **Cc:** "Axelrod, Tristan G." <TAxelrod@brownrudnick.com>, "Goodman, Eric R."
> <EGoodman@brownrudnick.com>
> **Subject: Fwd: Boy Scouts - Message from Tim Kosnoff - Co-Counsel to AIS
> Survivors**
>
>  Jim:
>
> In reference to my earlier email, I just received this (see below). This is absolutely
> inexcusable. How are you addressing and solving this. Please respond.
>
> We reserve all rights.
>
> David J. Molton
> Brown Rudnick LLP
> 7 Times Square
> New York, NY.  10036
> Office:  212-209-4822
> Cell:    646-853-5408
>
> Begin forwarded message:
>
>> **From:** BSA Survivors <BSASurvivors@pszjlaw.com>
>> **Date:** November 6, 2021 at 7:02:15 PM EDT

1

**To:** "Molton, David J." <DMolton@brownrudnick.com>
**Subject: Boy Scouts - Message from Tim Kosnoff - Co-Counsel to AIS Survivors**

CAUTION: External E-mail. Use caution accessing links or attachments.

Dear Clients of AIS:

Today the e-Ballot went out to you a few minutes ago from Eisenberg Rothweiler. I was not expecting it to be sent by that firm. I was not given an opportunity to review it and the reason is because that firm knew I would have objected to its form and content. It was wholly improper and possibly illegal for them to solicit your vote on a ballot that is supposed to be neutral. Instead they used deceit to spew their patently false and misleading statements. There is a simple word for why lawyers do things like that:  greed.

Please find my October 19, 2021 letter urging you to REJECT the Plan. I ask you respectfully to read my letter again. If you do, I am confident you will reach the same conclusions I did.

Please stay current on what is happening by following me on Twitter @sexabuseattys. Please feel free to call me or email me with any questions you may have. My email is tim@kosnoff.com<mailto:tim@kosnoff.com>. My cell number is 425-830-8201. I respectfully urge you to listen to the lawyer that listens to you and returns your phone calls.

Thank you.

Timothy Kosnoff


TIMOTHY D. KOSNOFF
Licensed Attorney

U.S. Mailing address:

1321 Upland Drive
PMB 4685
Houston, TX 77043
USA

Direct: 425-837-9690
Main:     206-257-3590
Fax:      206-837-9690
Toll free:  855-LAW4CSA

tim@kosnoff.com<mailto:tim@kosnoff.com>

*********************************************************************************

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Brown Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy or distribution.

To the extent Brown Rudnick is a "controller" of the "personal data" (as each term is defined in the European General Data Protection Regulation (EU/2016/679) or in the UK's Data Protection Act 2018) you have provided to us in this and other communications between us, please see our privacy statement and summary here which sets out details of the controller, the personal data we have collected, the purposes for which we use it (including any legitimate interests on which we rely), the persons to whom we may transfer the data and when and how we intend to transfer it outside the European Economic Area.

*********************************************************************************

## KOSNOFF LAW PLLC.

A PROFESSIONAL SERVICE CORPORATION

7001 Seaview Ave N.W.
SEATTLE, WASHINGTON 98117
**TELEPHONE: (425) 837-9690**

**Mail Forwarding Service: 1321 Upland Drive, PMB 4685, Houston, TX 77043**

**Timothy D. Kosnoff**
Direct: 425-830-8201

E-mail: tim@kosnoff.com

## KOSNOFF LAW RECOMMENDS THAT ABUSED IN SCOUTING CLIENTS <u>VOTE TO REJECT</u> THE BOY SCOUT PLAN

Dear Clients,

I am the founder of a movement known informally as Abused in Scouting. I have represented child abuse survivors in civil litigation since 1996. I have successfully litigated in state courts on behalf of men abused as scouts in courts throughout the country and have tried seven child sexual abuse civil jury trials, five to verdict. In short, no attorney in the country has more experience in representing victims like you than I have.

My firm recruited Eisenberg Rothweiler law firm and AVA law firm in 2019 to join me in an effort to reach out to men abused as boys in the Boy Scouts of America when I learned that the BSA intended to permanently extinguish the legal rights of men abused in scouting for over a century. We are co-counsel for all of you.

The Boy Scouts' bankruptcy case has reached an important juncture. You need to decide whether to vote for or against the Boy Scouts' reorganization plan that would define your rights going forward. As your attorneys, it is our job to give you the best advice we can based on our experience and a true and accurate explanation of the facts. But this decision is yours to make.

My advice to you is the **<u>opposite</u>** of the advice that the Eisenberg Rothweiler law firm has given you. **<u>I strongly urge you to VOTE NO</u>**. Let me explain why I fervently disagree with my co-counsel and the group of six law firms that supports the Boy Scout's plan and calls itself the Coalition. The reasons for my disagreement with them are numerous and are based on my analysis of the objective facts and my decades of experience in exactly this kind of case.

A U.S. Senator once said, "You are entitled to your own opinions, but you are not entitled to your own facts." The supporters of the BSA Plan are telling you their opinions. But those opinions are not supported by the facts or the truth. Here are the facts and the conclusions I have drawn from them after considering how the BSA Plan will affect you.

**KOSNOFF LAW**

October 18, 2021
Page 2

- **The BSA Plan will not compensate survivors fairly**.

    While $1.854 billion is an enormous amount of money, the number of sexual abuse claims filed in the Boy Scout's case sadly makes $1.854 billion a very small amount of money. The settlement trust expenses (which must be paid first) could be as high as 10%, which reduces the average payment per survivor to approximately $17,000. If some survivors are paid more, that means most of the other survivors will receive much less or nothing at all. Under your engagement letter with AIS, your payment will be reduced by 40% to pay for the attorneys' share of the payment.

- **Why are the numbers so low**?

    There are law firms that do not specialize in this type of work who borrowed millions of dollars from Wall Street hedge funds to run TV ad campaigns and finance the cost of their collection of claims from survivors. These are the same firms you see running ads for other injury cases like asbestos, opioids, vaginal mesh, baby powder talc, etc. Those law firms came into the Boy Scout's bankruptcy case and have treated survivors like "inventories" for the sole purpose of collecting their contingency fee. While you and other survivors might not receive large or meaningful payments, the "mass tort" lawyers will because they will take a piece of your payment which under the current $1.854 billion settlement fund will total more than $425 million.

    The Boy Scouts, Local Councils, and Hartford Insurance Company ("Hartford") negotiated with the "mass tort" lawyers instead of the Official Tort Claimants' Committee (the "TCC") because the "mass tort" lawyers were willing to accept much less as compensation for your claims.

- **Why was the Hartford Insurance settlement a cheap deal?**

    Hartford, the only settling insurer to date, has agreed to pay $787 million to settle with all of you. That amount is a tiny fraction of the coverage it is contractually obligated to pay. For example, let's consider only penetration claims in states where the statute of limitations is not a barrier to recover. The face value of Hartford's insurance coverage for the year 1972 *alone* is more than $800 million. And yet, the Coalition and Eisenberg Rothweiler want you to vote for a plan that pays less than that amount without taking into account the thousands of other claims in the same year and the many other thousands in 1971, 1973, 1974, 1975, and all the other years Hartford provided insurance coverage.

    Making matters even worse, the $787 million dollar settlement would not be dedicated to the specific survivor claims that trigger Hartford's policies. Instead, the $787 million will be used to pay all survivors even if their claims did not trigger a Hartford policy.

**KOSNOFF LAW**

October 18, 2021
Page 3

After all is said and done, the Hartford settlement would only yield approximately $8,500 per survivor after accounting for trust expenses and overhead.  I cannot support a plan that is so generous to an insurance company and provides such a meager recovery for all of you.  I urge you to reject it.

- **The BSA Plan cuts a cheap deal with the BSA local councils which are legally separate entities in exchange for complete legal immunity from separate claims you have against the local council in which you were abused.**

Eisenberg Rothweiler and the Coalition offered to settle with the Local Councils before undertaking any review of the claims or financial analysis of the Local Councils. In short, the Coalition blindly offered to settle for $600 million when the TCC demonstrated to the Coalition that the Local Councils had the ability to pay more than three times that amount without endangering their Scouting mission.

I find the Coalition's agreement (and Eisenberg Rothweiler's support of it) to be outrageous.  The Plan releases the Local Councils from responsibility for the harm they caused you and requires them to pay far less than they can afford.

- **The Chartered Organizations that founded and ran your troop, including churches, schools, civic organizations, YMCA, etc. are getting a release for free for all claims after 1975 for not objecting to the Plan.**

Under the terms of BSA's Plan, Chartered Organizations do not pay a cent, but nevertheless receive broad releases for more than 40 years of sexual abuse claims (1976-2020). Instead, Chartered Organizations receive a release of their sexual abuse liability in exchange for a transfer of their interests in insurance policies purchased by the BSA and Local Councils.  You might ask how that can possibly be fair to you.  It cannot be and, in fact, is terribly unfair to you.

- **BSA's Plan includes a $250 million settlement with the Mormon Church (TCJC) which had direct involvement in every aspect of the Scouting program for 100 years. The $250 million settlement is tiny in comparison to the Church's legal exposure and its available assets which are in the billions of dollars.**

The $250 million is not only far below the level of its culpability for abuse in TCJC wards, but it will only be distributed to survivors who have claims against the Mormon Church. Therefore, most of you will not benefit at all from this arrangement.

- **Rejection of the Plan does not mean many more years of waiting. It means the BSA and the other entities will quickly come back to the negotiating table and finally be serious**

**KOSNOFF LAW**

October 18, 2021
Page 4

**about fairly compensating survivors. A YES vote would likely mean years of appeals and probable rejection of the Plan by a higher court.**

The Boy Scout's "melting ice cube" defense is a hoax. The Boy Scouts hold hundreds of millions in cash and other assets that it designates as "restricted" and not available to pay you. It is hard to understand how that money is not available to pay you when the money was made available to provide the framework that led to your sexual abuse. In the end, the Boy Scouts are ready and willing to cut any deal they can, because they will be protected by a bankruptcy discharge while your claims will be left to the "mass tort" lawyers to take their share then leave you with crumbs.

- **There are grave *legal* problems with the BSA Plan even assuming it does receive the required two-thirds of the survivors' votes.  Those problems will delay this case for years. That is why it is critical that each and every one of you vote and that you vote NO**.

Under the BSA Plan, the Boy Scouts and the Coalition are trying to remove the insurance companies' contractual rights.  It is unclear if that effort will be successful, but it is sure to delay payments to survivors,  because the insurance companies will surely keep the case tied up in appeals and many years of litigation over their rights and obligations to provide any coverage.

Insurance coverage issues create other huge legal problem with the BSA Plan.  For example, the insurance companies will dispute they have to provide coverage to sexual abuse claims. The bankruptcy judge has acknowledged that she will not determine insurance coverage issues. Under the Plan, the Trust Distribution Procedures provides for the appointment of a Settlement Trustee who would evaluate all the survivor claims and make awards that would be legally binding on the insurance companies to pay. There is absolutely no legal support that would permit this and **ample law that says it cannot be done.**  The insurance companies will appeal this and stretch your claims out for years to come.

- The TCC is made up of 9 survivors of scout leader abuse, just like you. They have served tirelessly for 20 months. They are not paid for their service. They have a fiduciary duty to all the survivors to advocate for your best interests. The TCC urges survivors to **REJECT** the BSA Plan. There is nothing in it for them except the pride that comes from doing their best for you.

- **The TCC was shut out of the backrooms where these cheap, foolhardy deals were cut by the Coalition and Eisenberg Rothweiler.**

The TCC has its own Plan. For many months, it has been forbidden by the court to file its own Plan or to even talk about it until now. The TCC has the legal right to file its own bankruptcy plan starting next week. I don't know what it contains or if I will eventually support it but I want

**KOSNOFF LAW**

October 18, 2021
Page 5

to see it, because the BSA Plan is a disaster for all survivors. We can only go up from here. But first survivors must send a resounding message to all the players that the BSA Plan is a big fat **<u>NO!</u>**

### <u>CONCLUSION</u>

Your claims deserve fair compensation paid by those who are responsible for your pain and anguish.  The Boy Scouts, Local Councils and Chartered Organizations are at fault and have the resources to compensate you adequately.  The insurance companies have contractual obligations and the resources to live up to their contracts.  The BSA Plan shortchanges you and lets responsible parties off the hook.  That Plan compensates mass tort lawyers and paper pushers without adequately providing for you.

The BSA Plan is unacceptable.  I urge you, therefore, to vote NO on the BSA Plan.

As always, please feel free to contact me at any time with your questions and comments. Thank you for the honor of representing you.

Very truly yours,

*Timothy D. Kosnoff*

TIMOTHY D. KOSNOFF

# **EXHIBIT 3**

**TCC/Kosnoff Communications**

| | |
|---|---|
| **From:** | BSA Survivors <BSASurvivors@pszjlaw.com> |
| **Sent:** | Saturday, November 6, 2021 3:16 PM |
| **To:** | ▮▮▮▮▮▮▮ |
| **Subject:** | Boy Scouts - Message from Tim Kosnoff - Co-Counsel to AIS Survivors |
| **Attachments:** | TK-letter-to-clients.pdf |

Dear Clients of AIS:

Today the e-Ballot went out to you a few minutes ago from Eisenberg Rothweiler. I was not expecting it to be sent by that firm. I was not given an opportunity to review it and the reason is because that firm knew I would have objected to its form and content. It was wholly improper and possibly illegal for them to solicit your vote on a ballot that is supposed to be neutral. Instead they used deceit to spew their patently false and misleading statements. There is a simple word for why lawyers do things like that:  greed.

Please find my October 19, 2021 letter urging you to REJECT the Plan. I ask you respectfully to read my letter again. If you do, I am confident you will reach the same conclusions I did.

Please stay current on what is happening by following me on Twitter @sexabuseattys. Please feel free to call me or email me with any questions you may have. My email is tim@kosnoff.com<mailto:tim@kosnoff.com>. My cell number is 425-830-8201. I respectfully urge you to listen to the lawyer that listens to you and returns your phone calls.

Thank you.

Timothy Kosnoff


TIMOTHY D. KOSNOFF
Licensed Attorney

U.S. Mailing address:

1321 Upland Drive
PMB 4685
Houston, TX 77043
USA

Direct: 425-837-9690
Main:     206-257-3590
Fax:      206-837-9690
Toll free:  855-LAW4CSA

tim@kosnoff.com<mailto:tim@kosnoff.com>

**KOSNOFF LAW PLLC.**

A PROFESSIONAL SERVICE CORPORATION

7001 Seaview Ave N.W.

SEATTLE, WASHINGTON 98117

**TELEPHONE: (425) 837-9690**

Mail Forwarding Service: 1321 Upland Drive, PMB 4685, Houston, TX 77043

**Timothy D. Kosnoff**
Direct: 425-830-8201

E-mail: tim@kosnoff.com

## KOSNOFF LAW RECOMMENDS THAT ABUSED IN SCOUTING CLIENTS <u>VOTE TO REJECT</u> THE BOY SCOUT PLAN

Dear Clients,

I am the founder of a movement known informally as Abused in Scouting. I have represented child abuse survivors in civil litigation since 1996. I have successfully litigated in state courts on behalf of men abused as scouts in courts throughout the country and have tried seven child sexual abuse civil jury trials, five to verdict. In short, no attorney in the country has more experience in representing victims like you than I have.

My firm recruited Eisenberg Rothweiler law firm and AVA law firm in 2019 to join me in an effort to reach out to men abused as boys in the Boy Scouts of America when I learned that the BSA intended to permanently extinguish the legal rights of men abused in scouting for over a century. We are co-counsel for all of you.

The Boy Scouts' bankruptcy case has reached an important juncture. You need to decide whether to vote for or against the Boy Scouts' reorganization plan that would define your rights going forward. As your attorneys, it is our job to give you the best advice we can based on our experience and a true and accurate explanation of the facts. But this decision is yours to make.

My advice to you is the **<u>opposite</u>** of the advice that the Eisenberg Rothweiler law firm has given you. **<u>I strongly urge you to VOTE NO</u>**. Let me explain why I fervently disagree with my co-counsel and the group of six law firms that supports the Boy Scout's plan and calls itself the Coalition. The reasons for my disagreement with them are numerous and are based on my analysis of the objective facts and my decades of experience in exactly this kind of case.

A U.S. Senator once said, "You are entitled to your own opinions, but you are not entitled to your own facts." The supporters of the BSA Plan are telling you their opinions. But those opinions are not supported by the facts or the truth. Here are the facts and the conclusions I have drawn from them after considering how the BSA Plan will affect you.

**KOSNOFF LAW**

October 18, 2021
Page 2

- **The BSA Plan will not compensate survivors fairly**.

    While $1.854 billion is an enormous amount of money, the number of sexual abuse claims filed in the Boy Scout's case sadly makes $1.854 billion a very small amount of money. The settlement trust expenses (which must be paid first) could be as high as 10%, which reduces the average payment per survivor to approximately $17,000. If some survivors are paid more, that means most of the other survivors will receive much less or nothing at all. Under your engagement letter with AIS, your payment will be reduced by 40% to pay for the attorneys' share of the payment.

- **Why are the numbers so low**?

    There are law firms that do not specialize in this type of work who borrowed millions of dollars from Wall Street hedge funds to run TV ad campaigns and finance the cost of their collection of claims from survivors. These are the same firms you see running ads for other injury cases like asbestos, opioids, vaginal mesh, baby powder talc, etc.  Those law firms came into the Boy Scout's bankruptcy case and have treated survivors like "inventories" for the sole purpose of collecting their contingency fee. While you and other survivors might not receive large or meaningful payments, the "mass tort" lawyers will because they will take a piece of your payment which under the current $1.854 billion settlement fund will total more than $425 million.

    The Boy Scouts, Local Councils, and Hartford Insurance Company ("Hartford") negotiated with the "mass tort" lawyers instead of the Official Tort Claimants' Committee (the "TCC") because the "mass tort" lawyers were willing to accept much less as compensation for your claims.

- **Why was the Hartford Insurance settlement a cheap deal?**

    Hartford, the only settling insurer to date, has agreed to pay $787 million to settle with all of you.  That amount is a tiny fraction of the coverage it is contractually obligated to pay. For example, let's consider only penetration claims in states where the statute of limitations is not a barrier to recover.  The face value of Hartford's insurance coverage for the year 1972 *alone* is more than $800 million.  And yet, the Coalition and Eisenberg Rothweiler want you to vote for a plan that pays less than that amount without taking into account the thousands of other claims in the same year and the many other thousands in 1971, 1973, 1974, 1975, and all the other years Hartford provided insurance coverage.

    Making matters even worse, the $787 million dollar settlement would not be dedicated to the specific survivor claims that trigger Hartford's policies.  Instead, the $787 million will be used to pay all survivors even if their claims did not trigger a Hartford policy.

**KOSNOFF LAW**

October 18, 2021
Page 3

After all is said and done, the Hartford settlement would only yield approximately $8,500 per survivor after accounting for trust expenses and overhead.  I cannot support a plan that is so generous to an insurance company and provides such a meager recovery for all of you.  I urge you to reject it.

- **The BSA Plan cuts a cheap deal with the BSA local councils which are legally separate entities in exchange for complete legal immunity from separate claims you have against the local council in which you were abused.**

Eisenberg Rothweiler and the Coalition offered to settle with the Local Councils before undertaking any review of the claims or financial analysis of the Local Councils. In short, the Coalition blindly offered to settle for $600 million when the TCC demonstrated to the Coalition that the Local Councils had the ability to pay more than three times that amount without endangering their Scouting mission.

I find the Coalition's agreement (and Eisenberg Rothweiler's support of it) to be outrageous.  The Plan releases the Local Councils from responsibility for the harm they caused you and requires them to pay far less than they can afford.

- **The Chartered Organizations that founded and ran your troop, including churches, schools, civic organizations, YMCA, etc. are getting a release for free for all claims after 1975 for not objecting to the Plan.**

Under the terms of BSA's Plan, Chartered Organizations do not pay a cent, but nevertheless receive broad releases for more than 40 years of sexual abuse claims (1976-2020). Instead, Chartered Organizations receive a release of their sexual abuse liability in exchange for a transfer of their interests in insurance policies purchased by the BSA and Local Councils.  You might ask how that can possibly be fair to you.  It cannot be and, in fact, is terribly unfair to you.

- **BSA's Plan includes a $250 million settlement with the Mormon Church (TCJC) which had direct involvement in every aspect of the Scouting program for 100 years. The $250 million settlement is tiny in comparison to the Church's legal exposure and its available assets which are in the billions of dollars.**

The $250 million is not only far below the level of its culpability for abuse in TCJC wards, but it will only be distributed to survivors who have claims against the Mormon Church. Therefore, most of you will not benefit at all from this arrangement.

- **Rejection of the Plan does not mean many more years of waiting. It means the BSA and the other entities will quickly come back to the negotiating table and finally be serious**

**KOSNOFF LAW**

October 18, 2021
Page 4

**about fairly compensating survivors. A YES vote would likely mean years of appeals and probable rejection of the Plan by a higher court.**

The Boy Scout's "melting ice cube" defense is a hoax. The Boy Scouts hold hundreds of millions in cash and other assets that it designates as "restricted" and not available to pay you. It is hard to understand how that money is not available to pay you when the money was made available to provide the framework that led to your sexual abuse. In the end, the Boy Scouts are ready and willing to cut any deal they can, because they will be protected by a bankruptcy discharge while your claims will be left to the "mass tort" lawyers to take their share then leave you with crumbs.

• **There are grave *legal* problems with the BSA Plan even assuming it does receive the required two-thirds of the survivors' votes.  Those problems will delay this case for years. That is why it is critical that each and every one of you vote and that you vote NO**.

Under the BSA Plan, the Boy Scouts and the Coalition are trying to remove the insurance companies' contractual rights.  It is unclear if that effort will be successful, but it is sure to delay payments to survivors,  because the insurance companies will surely keep the case tied up in appeals and many years of litigation over their rights and obligations to provide any coverage.

Insurance coverage issues create other huge legal problem with the BSA Plan.  For example, the insurance companies will dispute they have to provide coverage to sexual abuse claims. The bankruptcy judge has acknowledged that she will not determine insurance coverage issues. Under the Plan, the Trust Distribution Procedures provides for the appointment of a Settlement Trustee who would evaluate all the survivor claims and make awards that would be legally binding on the insurance companies to pay. There is absolutely no legal support that would permit this and **ample law that says it cannot be done.**  The insurance companies will appeal this and stretch your claims out for years to come.

• The TCC is made up of 9 survivors of scout leader abuse, just like you. They have served tirelessly for 20 months. They are not paid for their service. They have a fiduciary duty to all the survivors to advocate for your best interests. The TCC urges survivors to **REJECT** the BSA Plan. There is nothing in it for them except the pride that comes from doing their best for you.

• **The TCC was shut out of the backrooms where these cheap, foolhardy deals were cut by the Coalition and Eisenberg Rothweiler.**

The TCC has its own Plan. For many months, it has been forbidden by the court to file its own Plan or to even talk about it until now. The TCC has the legal right to file its own bankruptcy plan starting next week. I don't know what it contains or if I will eventually support it but I want

**KOSNOFF LAW**

October 18, 2021
Page 5

to see it, because the BSA Plan is a disaster for all survivors. We can only go up from here. But first survivors must send a resounding message to all the players that the BSA Plan is a big fat **<u>NO!</u>**

<u>**CONCLUSION**</u>

Your claims deserve fair compensation paid by those who are responsible for your pain and anguish.  The Boy Scouts, Local Councils and Chartered Organizations are at fault and have the resources to compensate you adequately.   The insurance companies have contractual obligations and the resources to live up to their contracts.  The BSA Plan shortchanges you and lets responsible parties off the hook.  That Plan compensates mass tort lawyers and paper pushers without adequately providing for you.

The BSA Plan is unacceptable.  I urge you, therefore, to vote NO on the BSA Plan.

As always, please feel free to contact me at any time with your questions and comments. Thank you for the honor of representing you.

Very truly yours,

TIMOTHY D. KOSNOFF

**<u>EXHIBIT 4</u>**

**October 16, 2020 Hearing Transcript Excerpt**

Case 20-10343-LSS   Doc 7119-4   Filed 11/10/21   Page 2 of 4
Case 1:21-mc-00011-SPW-TJC   Document 10-3   Filed 11/15/21   Page 75 of 188

1

```
 1                   UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2
     IN RE:                        .  Chapter 11
 3                                 .  Case No.: 20-10343 (LSS)
     BOY SCOUTS OF AMERICA AND     .
 4   DELAWARE BSA, LLC,            .  (Jointly Administered)
                                   .
 5                  Debtors.       .
                                   .
 6   . . . . . . . . . . . . . . . .
                                   .
 7   BOY SCOUTS OF AMERICA,        .  Adversary Proceeding No.:
                                   .  20-50527 (LSS)
 8                  Plaintiff,     .
                                   .
 9   v.                            .
                                   .  Courtroom 2
10   A.A., et al.,                 .  824 Market Street
                                   .  Wilmington, Delaware 19801
11                  Defendants.    .
                                   .  Friday, October 16, 2020
12   . . . . . . . . . . . . . . . .  3:34 p.m.

13
           TRANSCRIPT OF HYBRID ZOOM/TELEPHONIC BENCH RULING
14          BEFORE THE HONORABLE LAURIE S. SILVERSTEIN
                 UNITED STATES BANKRUPTCY JUDGE
15

16   For the Coalition
     of Abused Scouts
17   for Justice:            Sunni P. Beville, Esquire
                             BROWN RUDNICK, LLP
18                           One Financial Center
                             Boston, Massachusetts 02111
19

20   Electronically
     Recorded by:            Ginger Mace, ECRO
21
     Transcription Service:  Reliable
22                           1007 N. Orange Street
                             Wilmington, Delaware 19801
23                           Telephone: (302) 654-8080
                             E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

Case 20-10343-LSS    Doc 7119-4    Filed 11/10/21    Page 3 of 4
Case 1:21-mc-00011-SPW-TJC    Document 10-3    Filed 11/15/21    Page 76 of 188

12

1 not, but I did find certain of the cases, again, to be

2 unhelpful to those citing them.

3          Finally, the remedies in the cited cases that were

4 relevant and Rule 2019 cases is disclosure; something that I

5 have already addressed.

6          So, the bottom line is the coalition has satisfied

7 its Rule 2019 disclosure statements, subject to any

8 obligations it has to supplement its filings.

9          Whether other entities need to file a Rule 2019

10 disclosure is something that came to my mind as I did this

11 analysis and I have not looked at all of the parties

12 appearing in front of me to determine whether others should

13 be filed Rule 2019 disclosures, but I suggest that each party

14 consider that and, as appropriate, make filings.

15          Moving on to Century's motion to compel

16 depositions and the motion to quash that was filed in

17 response, because I find that the coalition's Rule 2019

18 disclosures are sufficient, I denied Century's motion to

19 compel the depositions of Mr. Kosnoff and Mr. Van Arsdale.

20 The request was based on the insufficiency of the coalition's

21 Rule 2019 disclosure statement and so there's no basis for it

22 at this time.

23          But in connection with this, let me note that

24 Mr. Kosnoff's email was unfortunate, more than unfortunately,

25 but Mr. Kosnoff's poor judgment in how he expresses himself

1   or how he views other professionals is not, alone, a basis to

2   compel his deposition related to Rule 2019.

3            Because I am denying Century's motion to compel,

4   the flipside of Century's motion, that is the motion to

5   quash, is moot.

6            The motion to participate in mediation made by the

7   coalition; I'm not going to grant it, subject to an

8   appropriate modification or supplement to the protective

9   order addressing document disclosure.

10           I am sensitive to the argument made by the

11   insurers that protection of certain documents, subject to

12   common interest or other privilege to the coalition, may

13   permit abuse victims access to documents they would not be

14   able to obtain in underlying litigation.

15           I am also sensitive to the fact that almost all or

16   possibly all of the coalition's members are not yet parties

17   to any litigation against the Boy Scouts.

18           This document-production issue needs to be

19   addressed.  I believe, but it might be hopeful recollection,

20   that I heard Mr. Schiavoni say that if he had been approached

21   about this issue by the coalition, he may have been able to

22   work it out.  So, I am hopeful, but I'm not going to leave

23   this open-ended.

24           I'm directing the parties to confer in good faith

25   on the issue and I want to status next Friday if a

# **EXHIBIT 5**

**October 14, 2020 Hearing Transcript Excerpt (Morning Session)**

1

2

3

4

5

6

7          Transcription of Audio File

8          Boy Scouts 10.14.2020 AM Session

9              Audio Runtime:  5:39:30

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 33

1   statement, but the only redaction being with respect

2   to the pricing information included in the state court

3   council engagement letter.

4        Your Honor, on September 29th, Kosnoff and Andrew

5   Van Arsdale resigned from the Coalition.  In the weeks

6   following the hearing, several new law firms were

7   added to the Coalition and their clients became

8   Coalition members.  The new firms, Your Honor, are

9   Motley Rice, Napoli Shkolnik, Mark J. Garn and

10  Partners (phonetic), Crowd Continsman Law Firm

11  (phonetic), Juneau and Associates (phonetic), and

12  Whisevinda (phonetic).  But Your Honor, that brings us

13  to a total of 11 law firms acting as representatives

14  in the Coalition representing over 28,000 sexual abuse

15  victims.

16       On October 7th, the Coalition filed its second

17  amended verified 2019 statement.  That, Your Honor,

18  included the pillars of 2019.  We'll walk through

19  those later in my presentation.  Included an updated

20  disclosure from Exhibit A, filed those under seal in

21  accordance with Your Honor's order and also produced

22  those unredacted copies to the correcting parties.

23  And to the entities identified in your order as well.

24  Thereafter, Your Honor, the Coalition continued its

25  discussions with the US Trustees and ultimately

## <u>EXHIBIT 6</u>

**October 14, 2020 Hearing Transcript Excerpt (Afternoon Session)**

Page 1

1

2

3

4

5

6

7          Transcription of Audio File

8          Boy Scouts 10.14.2020 PM Session

9              Audio Runtime:  5:39:30

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 23

1   eases the burden on a claimant, eases the burden on

2   victims, subscribes with the aspirational statements

3   made by the debtor the first day that all victims, all

4   victims should be heard and have a right to file proof

5   of claims.

6                   And in this COVID situation, Judge, when

7   I'm sitting here in my home office for the how many

8   hundredth day, we all know how difficult it is for us

9   professionals that have unbelievable resources at our

10  disposal to communicate and do things, compared to the

11  universe of victims out there, many of whom aren't as

12  fortunate as we are.

13                  So you're going to be hearing more about

14  that, but we think that, again, something we've added

15  value to in this case and has shown deeds.  And again,

16  in turning to the mediator's statement, Judge, they too,

17  think the same thing that they put on the record that it

18  would hinder their efforts if we weren't involved.  So

19  dealing with what I call the second elephant in the

20  room, the Kosnoff e-mail.

21                  Listen, I'm not going to sit here and make

22  up explanations for it, I wasn't there, I'm not going to

23  make up excuses for it, I can't.  But I'm going to say,

24  look what we've done and look who we are now.  Look at

25  the firm representative who have joined us, all of whom

Page 24

1   have qualified bona fides in the mass tort bankruptcy

2   world and in the mass tort world.  So that's how I tried

3   to deal, Your Honor, with some of the -- some of the

4   things that were said earlier in anticipation, but

5   trying to really flesh out what's really going on here.

6            Dealing with the substance of some of the

7   objections and I think I'm short and really Judge, I

8   really tried to be concise, you know, Century and

9   related insurers object that the Coalition's former

10  counsel (unintelligible) was conflicted.  They're go on

11  -- Stanley Tarr (phonetic) who was their counsel who is

12  no longer part of this and Rachel Mercy (phonetic).  So

13  I think that's gone.

14           And also, Judge, the whole issue then that

15  was raised today about conflicts among parties among the

16  members of the Coalition, sure, there may be a member of

17  the Coalition who has a different claim for damages or

18  whatnot.  I don't think that really creates a conflict

19  per se in terms of the collective interests that

20  we're -- that we're representing, Judge.  And I do want

21  to say that the ad hoc committee of local counsel who

22  we've been dealing with for some time arguably has the

23  same issue.

24           They've got local counsel there who have

25  had lots of property, they've got local counsel arguably

**<u>EXHIBIT 7</u>**

**November 2, 2021 Tweet**



## EXHIBIT 8

**October 30, 2021 Tweet**



**Kosnoff Law**
@SexAbuseAttys

Ken and the SHYSTERETTES tell you there will be
billions more in settlements. Mediations in LA a week
ago and not a penny. But Kenny and his mass tort
mobster buddies had a nice boat ride on your dime.
He's incompetent and untruthful. Save yourselves
survivors, Vote NO!

3:40 PM · Oct 30, 2021 · Twitter for iPhone

## **EXHIBIT 9**

**September 29, 2021 Tweets**



Kosnoff Law @SexAbuseAttys · Sep 29

Biggest decision she made yesterday was keeping the $3500 election on the ballot. The BSA/Coalition/FCR ("the evil cabal") saw its ballot box stuffing scheme get stuffed up its...xxx. Lauria was noticeably crestfallen as no doubt was the entire cabal. No way to 2/3rds. It's over.

2        4

Kosnoff Law @SexAbuseAttys · Sep 29

Rothweiler's "leave no survivor behind" remark caused me to simultaneously gag and laugh. To be accurate, he and his mass tort mobster cohorts of the Coalition intend to enrich themselves in order to leave ALL survivors behind. They are beneath contempt.

2        4

**<u>EXHIBIT 10</u>**

**September 15, 2021 Tweet**



**Kosnoff Law**
@SexAbuseAttys
···

Kevin Carey may have been an adequate bankruptcy judge but he's been a disastrous mediatior in the BSA case. Thanks Judge Silverstein, you picked him. Congratulations.

12:47 AM · Sep 15, 2021 · Twitter for iPhone

**<u>EXHIBIT 11</u>**

**July 25, 2021 Tweet**



**Kosnoff Law**
@SexAbuseAttys

···

Tomorrow starts what should be a pivotal week in the
BSA case. It won't be because we don't have a judge.
A jellyfish. Her thing is to decide nothing. Do nothing.
She hasn't ruled once. Sad! True to form she will let
the case languish until BSA runs out of cash which is
near.

11:35 PM · Jul 25, 2021 · Twitter for iPhone

**<u>EXHIBIT 12</u>**

**July 29, 2021 Hearing Transcript Excerpt**

Case 20-10343-LSS   Doc 7119-12   Filed 11/10/21   Page 2 of 3
Case 1:21-mc-00011-SPW-TJC   Document 10-3   Filed 11/15/21   Page 96 of 188

1

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

                                    .    Chapter 11
 3    IN RE:                         .
                                     .    Case No. 20-10343 (LSS)
 4    BOY SCOUTS OF AMERICA AND      .
      DELAWARE BSA, LLC,             .
 5                                   .
                                     .    Courtroom No. 2
 6                                   .    824 North Market Street
                                     .    Wilmington, Delaware 19801
 7                                   .
                     Debtors.        .    July 29, 2021
 8    . . . . . . . . . . . . . . . .     10:00 A.M.

 9                  TRANSCRIPT OF TELEPHONIC HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                  UNITED STATES BANKRUPTCY JUDGE

11    TELEPHONIC APPEARANCES:

12    For the Debtor:          Derek C. Abbott, Esquire
                               Andrew R. Remming, Esquire
13                             Paige N. Topper, Esquire
                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
14                             1201 North Market Street, 16th Floor
                               Wilmington, Delaware 19899
15
                               - and -
16
                               Jessica C. Lauria, Esquire
17                             Glenn Kurtz, Esquire
                               WHITE & CASE LLP
18                             1221 Avenue of the Americas
                               New York, New York 10020
19
20    Audio Operator:          Brandon J. McCarthy, ECRO

21    Transcription Company:   Reliable
                               1007 N. Orange Street
22                             Wilmington, Delaware 19801
                               (302)654-8080
23                             Email:  gmatthews@reliable-co.com

24
      Proceedings recorded by electronic sound recording; transcript
25    produced by transcription service.
```

Case 20-10343-LSS   Doc 7119-12   Filed 11/10/21   Page 3 of 3
Case 1:21-mc-00011-SPW-TJC   Document 10-3   Filed 11/15/21   Page 97 of 188

32

1  you know, get it over $10 million and money going forward. So

2  those disclosures are important for that.  They're important

3  for the solicitation motion and they're also important for the

4  reasons that Mr. Ruggeri has laid that nobody knows who anyone

5  is negotiating with here.

6         As a final reason that they're important is, you

7  know, these submissions by Mr. Kosnoff they have been

8  incredibly unproductive in trying to reach a resolution.

9  We've put before Your Honor -- you know, there's things he's

10  said about the court and the court process that are extremely

11  unproductive to trying to reach resolution of the case with

12  parties, but the attack, frankly, on  individual lawyers, on

13  parties.

14         My client they published pictures outside -- Mr.

15  Kosnoff published pictures outside his house of, you know, I

16  think it would put us in danger.  I personally have threats

17  made against me, my identity, identifying information on the

18  internet. I have gone to the mediators to complain and ask for

19  some relief.  I have been told, basically, there is nothing

20  anybody can do.  I think Mr. Kosnoff needs to have a 2019 on

21  file.  He needs to be before the court and we need to have

22  those disclosures in order to move the proceeding forward.

23         The coalition has not been helpful in any way on

24  this.  They have acquiesced to the demand to (indiscernible).

25  We have not been able to get them to, you know, have this kind

**<u>EXHIBIT 13</u>**

**September 7, 2021 Tweet**



**Kosnoff Law**
@SexAbuseAttys    ···

Tancster buddy I agree, let's get on with this nonsense.
Depose AVA. AIS has nothing to hide. If it does, I'd like
to know about it, too. But Tanc, don't play games with
me. I have a long memory.

casedocs.omniagentsolutions.com/cmsvol2/pub_47…

8:57 PM · Sep 7, 2021 · Twitter for iPhone

**<u>EXHIBIT 14</u>**

**January 26, 2021 Tweet**

← **Tweet**


**Kosnoff Law**
@SexAbuseAttys   ...

## Prove it or Pay It Fat Man!

> omm.com
> Tancred V. Schiavoni - O'Melveny
> Tancred Schiavoni, Chair of the Firm's Insurance Practice, represents insurance and reinsurance companies in a variet...

8:37 PM · Jan 26, 2021 · Twitter for iPhone

## **EXHIBIT 15**

**November 8, 2021 Tweet**



**Kosnoff Law**
@SexAbuseAttys

···

Survivors, I emailed you Friday night about the BSA Plan and why I urged you to VOTE TO REJECT. I offered you to speak with me and the response has been overwhelming. Since Friday I've received thousands of calls, texts and emails.

12:12 PM · Nov 8, 2021 · Twitter for iPhone

**<u>EXHIBIT 16</u>**

**Debtors' First November 7 Letter**

**WHITE & CASE**

November 7, 2021

VIA E-MAIL

Tort Claimants' Committee
c/o James I. Stang
Pachulski Stang Ziehl & Jones LLP
jstang@pszjlaw.com

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
**T** +1 212 819 8200

**whitecase.com**

**Re:    In re Boy Scouts of America and Delaware BSA, LLC**

Dear Jim:

It has come to our attention that the attached e-mail correspondence and letter from Timothy D. Kosnoff was distributed to thousands of individuals, including survivors represented by various state court counsel, from the e-mail address used by the Tort Claimants' Committee for official communications with survivors: BSASurvivors@pszjlaw.com. We have heard from Omni Agent Solutions, the Solicitation Agent in these chapter 11 cases, and various state court counsel representing abuse survivors that this communication is causing confusion among survivors, because, among other things, the survivor recipients are not represented by Mr. Kosnoff.

We are extremely concerned that this communication was an unauthorized use of the Tort Claimants' Committee's e-mail address and listserv in violation of several laws. Alternatively, if this communication was intentionally distributed by the Tort Claimants' Committee, we believe it was ethically and legally improper to transmit the views of one attorney to thousands of survivors represented by counsel.

Please respond by 5 p.m. ET today with all facts and circumstances related to this communication.

Sincerely,

/s/ Jessica C. Lauria

**Jessica C. Lauria**
Partner

**E** jessica.lauria@whitecase.com

cc:    Michael C. Andolina
       Matthew E. Linder
       Laura E. Baccash
       Blair M. Warner

WHITE & CASE

November 7, 2021

Derek Abbott
John Lucas
Debra Grassgreen
Robert Orgel
James O'Neill
Robert S. Brady
Edwin J. Harron
David Molton
Eric R. Goodman
Tristan G. Axelrod

**November 6, 2021 Email from BSASurvivors@pszjlaw.com**

| | |
|---|---|
| **From:** | BSA Survivors <BSASurvivors@pszjlaw.com> |
| **Sent:** | Saturday, November 6, 2021 3:16 PM |
| **To:** | ████████ |
| **Subject:** | Boy Scouts - Message from Tim Kosnoff - Co-Counsel to AIS Survivors |
| **Attachments:** | TK-letter-to-clients.pdf |

Dear Clients of AIS:

Today the e-Ballot went out to you a few minutes ago from Eisenberg Rothweiler. I was not expecting it to be sent by that firm. I was not given an opportunity to review it and the reason is because that firm knew I would have objected to its form and content. It was wholly improper and possibly illegal for them to solicit your vote on a ballot that is supposed to be neutral. Instead they used deceit to spew their patently false and misleading statements. There is a simple word for why lawyers do things like that:  greed.

Please find my October 19, 2021 letter urging you to REJECT the Plan. I ask you respectfully to read my letter again. If you do, I am confident you will reach the same conclusions I did.

Please stay current on what is happening by following me on Twitter @sexabuseattys. Please feel free to call me or email me with any questions you may have. My email is tim@kosnoff.com<mailto:tim@kosnoff.com>. My cell number is 425-830-8201. I respectfully urge you to listen to the lawyer that listens to you and returns your phone calls.

Thank you.

Timothy Kosnoff


TIMOTHY D. KOSNOFF
Licensed Attorney

U.S. Mailing address:

1321 Upland Drive
PMB 4685
Houston, TX 77043
USA

Direct: 425-837-9690
Main:     206-257-3590
Fax:      206-837-9690
Toll free:  855-LAW4CSA

tim@kosnoff.com<mailto:tim@kosnoff.com>

**October 18, 2021 Letter from Timothy D. Kosnoff**

**KOSNOFF LAW PLLC.**

A PROFESSIONAL SERVICE CORPORATION

7001 Seaview Ave N.W.

SEATTLE, WASHINGTON 98117

**TELEPHONE: (425) 837-9690**

Mail Forwarding Service: 1321 Upland Drive, PMB 4685, Houston, TX 77043

**Timothy D. Kosnoff**
Direct: 425-830-8201

E-mail: tim@kosnoff.com

## KOSNOFF LAW RECOMMENDS THAT ABUSED IN SCOUTING CLIENTS <u>VOTE TO REJECT</u> THE BOY SCOUT PLAN

Dear Clients,

I am the founder of a movement known informally as Abused in Scouting. I have represented child abuse survivors in civil litigation since 1996. I have successfully litigated in state courts on behalf of men abused as scouts in courts throughout the country and have tried seven child sexual abuse civil jury trials, five to verdict. In short, no attorney in the country has more experience in representing victims like you than I have.

My firm recruited Eisenberg Rothweiler law firm and AVA law firm in 2019 to join me in an effort to reach out to men abused as boys in the Boy Scouts of America when I learned that the BSA intended to permanently extinguish the legal rights of men abused in scouting for over a century. We are co-counsel for all of you.

The Boy Scouts' bankruptcy case has reached an important juncture. You need to decide whether to vote for or against the Boy Scouts' reorganization plan that would define your rights going forward. As your attorneys, it is our job to give you the best advice we can based on our experience and a true and accurate explanation of the facts. But this decision is yours to make.

My advice to you is the **opposite** of the advice that the Eisenberg Rothweiler law firm has given you. **I strongly urge you to VOTE NO**. Let me explain why I fervently disagree with my co-counsel and the group of six law firms that supports the Boy Scout's plan and calls itself the Coalition. The reasons for my disagreement with them are numerous and are based on my analysis of the objective facts and my decades of experience in exactly this kind of case.

A U.S. Senator once said, "You are entitled to your own opinions, but you are not entitled to your own facts." The supporters of the BSA Plan are telling you their opinions. But those opinions are not supported by the facts or the truth. Here are the facts and the conclusions I have drawn from them after considering how the BSA Plan will affect you.

**KOSNOFF LAW**

October 18, 2021
Page 2


- **The BSA Plan will not compensate survivors fairly**.

    While $1.854 billion is an enormous amount of money, the number of sexual abuse claims filed in the Boy Scout's case sadly makes $1.854 billion a very small amount of money. The settlement trust expenses (which must be paid first) could be as high as 10%, which reduces the average payment per survivor to approximately $17,000. If some survivors are paid more, that means most of the other survivors will receive much less or nothing at all. Under your engagement letter with AIS, your payment will be reduced by 40% to pay for the attorneys' share of the payment.

- **Why are the numbers so low**?

    There are law firms that do not specialize in this type of work who borrowed millions of dollars from Wall Street hedge funds to run TV ad campaigns and finance the cost of their collection of claims from survivors. These are the same firms you see running ads for other injury cases like asbestos, opioids, vaginal mesh, baby powder talc, etc.  Those law firms came into the Boy Scout's bankruptcy case and have treated survivors like "inventories" for the sole purpose of collecting their contingency fee. While you and other survivors might not receive large or meaningful payments, the "mass tort" lawyers will because they will take a piece of your payment which under the current $1.854 billion settlement fund will total more than $425 million.

    The Boy Scouts, Local Councils, and Hartford Insurance Company ("Hartford") negotiated with the "mass tort" lawyers instead of the Official Tort Claimants' Committee (the "TCC") because the "mass tort" lawyers were willing to accept much less as compensation for your claims.

- **Why was the Hartford Insurance settlement a cheap deal?**

    Hartford, the only settling insurer to date, has agreed to pay $787 million to settle with all of you.  That amount is a tiny fraction of the coverage it is contractually obligated to pay. For example, let's consider only penetration claims in states where the statute of limitations is not a barrier to recover.  The face value of Hartford's insurance coverage for the year 1972 *alone* is more than $800 million.  And yet, the Coalition and Eisenberg Rothweiler want you to vote for a plan that pays less than that amount without taking into account the thousands of other claims in the same year and the many other thousands in 1971, 1973, 1974, 1975, and all the other years Hartford provided insurance coverage.

    Making matters even worse, the $787 million dollar settlement would not be dedicated to the specific survivor claims that trigger Hartford's policies.  Instead, the $787 million will be used to pay all survivors even if their claims did not trigger a Hartford policy.

**KOSNOFF LAW**

October 18, 2021
Page 3

After all is said and done, the Hartford settlement would only yield approximately $8,500 per survivor after accounting for trust expenses and overhead.  I cannot support a plan that is so generous to an insurance company and provides such a meager recovery for all of you.  I urge you to reject it.

- **The BSA Plan cuts a cheap deal with the BSA local councils which are legally separate entities in exchange for complete legal immunity from separate claims you have against the local council in which you were abused.**

Eisenberg Rothweiler and the Coalition offered to settle with the Local Councils before undertaking any review of the claims or financial analysis of the Local Councils. In short, the Coalition blindly offered to settle for $600 million when the TCC demonstrated to the Coalition that the Local Councils had the ability to pay more than three times that amount without endangering their Scouting mission.

I find the Coalition's agreement (and Eisenberg Rothweiler's support of it) to be outrageous.  The Plan releases the Local Councils from responsibility for the harm they caused you and requires them to pay far less than they can afford.

- **The Chartered Organizations that founded and ran your troop, including churches, schools, civic organizations, YMCA, etc. are getting a release for free for all claims after 1975 for not objecting to the Plan.**

Under the terms of BSA's Plan, Chartered Organizations do not pay a cent, but nevertheless receive broad releases for more than 40 years of sexual abuse claims (1976-2020). Instead, Chartered Organizations receive a release of their sexual abuse liability in exchange for a transfer of their interests in insurance policies purchased by the BSA and Local Councils.  You might ask how that can possibly be fair to you.  It cannot be and, in fact, is terribly unfair to you.

- **BSA's Plan includes a $250 million settlement with the Mormon Church (TCJC) which had direct involvement in every aspect of the Scouting program for 100 years. The $250 million settlement is tiny in comparison to the Church's legal exposure and its available assets which are in the billions of dollars.**

The $250 million is not only far below the level of its culpability for abuse in TCJC wards, but it will only be distributed to survivors who have claims against the Mormon Church. Therefore, most of you will not benefit at all from this arrangement.

- **Rejection of the Plan does not mean many more years of waiting. It means the BSA and the other entities will quickly come back to the negotiating table and finally be serious**

**KOSNOFF LAW**

October 18, 2021
Page 4

**about fairly compensating survivors. A YES vote would likely mean years of appeals and probable rejection of the Plan by a higher court.**

The Boy Scout's "melting ice cube" defense is a hoax. The Boy Scouts hold hundreds of millions in cash and other assets that it designates as "restricted" and not available to pay you. It is hard to understand how that money is not available to pay you when the money was made available to provide the framework that led to your sexual abuse. In the end, the Boy Scouts are ready and willing to cut any deal they can, because they will be protected by a bankruptcy discharge while your claims will be left to the "mass tort" lawyers to take their share then leave you with crumbs.

• **There are grave *legal* problems with the BSA Plan even assuming it does receive the required two-thirds of the survivors' votes. Those problems will delay this case for years. That is why it is critical that each and every one of you vote and that you vote NO**.

Under the BSA Plan, the Boy Scouts and the Coalition are trying to remove the insurance companies' contractual rights. It is unclear if that effort will be successful, but it is sure to delay payments to survivors, because the insurance companies will surely keep the case tied up in appeals and many years of litigation over their rights and obligations to provide any coverage.

Insurance coverage issues create other huge legal problem with the BSA Plan. For example, the insurance companies will dispute they have to provide coverage to sexual abuse claims. The bankruptcy judge has acknowledged that she will not determine insurance coverage issues. Under the Plan, the Trust Distribution Procedures provides for the appointment of a Settlement Trustee who would evaluate all the survivor claims and make awards that would be legally binding on the insurance companies to pay. There is absolutely no legal support that would permit this and **ample law that says it cannot be done.** The insurance companies will appeal this and stretch your claims out for years to come.

• The TCC is made up of 9 survivors of scout leader abuse, just like you. They have served tirelessly for 20 months. They are not paid for their service. They have a fiduciary duty to all the survivors to advocate for your best interests. The TCC urges survivors to **REJECT** the BSA Plan. There is nothing in it for them except the pride that comes from doing their best for you.

• **The TCC was shut out of the backrooms where these cheap, foolhardy deals were cut by the Coalition and Eisenberg Rothweiler.**

The TCC has its own Plan. For many months, it has been forbidden by the court to file its own Plan or to even talk about it until now. The TCC has the legal right to file its own bankruptcy plan starting next week. I don't know what it contains or if I will eventually support it but I want

**KOSNOFF LAW**

October 18, 2021
Page 5


to see it, because the BSA Plan is a disaster for all survivors. We can only go up from here. But first survivors must send a resounding message to all the players that the BSA Plan is a big fat **NO!**

<u>**CONCLUSION**</u>

Your claims deserve fair compensation paid by those who are responsible for your pain and anguish.  The Boy Scouts, Local Councils and Chartered Organizations are at fault and have the resources to compensate you adequately.  The insurance companies have contractual obligations and the resources to live up to their contracts.  The BSA Plan shortchanges you and lets responsible parties off the hook.  That Plan compensates mass tort lawyers and paper pushers without adequately providing for you.

The BSA Plan is unacceptable.  I urge you, therefore, to vote NO on the BSA Plan.

As always, please feel free to contact me at any time with your questions and comments. Thank you for the honor of representing you.

Very truly yours,

TIMOTHY D. KOSNOFF

**<u>EXHIBIT 17</u>**

**TCC's First Response Email**

**Warner, Blair**

| | |
|---|---|
| **From:** | James Stang <jstang@pszjlaw.com> |
| **Sent:** | Sunday, November 7, 2021 12:08 PM |
| **To:** | Warner, Blair |
| **Cc:** | Lauria (Boelter), Jessica; Andolina, Michael; Linder, Matthew; Baccash, Laura; Abbott, Derek; John W. Lucas; Debra Grassgreen; Rob Orgel; James O'Neill; Robert Brady; Edwin Harron; David Molton; Goodman, Eric R.; Tristan Axelrod |
| **Subject:** | Re: BSA - Letter to TCC |
| **Attachments:** | image003.png |

To all concerned:

My firm intended to forward Mr. Kosnoff's email to all of his clients. I have confirmed that my  staff was instructed to limit the emails to his clients only. I have just learned that, notwithstanding that instruction, staff sent the email to our entire listserv. This was inadvertent and was unintentional.I am taking immediate steps to email those people Who are not Mr. Kosnoff's clients  and inform them that the communication was inadvertent and that it should be disregarded.

Jim

Sent from my iPhone

On Nov 7, 2021, at 7:34 AM, Warner, Blair <blair.warner@whitecase.com> wrote:

Jim:

Please see the attached correspondence from Jessica Lauria.

Blair Warner  |  Associate
T  +1 312 881 5374<tel:+13128815374>    M  +1 312 890 6554<tel:+13128906554>    E blair.warner@whitecase.com<mailto:blair.warner@whitecase.com>
White & Case LLP  |  111 South Wacker Drive, Suite 5100  |  Chicago, IL 60606-4302 <image003.png>

========================================================================

This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available here<https://www.whitecase.com/privacy-policy>.

========================================================================

<BSA - Letter to TCC (11.7.21).PDF>

**<u>EXHIBIT 18</u>**

**TCC Purported Correction Email**

**Warner, Blair**

| | |
|---|---|
| **From:** | BSA Survivors <BSASurvivors@pszjlaw.com> |
| **Sent:** | Sunday, November 7, 2021 3:44 PM |
| **To:** | Molton, David J. |
| **Subject:** | BSA - TCC Email Correction |

CAUTION: External E-mail. Use caution accessing links or attachments.

Please be advised that on November 5 and 6, 2021, the TCC sent emails to survivors that was on behalf of Tim Kosnoff. The email was intended only for Mr. Kosnoff's Abused in Scouting (AIS) clients. If you received the email and you are not one of Mr. Kosnoff's AIS clients please disregard the email. The TCC apologizes for any confusion.

Counsel to the Official Tort Claimants' Committee, PSZJ.

**<u>EXHIBIT 19</u>**

**Debtors' Second November 7 Letter**

**WHITE & CASE**

November 7, 2021

VIA E-MAIL

Tort Claimants' Committee
c/o James I. Stang
Pachulski Stang Ziehl & Jones LLP
jstang@pszjlaw.com

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
**T** +1 212 819 8200

**whitecase.com**

**Re:    In re Boy Scouts of America and Delaware BSA, LLC**

Dear Jim:

Following-up on my letter from earlier today, the Tort Claimants' Committee has now confirmed it transmitted Mr. Kosnoff's communication *from an official Tort Claimants' Committee email address* to its entire Listserv, which we understand includes thousands of survivors who are clients of dozens of state court lawyers. The Debtors are shocked and dismayed to learn that this communication was intentionally distributed by the Tort Claimants' Committee.[1] As you know, this has caused significant confusion among survivors and a further distraction for the Debtors.

In order for the Debtors to determine next steps, we need the following additional information immediately:

1. Provide (a) the Tort Claimants' Committee's entire Listserv (i.e., the list of all individuals, including email addresses that were sent Mr. Kosnoff's email) and (b) the list of "all of [Mr. Kosnoff's] clients" that you claim were the intended recipients of the email.

2. With respect to 1(b), how did the Tort Claimants' Committee determined who is a client of Mr. Kosnoff?

3. Why did this email come from Tort Claimants' Committee and not from Mr. Kosnoff directly? Please provide the legal basis and authority for the Tort Claimants' Committee's decision to distribute such communications through its official email Listserv.

4. We understand that this communication was sent to survivors in multiple tranches over the course of several hours. Why was this the method of transmittal?

5. What does the Tort Claimants' Committee intend to do to correct communications it made on behalf of one lawyer to survivors represented by other counsel?

---

[1]    Per your November 7, 2021 email, your position is that Pachulski "intended to forward Mr. Kosnoff's email to all of his clients," but your "staff" made an error and sent the email to our entire listserv.

**WHITE & CASE**

November 7, 2021

6.  Do you intend to charge your firm's fees and expenses attributable to the distribution and remedy of this error to the Debtors and their estates?

7.  Please immediately produce all documents or communications relating to these issues, including but not limited to (a) all communications between the Tort Claimants' Committee and Mr. Kosnoff; and (b) all internal communications and documents regarding this issue, including communications relating to how your "staff was instructed."

Please address these issues in the response we requested previously by 5 pm ET.

Sincerely,

/s/ Jessica C. Lauria

**Jessica C. Lauria**
Partner

**E** jessica.lauria@whitecase.com

cc:     Michael C. Andolina
        Matthew E. Linder
        Laura E. Baccash
        Blair M. Warner
        Derek Abbott
        John Lucas
        Debra Grassgreen
        Robert Orgel
        James O'Neill
        Robert S. Brady
        Edwin J. Harron
        David Molton
        Eric R. Goodman
        Tristan G. Axelrod

## **EXHIBIT 20**

**TCC's Second Response Email**

**Warner, Blair**

| | |
|---|---|
| **From:** | James Stang <jstang@pszjlaw.com> |
| **Sent:** | Sunday, November 7, 2021 4:42 PM |
| **To:** | Warner, Blair |
| **Cc:** | Lauria (Boelter), Jessica; Andolina, Michael; Linder, Matthew; Baccash, Laura; Abbott, Derek; John W. Lucas; Debra Grassgreen; Rob Orgel; James O'Neill; Robert Brady; Edwin Harron; David Molton; Goodman, Eric R.; Tristan Axelrod |
| **Subject:** | RE: BSA - Letter to TCC |

Jessica:

I am writing to you in response to your letter sent under cover of Blair's email of November 7 at 12.25 PM (Pacific). As I have personal obligations for the balance of the day, I will not be answering any additional letters today from you or David Molton with a unilateral response deadline. As to my colleagues at the firm, they are spending all of their time, including over the weekend, responding to and reviewing the hundreds of thousands of pages of discovery sought and produced since Friday.

As I already have informed you by separate email, my firm inadvertently sent Mr. Kosnoff's letter to parties other than those he represents. My firm did intentionally send the email to Mr. Kosnoff's clients consistent with the TCC's rights and powers under Bankruptcy Code sections 1102 and 1103, In re Century Glove, 860 F.2d 94 (3d Cir. 1989) and other applicable bankruptcy and non-bankruptcy law. We offered Mr. Kosnoff the opportunity to send his email via "BSASurvivor@pszjlaw.com" in response to Mr. Rothweiler's "e-ballot" email ". Mr. Kosnoff accepted our offer and authorized us to send the email to his clients. We instructed staff to send the email only to Mr. Kosnoff's clients. Staff mistakenly sent it to an email group that included not only Mr. Kosnoff's clients but other parties as well. We did not direct that the email be sent out in tranches. Rather, given the number of email addresses involved, the technology the firm uses sent them out in batches. After I learned that parties other than Mr. Kosnoff's clients were in the email group, I immediately directed that another email be sent to these other parties stating that my firm has mistakenly sent the email to them and urging them to disregard the email. I have been told that this follow-up email has gone out to such other parties.

As to the specifics of your letter:

1. Contrary to your statement in your letter, I do not know that the initial email has caused significant confusion among survivors. I do know that the Debtor disagrees with the TCC's conclusion that the Fifth Amended Plan of Reorganization (the "Plan") should not be confirmed.

2. I am not going to send you the "Listserve". In light of my representations above, I do not see the necessity of doing so and I consider the "Listserve" to be privileged work product.

3. The TCC is relying on Mr. Kosnoff's representations as to which clients he represents. As you know from the filed Rule 2019 statements, the AIS retainer agreements include his firm. While he disagrees with his co-counsel on their strong recommendation that AIS clients accept the Plan, he still represents the AIS clients.

4. Pursuant to Bankruptcy Code sections 1102 and 1103 and Century Glove, the TCC is allowed to solicit rejections of the Plan with materials other than the Disclosure Statement. In furtherance of the TCC's rights and powers, it transmitted Mr. Kosnoff's email. While we can debate whether Sections 1102 and 1103 override applicable state law regarding communications with represented parties and whether such applicable state law would restrict the TCC's rights and powers, I have acknowledged that email was inadvertently sent to non-AIS clients and we have sent follow up emails to that effect and asking parties to disregard the email transmitting Mr. Kosnoff's letter.

5. My firm will not charge the estate for sending out the initial email or the corrective email. We are doing this because it would be impossible to prorate the charges between intended recipients and unintended recipients. We are doing so notwithstanding the propriety of us sending Mr. Kosnoff's emails to his clients.

6. Given the enormous amount of confirmation discovery and applicable privileges, I am not going to redirect resources to start producing additional emails regarding this issue. The communications with Mr. Kosnoff and my firm regarding this

issue were confined to Mr. Lucas and Mr. Lucas gave the instruction to staff which then mistakenly sent out the email to the over-inclusive email group.

Yours,

James Stang

James Stang
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 310.772.2354
Tel: 310.277.6910 | Cell: 310.420.7535 | Fax: 310.201.0760 jstang@pszjlaw.com www.pszjlaw.com

Los Angeles | San Francisco | Wilmington, DE | New York | Houston

James Stang
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 310.772.2354
Tel: 310.277.6910 | Cell: 310.420.7535 | Fax: 310.201.0760 jstang@pszjlaw.com www.pszjlaw.com

Los Angeles | San Francisco | Wilmington, DE | New York | Houston

-----Original Message-----
From: Warner, Blair [mailto:blair.warner@whitecase.com]
Sent: Sunday, November 07, 2021 12:25 PM
To: James Stang
Cc: Jessica Lauria; Michael Andolina; Matthew Linder; Laura E. Baccash; Abbott, Derek; John W. Lucas; Debra Grassgreen; Rob Orgel; James O'Neill; Robert Brady; Edwin Harron; David Molton; Goodman, Eric R.; Tristan Axelrod
Subject: RE: BSA - Letter to TCC

Jim:

Please see the attached further correspondence from Jessica Lauria.

Blair Warner  |  Associate
T  +1 312 881 5374    M  +1 312 890 6554
Short Dial *8 017 5374

-----Original Message-----
From: James Stang <jstang@pszjlaw.com>
Sent: Sunday, November 7, 2021 12:08 PM
To: Warner, Blair <blair.warner@whitecase.com>
Cc: Lauria (Boelter), Jessica <jessica.lauria@whitecase.com>; Andolina, Michael <mandolina@whitecase.com>; Linder, Matthew <mlinder@whitecase.com>; Baccash, Laura <laura.baccash@whitecase.com>; Abbott, Derek <DAbbott@morrisnichols.com>; John W. Lucas <jlucas@pszjlaw.com>; Debra Grassgreen <dgrassgreen@pszjlaw.com>; Rob Orgel <rorgel@pszjlaw.com>; James O'Neill <JONeill@pszjlaw.com>; Robert Brady <rbrady@ycst.com>; Edwin Harron <eharron@ycst.com>; David Molton <dmolton@brownrudnick.com>; Goodman, Eric R. <EGoodman@brownrudnick.com>; Tristan Axelrod <taxelrod@brownrudnick.com>
Subject: Re: BSA - Letter to TCC

To all concerned:

My firm intended to forward Mr. Kosnoff's email to all of his clients. I have confirmed that my  staff was instructed to limit the emails to his clients only. I have just learned that, notwithstanding that instruction, staff sent the email to our entire listserv. This was inadvertent and was unintentional.I am taking immediate steps to email those people Who are not Mr. Kosnoff's clients  and inform them that the communication was inadvertent and that it should be disregarded.

Jim

Sent from my iPhone

On Nov 7, 2021, at 7:34 AM, Warner, Blair <blair.warner@whitecase.com> wrote:


Jim:

Please see the attached correspondence from Jessica Lauria.


Blair Warner  |  Associate
T  +1 312 881 5374<tel:+13128815374>    M  +1 312 890 6554<tel:+13128906554>    E
blair.warner@whitecase.com<mailto:blair.warner@whitecase.com>
White & Case LLP  |  111 South Wacker Drive, Suite 5100  |  Chicago, IL 60606-4302 <image003.png>


========================================================================

This email communication is confidential and is intended only for the individual(s) or entity named above and others who
have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or
disclose the contents of this communication to others. Please notify the sender that you have received this email in error
by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available here<https://www.whitecase.com/privacy-policy>.

========================================================================

<BSA - Letter to TCC (11.7.21).PDF>

========================================================================

This email communication is confidential and is intended only for the individual(s) or entity named above and others who
have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or
disclose the contents of this communication to others. Please notify the sender that you have received this email in error
by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.


========================================================================

## EXHIBIT 21

**Debtors' November 8 Letter**

**WHITE & CASE**

November 8, 2021

VIA E-MAIL

Tort Claimants' Committee
c/o James I. Stang
Pachulski Stang Ziehl & Jones LLP
jstang@pszjlaw.com

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
**T** +1 212 819 8200

**whitecase.com**

**Re:     In re Boy Scouts of America and Delaware BSA, LLC**

Dear Jim:

I am writing in response to your November 7 email reply to my letters of the same date, where you again acknowledged that the Tort Claimants' Committee transmitted Mr. Kosnoff's communication *from an official Tort Claimants' Committee email address* to its entire listserv. Although you have refused to provide us with a copy of the listserv, we understand it includes thousands of survivors, including survivors who are clients of dozens of state court lawyers. The Tort Claimants' Committee now claims to have sent a follow-up email to the listserv or to particular non-Abused in Scouting abuse survivors and counsel on Sunday afternoon.

However, this communication was: (i) sent only after repeated requests from counsel to the Coalition and the Debtors for information, (ii) sent 24 hours after the Tort Claimants' Committee was first informed by counsel to the Coalition of the communication, and (iii) insufficient to remedy the harm that your Committee may have caused to the Debtors' ability to reorganize. The Tort Claimants' Committee has also refused to disclose who received this follow-up communication.

The Debtors do not yet know the full ramifications of the Tort Claimants' Committee's actions, but it is clear the Tort Claimants' Committee has caused significant confusion among survivors and harm to these cases by distributing Mr. Kosnoff's material, including to survivors that are represented by other counsel. This confusion has clearly not been remedied – and may have been exacerbated – by the Tort Claimants' Committee's communication yesterday to an unknown group of survivors and lawyers. Accordingly, the Debtors request that you immediately take the actions set forth below. To the extent that you refuse to take such remedial steps promptly, the Debtors intend to seek emergency relief from the Court.

1.   Provide (a) the Tort Claimants' Committee's entire listserv (i.e., the list of all individuals, including email addresses, that were sent Mr. Kosnoff's email on November 6, 2021), (b) the list of "all of [Mr. Kosnoff's] clients" that you claim were the intended recipients of the email, and (c) the list of all individuals on whom you served the follow-up email. This information is not privileged. Moreover, because you contacted survivors represented by other counsel without such counsel's consent, it is imperative that such survivors'

**WHITE & CASE**

November 8, 2021

counsel be informed of this transgression so that they can directly reach out to their clients to mitigate the damage.

2.  Send the following corrective email to the entire listserv today:

    To all concerned:

    My firm sent an email from Mr. Kosnoff to all individuals on this listserv on November 6, 2021. We urge each of you to disregard its contents. Many of you have counsel who represent your interests and who have very different opinions as to how you should vote on the Boy Scouts' plan of reorganization. In fact, we understand that counsel representing a majority of the survivors in these cases support the plan and are urging their clients to vote "YES" on the plan.  We are not trying to interfere with the advice that you are receiving from your own counsel, and if you have questions on how to vote on the plan, we strongly encourage you to seek advice from your counsel.

    Furthermore, the Tort Claimants' Committee does not agree with and affirmatively rejects any and all statements made about the Eisenberg Rothweiler law firm in the letter from Mr. Kosnoff that was attached to the email sent to you.  The Tort Claimants' Committee regrets any suggestion that its counsel endorsed the distribution of such statements. Finally, please see the attached letters from the Debtors, Future Claimants' Representative and Coalition of Abused Scouts for Justice.

    Jim

3.  Agree to attach and distribute the authorized solicitation letters drafted by the Debtors [Docket No. 6438, Ex. 7] and the Future Claimants' Representative and the Coalition [Docket No. 6441] to everyone on the listserv in connection with the email described in paragraph 2 directly above, copies of which are attached to this letter.

4.  Agree to respond to the Debtors' forthcoming discovery by November 9, 2021, and complete production by November 12, 2021.

5.  Refrain from distributing, for the entirety of the chapter 11 cases, any and all communications from or on behalf of any state court counsel, including to parties on the listserv.

6.  Agree to give prior notice to the Debtors of any substantive communications that the Tort Claimants' Committee intends to distribute to parties on the listserv at least 48 hours prior to distribution.

The Debtors reserve all rights to seek further remedies in connection with this matter including, without limitation, designation of votes potentially affected by this distribution and the right to require the Tort Claimants' Committee to send further remedial communications to parties who received Mr. Kosnoff's communication from the Tort Claimants' Committee.

WHITE & CASE

November 8, 2021

Please confirm that you will agree to the above-requested remedies by 8 p.m. (PT)/11 p.m. (ET) today.

Sincerely,

*/s/ Jessica C. Lauria*

**Jessica C. Lauria**
Partner

**E** jessica.lauria@whitecase.com

cc:    Michael C. Andolina
       Matthew E. Linder
       Laura E. Baccash
       Blair M. Warner
       Derek Abbott
       John Lucas
       Debra Grassgreen
       Robert Orgel
       James O'Neill
       Robert S. Brady
       Edwin J. Harron
       David Molton
       Eric R. Goodman
       Tristan G. Axelrod
       Rachael Ringer
       Megan Wasson

**Solicitation Letter from the Debtors**

BOY SCOUTS OF AMERICA
NATIONAL COUNCIL

September 30, 2021

> Re:    *In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343
> (LSS), Chapter 11 Bankruptcy

**To All Holders of Claims Entitled to Vote on the Plan:**

On February 18, 2020, the Boy Scouts of America and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors filed the Chapter 11 Cases in order to address the significant potential liabilities arising from Claims related to alleged historical acts of Abuse in the BSA's programs.

The BSA cares deeply about all survivors of child abuse. The BSA understands that no apology can repair the damage caused by abuse or take away the pain that survivors have endured. The BSA is steadfast in its commitment to continually improve all of its policies to prevent abuse.

---

**THE DEBTORS, THE COALITION OF ABUSED SCOUTS FOR JUSTICE, THE FUTURE CLAIMANTS' REPRESENTATIVE, THE CREDITORS' COMMITTEE AND THE AD HOC COMMITTEE OF LOCAL COUNCILS (THE "SUPPORTING PARTIES") BELIEVE THE PLAN OF REORGANIZATION PROVIDES HOLDERS OF CLAIMS, INCLUDING ABUSE CLAIMS, SUBSTANTIALLY GREATER RECOVERY THAN ANY OTHER ALTERNATIVE AND URGE YOU TO SUBMIT A TIMELY BALLOT VOTING TO ACCEPT THE PLAN OF REORGANIZATION.**

**THE VOTING DEADLINE IS DECEMBER 14, 2021 AT 4:00 P.M. (EASTERN TIME).**

---

On September 30, 2021, the Bankruptcy Court entered an order [D.I. 6438] approving the *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6445] (together with all schedules and exhibits thereto, and as may be modified, amended, or supplemented from time to time, the "Disclosure Statement"). On the same date, the Bankruptcy Court entered an order [D.I. 6438] (the "Solicitation Procedures Order") that, among other things, authorizes the Debtors to solicit votes to accept or reject the *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6443] (together with all schedules and exhibits thereto, and as may be modified, amended, or supplemented from time to time, the "Plan").[1]

**The Plan is supported by the Debtors and the other Supporting Parties. The BSA and the Supporting Parties all believe that the Plan represents the best possible means to (a) timely and equitably compensate survivors of alleged Abuse in Scouting and (b) ensure**

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

**BOY SCOUTS OF AMERICA**
NATIONAL COUNCIL

**that the BSA emerges from bankruptcy with the ability to continue its vital charitable mission. The BSA and the other Supporting Parties believe that the Plan provides the highest and best recovery—and the best outcome—for all creditors and is in the best interests of the Debtors' estates. Therefore, the BSA and the other Supporting Parties urge eligible creditors to vote to accept the Plan.**

You are receiving this letter and the accompanying materials because you may be entitled to vote on the Plan. The following materials constitute the "Solicitation Package" which, in addition to this letter, is comprised of:

(a)     the Disclosure Statement, including all exhibits thereto, attached to which is the Plan, including all of its exhibits and schedules (to the extent such exhibits and schedules are filed with the Bankruptcy Court before the Solicitation Date);

(b)     the Solicitation Procedures Order;

(c)     the Confirmation Hearing Notice;

(d)     an appropriate ballot with detailed voting instructions, including instructions for voting online via the electronic ballot submission platform (the "E-Ballot Platform") on the website of Omni Agent Solutions, the Debtors' claims, noticing, and solicitation agent in these chapter 11 cases (the "Solicitation Agent"), and return instructions or a return envelope with postage, if applicable;

(e)     a letter from any official committee or the Coalition, substantially in the form filed on the docket of the Chapter 11 Cases (and as may be modified, amended, or supplemented from time to time); and

(f)     any other materials ordered by the Bankruptcy Court to be included as part of the Solicitation Package.

---

### ACCESS TO PLAN AND DISCLOSURE STATEMENT

**IMPORTANT**:  You should have received a hard copy or USB flash drive copy of the Plan, the Disclosure Statement, and the Solicitation Procedures Order (excluding exhibits except for the Solicitation Procedures).  You may also access the Plan, the Disclosure Statement, and the Solicitation Procedures Order free of charge at https://omniagentsolutions.com/bsa-SAballots (Direct Abuse Claims) or https://omniagentsolutions.com/bsa-ballots (all other Claims).  You may also obtain copies of any of the other Solicitation Package materials free of charge at these websites.  If you would prefer to receive paper copies or documents on a USB drive, please contact the Solicitation Agent to make such a request by: (a) calling the Debtors' toll-free restructuring hotline at 1-866-907-2721, (b) emailing BSAballots@omniagnt.com, (c) writing to Boy Scouts of America Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367, or (d) submitting an inquiry on the Debtors' restructuring website at https://omniagentsolutions.com/BSA.

---

BOY SCOUTS OF AMERICA
NATIONAL COUNCIL

The comprehensive restructuring of the Debtors proposed in the Plan is the product of agreements reached among the BSA, the other Supporting Parties, JPM (the Debtors' senior secured lender), Hartford, and The Church of Jesus Christ of Latter-day Saints ("TCJC"), which provides the framework for global resolution of Abuse Claims against the Debtors, Related Non-Debtor Entities, and Local Councils, as well as any other Contributing Chartered Organizations, Participating Chartered Organizations, and Settling Insurance Companies that may become party to the restructuring settlements after the date of this letter, in exchange for contributions by such parties to the Settlement Trust for the benefit of survivors of Abuse (collectively, "Abuse Survivors"). The Plan has been designed to maximize and expedite recoveries to Abuse Survivors, resulting in substantial recoveries, as set forth in the recovery chart in the Disclosure Statement. The Debtors and the other Supporting Parties strongly encourage all holders of Claims in the Voting Classes, including Direct Abuse Claims, to vote in favor of the Plan.

The Plan, which incorporates a settlement with Hartford for $787 million and a settlement with TCJC for $250 million, as well as the JPM / Creditors' Committee Settlement, provides for a mechanism to channel to the Settlement Trust all Abuse Claims asserted against the Debtors and certain non-debtor third parties, including the Local Councils, Participating Chartered Organizations, Contributing Chartered Organizations (including TCJC), and Settling Insurance Companies (including Hartford) that make contributions to the Settlement Trust for the benefit of Abuse Survivors. If the Plan is approved, the Settlement Trust will exclusively administer and resolve the Abuse Claims. In exchange for channeling all Abuse Claims to the Settlement Trust, as described in the Disclosure Statement, the BSA will make a substantial contribution to the Settlement Trust of approximately $220 million assuming an Effective Date of December 31, 2021. The BSA will also assign and transfer to the Settlement Trust all of its insurance rights under the BSA's insurance policies, thereby providing the potential for substantial insurance recoveries to holders of Direct Abuse Claims.

Additionally, Local Councils will make a substantial contribution to the Settlement Trust to resolve the Abuse Claims that may be asserted against them in exchange for being included as Protected Parties under the Plan and receiving the benefits of the Channeling Injunction, consisting of (a) $500 million, comprised of at least $300 million in Cash with the balance in property, exclusive of insurance rights, (b) the DST Note, a $100 million interest-bearing variable-payment obligation note issued to the Settlement Trust by a Delaware statutory trust on or as soon as practicable after the Effective Date, and (c) the assignment and transfer to the Settlement Trust of all Local Council insurance rights under the BSA's and Local Councils' liability insurance policies that provide coverage for Abuse Claims, thereby providing the potential for substantial insurance recoveries to holders of Direct Abuse Claims.

The Plan also provides a mechanism by which Chartered Organizations can become Participating Chartered Organizations (unless they elect not to or are chapter 11 debtors in their own restructuring cases) through the assignment and transfer to the Settlement Trust of all of their post-1975 insurance rights under BSA and Local Council policies that provide coverage for Abuse Claims in exchange for being included as a Limited Protected Party under the Plan, resulting in the potential for substantial additional insurance recoveries for holders of Abuse Claims. Insurance Companies may also make substantial contributions and Chartered Organizations may also make further substantial contributions to the Settlement Trust in exchange for becoming

3

BOY SCOUTS OF AMERICA
NATIONAL COUNCIL

Protected Parties under the Plan and receiving the comprehensive benefits of the Channeling Injunction.

Additionally, the Plan also provides for the BSA's assumption of its prepetition Pension Plan and specifies the treatment of holders of Allowed Convenience Claims, Allowed General Unsecured Claims and Allowed Non-Abuse Litigation Claims, resulting in substantial recoveries, as set forth in the recovery chart in the Disclosure Statement. The treatment of all classes of Claims entitled to vote is described more fully in the Plan and the Disclosure Statement.

The Debtors and the Supporting Parties support confirmation of the Plan and urge all claimants to vote in favor of the Plan. **The Debtors and the Supporting Parties believe that the Plan will offer the highest and best recovery for all creditors and that the Plan will provide more certain recoveries to survivors of Abuse and other creditors than any other alternative. The Debtors and the Supporting Parties also believe that the Plan will provide those recoveries more quickly than would any alternative, including by avoiding time-consuming and costly litigation.**

If the Plan cannot be confirmed by the Bankruptcy Court, or if an insufficient number of voting claimants vote in favor of the Plan, (i) the Debtors may be required to liquidate and/or voluntarily convert these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code, (ii) the Debtors may seek approval of a revised plan of reorganization that provides for less favorable treatment for creditors, or (iii) other parties may submit an alternate plan to reorganize BSA. **The Debtors believe that all of these alternatives would result in significantly reduced recoveries for Abuse Survivors, and would significantly delay the date by which Abuse Survivors can begin expecting payments from the Settlement Trust.**

**To Chartered Organizations that Hold Indirect Abuse Claims Under the Plan:** Thank you for your support of the Scouting movement. Millions of young men and women have passed through your doors, and our joint mission to serve them has helped countless youth become prepared for life. Your support for the Plan is essential for the mission of Scouting, and the success of the BSA's bankruptcy case depends your support for the Chartered Organization settlement framework set forth in the Plan. The BSA urges you to support the survival and continuation of Scouting by voting your Indirect Abuse Claim in favor of the Plan.

**Please read the Plan carefully. In particular, please review the injunction, release, and exculpation provisions provided in Article X of the Plan. If you vote to accept or reject the Plan, you will be releasing the Released Parties from any and all Claims/Causes of Action to the extent provided in Article X.J.4 of the Plan unless you "opt-out" of such releases. If you decide to opt out of the release in Article X.J.4 of the Plan, please do so by checking the appropriate box on your ballot.**

**If you are the holder of an Abuse Claim, then regardless of whether you opt out of the releases in Article X.J.4 of the Plan, if the Plan is confirmed, you will be bound by the releases and Channeling Injunction set forth in Article X.J.3 and Article X.F of the Plan.**

4

**BOY SCOUTS OF AMERICA**
NATIONAL COUNCIL

The Debtors and other Supporting Parties believe that the Plan constitutes a good-faith compromise and settlement of all Claims and controversies based upon the unique circumstances of these chapter 11 cases, and will provide the maximum recovery for creditors.  The Debtors and other Supporting Parties believe that the acceptance of the Plan by holders of Claims entitled to vote to accept or reject the Plan is in the best interests of holders of Claims against the Debtors.  Moreover, the Debtors and other Supporting Parties believe that any alternative other than Confirmation of the Plan may result in, among other risks, delays and significantly increased administrative expenses, and significantly diminished distributions on account of Allowed Claims.

> **THE DEBTORS AND OTHER SUPPORTING PARTIES STRONGLY URGE YOU TO TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN IN ACCORDANCE WITH THE INSTRUCTIONS IN YOUR BALLOT.**
>
> **THE VOTING DEADLINE IS DECEMBER 14, 2021 AT 4:00 P.M. (EASTERN TIME).**

For the reasons set forth herein and in the Disclosure Statement, the Debtors and other Supporting Parties recommend that all persons or entities entitled to vote on the Plan vote to accept the Plan by timely submitting a properly completed ballot.  Instructions for casting your vote on the Plan are provided on your ballot.  You are strongly encouraged to submit your ballot online via the E-Ballot Platform on the Solicitation Agent's website.  In order to have your vote to accept or reject the Plan counted, your Ballot must **actually be received** by the Solicitation Agent on or before **December 14, 2021 at 4:00 p.m. (Eastern Time)**.

If you would like electronic copies of any of the materials enclosed herein, or any other filings in the Debtors' chapter 11 cases, they can be accessed at the Debtors' restructuring website free of charge at https://omniagentsolutions.com/BSA.

If you have any questions, or need to obtain additional solicitation materials, you may contact the Solicitation Agent by: (a) calling the Debtors' toll-free restructuring hotline at 866-907-2721, (b) emailing BSAballots@omniagnt.com, (c) writing to Boy Scouts of America Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367, or (d) submitting an inquiry on the Debtors' restructuring website at https://omniagentsolutions.com/bsa.  Please note that the Solicitation Agent is not authorized to, and will not, provide legal advice to you.  If you need legal advice, please consult with your attorney.

Sincerely,

*Boy Scouts of America and Delaware BSA, LLC*



**Solicitation Letter from the Coalition and the Future Claimants' Representative**

**brown**rudnick



September 30, 2021

**To:** Holders of Direct Abuse Claims Against the Boy Scouts of America
**From:** Coalition of Abused Scouts for Justice and Court-Appointed Future Claimants' Representative

**RE:   RECOMMENDATION THAT SEXUAL ABUSE VICTIMS VOTE TO ACCEPT THE
        BOY SCOUTS OF AMERICA REORGANIZATION PLAN**

The **Coalition of Abused Scouts for Justice** (the "**Coalition**") and **James Patton**, **the Future Claims Representative** (the "**FCR**") appointed in the chapter 11 cases of the Boy Scouts of America (the "**BSA**"), together and jointly urge survivors to ***vote to ACCEPT the reorganization Plan*** (the "Plan") proposed and negotiated between the BSA and these survivor representatives, the Coalition and the FCR.

The Coalition is an ad hoc committee that represents survivors of sexual abuse suffered in connection with Scouting. The Coalition's members – approximately 18,000 survivors – are represented by over two dozen law firms that collectively represent over 60,000 survivors. The Coalition was formed to negotiate on behalf of its substantial survivor constituency, maximize the recovery available to all survivors, and minimize the time and expense to achieve those recoveries. The FCR was appointed by the Bankruptcy Court to be the official advocate for the interests of future claimants, including current minors and survivors suffering from repressed memories of their abuse.

The Coalition and the FCR have worked tirelessly on behalf of survivors to negotiate the terms of the Plan, which will provide ***over $1.7 billion*** (likely more) to be paid to survivors. It also provides the framework for substantial future settlements that will increase the recovery for survivors. The Plan is currently supported by representatives of approximately 70,000 survivors.

**The Plan represents the only assured path to recover and pay billions of dollars to survivors of sexual abuse in the BSA's programs. The only other path for survivors likely involves years of litigation and significant risk that survivors will receive much less than they are assured of receiving under the Plan. In our view, the settlement embodied in the Plan represents the best possible outcome for sexual abuse survivors. It will result in meaningful distributions of over a billion dollars in value (likely more) to survivors following confirmation, without lengthy, expensive and harmful litigation of individual abuse claims. A very brief description of the Plan terms, as pertaining to you and your recoveries, is contained below.**

**I.   What You Will Receive Under the Plan**

If the Plan is confirmed, a newly formed Settlement Trust will be established. Your claim against BSA, as well as any Local Council, and certain other "Protected Parties," will be transferred to and paid from the Settlement Trust. The Settlement Trust will assess your claim in accordance with its Trust Distribution Procedures (TDP) and value the claim based on the type and extent of abuse suffered and other factors. Based on these factors, most claims will be valued between $3,500 and $2,700,000. If you do not wish to undergo the full claims evaluation process, you will be able to elect to receive a one-time payment of $3,500, prior to the start of that process.

28647764.2



To: Holders of Direct Abuse Claims Against the Boy Scouts of America
September 30, 2021
Page 2



The Settlement Trust will collect funds from the BSA, its Local Councils, their insurers, and chartered organizations, and distribute available funds to survivors. To date, there are settlements that will provide over $1.8 billion (likely more) in initial funding to the Settlement Trust. The actual amount of your recovery, unless you select the one-time $3,500 payment, will depend on both the specifics of your claim and the amounts contributed to the Settlement Trust by, among others, insurance companies and chartered organizations in the future.

## II.   What the Boy Scouts and Their Affiliates And Insurers Are Contributing to the Plan

**To date, the Coalition and FCR have negotiated commitments of approximately $1.8 billion to the Settlement Trust. The Coalition and FCR expect that number to grow significantly in coming months given this amount only includes financial contributions from one (1) insurer settlement and one (1) Chartered Organization settlement to date, with potentially many insurer and Charter Organization financial contribution settlements to come.**

**Of the over $1.8 billion that we have negotiated to date, these contributions include:**

- **The BSA itself will contribute assets worth approximately $220 million to the Settlement Trust, along with potentially billions of dollars' worth of insurance rights.** The exact amount depends on certain timing factors and the prices of non-liquid assets which will have to be monetized. The Coalition and FCR believe this is the maximum amount that could be contributed by the BSA by law without forcing the organization into liquidation or years-long litigation, either of which would diminish assets available to abuse survivors.

- **The BSA's Local Councils will contribute assets valued at approximately $600 million to the Settlement Trust, along with potentially billions of dollars' worth of insurance rights.** While this may leave some Local Councils with significant assets, BSA's own insurance polices cannot be unlocked without the Local Councils' rights to those policies. Moreover, not every Local Council faces the same abuse liability, and many of the Local Councils with the most property and assets are located in jurisdictions that do not have favorable statutes of limitations for survivors. Additionally, many Local Councils take the position that most of their property is legally restricted and cannot be used to pay survivors. While the Coalition and FCR do not necessarily agree with all (or many) of the positions being taken by the Local Councils, we believe that in the absence of an agreed settlement like the one represented by the BSA Plan, many of these Local Councils may not have an incentive to contribute insurance rights. The settlement that we have negotiated with Local Councils – for $600 million in the aggregate – is very substantial. Indeed, some Local Councils under the settlement may be paying more than they would likely have to pay in the absence of a settlement. The settlement also avoids the likelihood that some or many Local Councils would be forced to liquidate, which would make it more challenging to recover assets for survivors.

- The Hartford insurance company will contribute $787 million to the Settlement Trust. You may remember that BSA announced a settlement with Hartford in April 2021 that BSA claimed was for $650 million. The Coalition and FCR opposed that settlement vigorously. We thought that it did not make Hartford pay enough to survivors and it contained a provision through which Hartford could have paid substantially less, potentially $400 million or below. Survivors face a significant risk that the Bankruptcy Court might enforce this earlier settlement agreement with these unfavorable terms that might allow Hartford to pay only a fraction of its exposure.



To: Holders of Direct Abuse Claims Against the Boy Scouts of America
September 30, 2021
Page 3



The Coalition and FCR led negotiations to correct these problems with the original Hartford settlement. The deal in the Plan does this. Through the work of the Coalition and the FCR, Hartford has agreed to increase its contribution to $787 million. That amount is not subject to reduction. And it is only available through the Plan. In the Coalition and FCR's view this settlement amount, the assurance that it will be received under the Plan, and the elimination of the risk that Hartford might pay substantially less make this revised settlement with Hartford fair.

- **The Church of Jesus Christ of Latter-Day Saints ("TCJC") will contribute $250 million to the Settlement Trust**, **along with potentially billions of dollars' worth of insurance rights.** The Coalition and FCR believe that this amount represents a substantial portion of the aggregate liability for sex abuse claims related to the TCJC (for which it is co-liable with the BSA, Local Councils, and insurers such as Hartford, who will also contribute to survivor recoveries, as noted above). The Coalition and FCR believe that this commitment is reasonable and provides an excellent recovery for survivors of abuse related to the TCJC's scouting programs.

- **The Coalition and the FCR will continue to negotiate with dozens of other insurers and sponsoring "chartered organizations" to make significant additional contributions to the Settlement Trust for the benefit of survivors.** The Plan provides a framework to allow the Coalition and the FCR to continue to negotiate additional settlements for the benefit of survivors. The substantial amounts that will be available to survivors in the Settlement Trust on Day One represent the payments of only one insurer and one chartered organization (in addition to the BSA and Local Councils). There are literally dozens of insurers and chartered organizations with whom we are continuing to negotiate. Many of the BSA's insurers have disputed that they are obligated to honor their coverage obligations. Some have gone so far as to allege widespread fraud by survivors and their representatives in the filing of claims. The Plan is designed to reduce their ability to continue to shirk their coverage obligations. We believe it will force them to honor their promises to pay, and make significant financial contributions for the benefit of survivors and the Settlement Trust. We believe that with continued negotiation (or, if necessary, litigation), insurers and chartered organizations will, over time, significantly increase the amounts they will pay to compensate survivors.

### III. The Plan Provides a Fair and Equitable Recovery for the Harm You Suffered, and Allows the Boy Scouts to Continue Their Charitable Mission

We strongly believe that the Plan represents fair value for those who suffered abuse in connection with BSA programs. In fact, if the Bankruptcy Court does not find that the Plan will provide you a fair and reasonable recovery, the Plan cannot be confirmed. The Coalition, FCR and the BSA believe that the Plan will indeed provide a substantial recovery, and much more quickly than if the parties choose litigation.

Moreover, **the Plan will allow the BSA to continue into the future, while requiring the BSA to implement even stronger protections against sexual abuse for future participants.** The Coalition and FCR understand that abuse survivors may or may not support the continuation of the BSA's charitable mission. However, the BSA's survival is important for two reasons:

- If the BSA were to terminate its programs and liquidate its assets, it is very unlikely that abuse survivors would receive greater recoveries than under the Plan. This is because, among other things, the BSA and Local Councils would likely incur over a billion dollars in priority pension liability, and insurers would be incentivized to deny and litigate coverage obligations on an individual-by-individual basis.



To: Holders of Direct Abuse Claims Against the Boy Scouts of America
September 30, 2021
Page 4



- The BSA and the Local Councils have made financial commitments to make ongoing contributions to the Settlement Trust depending on its financial performance. In other words, the more youths that choose to participate in BSA programs in future, the more likely it is that the BSA will be able to honor its obligations under the Plan.

**The Coalition and FCR believe that any alternative to confirmation of the Plan will result in extensive delays, increased administrative expenses, and the termination of the valuable settlements that have been negotiated in the Plan. Each of these occurrences would, in turn, result in significantly smaller distributions to abuse survivors.**

**We believe the Plan maximizes the achievable recovery for survivors. Therefore, the Coalition and FCR strongly recommend that you timely vote to accept the Plan in accordance with the procedures that have been established by the Bankruptcy Court.**

## IV.   When, How and Why to Vote

You have been provided with a ballot to vote to accept or reject the Plan. In order to have your vote counted, you must complete and return the ballot by **December 14, 2021 at 4:00 p.m. (Eastern Time)** as the deadline to vote to accept or reject the Plan (the "Voting Deadline").

Your timely vote is important. The Plan cannot be confirmed without the broad consent of abuse survivors.

*THE FOREGOING IS NOT INTENDED AS A SUBSTITUTE FOR THE PLAN AND DISCLOSURE STATEMENT. ALL SURVIVORS SHOULD READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY, AND SPEAK TO THEIR LAWYER OR OTHER ADVISOR TO THE EXTENT THEY WISH TO DO SO.*

If you have any questions as to this recommendation, you may contact the Coalition at BSACoalition@brownrudnick.com and the FCR at BSA-FCR@ycst.com.

Sincerely,

For the Coalition,                                    For the FCR,
BROWN RUDNICK LLP                          YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady

David J. Molton

64166782 v1-WorkSiteUS-036293/0001

**EXHIBIT 22**

**Debtors' Interrogatory Requests to the TCC**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>           Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

### DEBTORS' SECOND SET OF INTERROGATORIES TO THE OFFICIAL COMMITTEE OF TORT CLAIMANTS

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this matter by Federal Rules of Bankruptcy Procedure 9014, 7026 and 7033, and pursuant to the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Boy Scouts of America ("BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 case (together, the "Debtors"), by and through their undersigned counsel, hereby request that the Official Committee of Tort Claimants (the "Tort Claimants' Committee" or "TCC"), serve the following *Debtors' Second Set of Interrogatories to Official Committee of Tort Claimants' Committee* (the "Interrogatories") in connection with the Confirmation of the *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (D.I. 6443) (as such may be amended or modified from time to time pursuant to section 1127 of the Bankruptcy Code, the "Plan"), with responses and objections to be served by November 9, 2021, and the attendant answers to be substantially completed by November 12, 2021.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

## **DEFINITIONS**

For the purposes of these Interrogatories, the following Definitions shall apply:

1.      "<u>Any</u>" or "<u>each</u>" should be understood to include and encompass "all;" "or" should be understood to include and encompass "and;" and "and" should be understood to include and encompass "or."

2.      "<u>Communication</u>" means any oral or written utterance, notation, or statement of any nature whatsoever between or among two or more persons, by or to whomsoever made, and including without limitation, correspondence, documents, conversations, dialogues, discussions, e-mail, interviews, consultations, agreements, and other understandings, including Bloomberg messages and text messages.

3.      "<u>Concerning</u>," "regarding," "in connection with," "relating to," and/or "referring to" shall be construed to mean, without limitation, relating to, referring to, describing, evidencing, constituting, discussing, supporting, pertaining to, containing, analyzing, evaluating, studying, recording, showing, memorializing, reporting on, commenting on, mentioning, reviewed in conjunction with, setting forth, contradicting, refuting, considering, or recommending, in whole or in part.

4.      "<u>Document(s)</u>" means any printed, written, typed, recorded, transcribed, taped, photographic, or graphic mater, however produced or reproduced, including, but not limited to: any letter, correspondence, or communication of any sort, including Bloomberg or text messages; film, print or negative of photograph; sound recording; video recording; note, notebook, diary, calendar, minutes, memorandum, contract, agreement, or any amendment thereto; telex, telegram, cable; summary, report or record of telephone conversation, voice mail or voice mail back-up, personal conversation, discussion, interview, meeting, conference, investigation, negotiation, act or activity; projection, work paper, or draft; computer or compute network output

2

or input, hard or floppy disc, e-mail, magnetic and/or optical medias, archived or back up data on any of these medias, and documents that have been deleted but are recoverable from any of these medias; opinion or report of consultant; request, order, invoice or bill of  lading; analysis, diagram, map, index, sketch, drawing, plan, chart, manual, brochure, pamphlet, advertisement, circular, newspaper or magazine clipping, press release; receipt, journal, ledger, schedule, bill, or voucher; financial statement, statement of account, bank statement, checkbook, stubs, or register, cancelled check, deposit slip, charge slip, tax return (income or other), requisition, file, study, graph, tabulation, and any and all other writings and recording of whatever nature, whether signed or unsigned or transcribed, and any other data compilation from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonable usable form; including, without limitation, all things meeting the definition of "Documents" or "electronically stored information" set forth in Rule 34 of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, or meeting the definition of "writings and recordings" set forth in Rule 1001 of the Federal Rules of Evidence.  Any document with any marks as initials, comments, or notations of any kind is not deemed to be identical to one without such marks and is a separate document within the meaning of this term.

5.      "Kosnoff" means Timothy D. Kosnoff.

6.      "Kosnoff Law" means Kosnoff Law PLLC, including all of its agents, employees, representatives and advisors.

7.      "Kosnoff Letter" means the letter dated October 18, 2021 from Timothy D. Kosnoff with the subject line "KOSNOFF LAW RECOMMENDS THAT ABUSED IN SCOUTING CLIENTS VOTE TO REJECT THE BOY SCOUT PLAN."

8.    "Plan" shall have the meaning ascribed to it in the *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (D.I. 6443).

9.    "You," "Your," "TCC," and "Tort Claimants' Committee" shall mean the Official Committee of Tort Claimants, including all of its members and its and its members' respective agents, representatives and advisors, including, without limitation, Berkeley Research Group, LLC, CBRE, Inc., The Claro Group LLC, John R. Conte, Ph.D, Keen-Summit Capital Partners LLC, Pachulski Stang Ziehl & Jones LLP, Pasich LLP and Rock Creek Advisors LLC.

## **INSTRUCTIONS**

The preceding Definitions apply to each of these Instructions and for purposes of these Interrogatories, the following Instructions shall be followed:

1.    Rule 33 of the Federal Rules of Civil Procedure, as incorporated by Rules 7033 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, is hereby incorporated by reference and applies to each of the Definitions, Instructions and Interrogatories.

As the term "possession" pertains to e-mails, the term includes, but is not limited to, e-mails contained in your electronic e-mail directories containing (i) "deleted" e-mails which have not been permanently deleted, including all subdirectories irrespective of the title of such subdirectories; (ii) "sent" e-mails, including all subdirectories irrespective of the title of such subdirectories; and (iii) "received" e-mails, including all subdirectories irrespective of the title of such subdirectories.

The word "all" shall also include "each of," and vice versa.  The word "any" shall be construed to mean "any and all" where the effect of such construction is to broaden the scope of the Document Requests.

In responding to each of the Interrogatories, you are to review and search all relevant files of appropriate entities and persons.

If any responsive information or documents is known to have existed and cannot now be located, or has been destroyed, discarded, or otherwise disposed, set forth a complete statement of the circumstances surrounding such loss, destruction, discarding, or other disposition, including:

a.  A description of the information or documents, including the date, a summary of its contents and the identity of its author and the Person(s) to whom it was sent or shown:

b.  The last known custodian;

c.  Whether the information or document is missing or lost or was destroyed, discarded, or otherwise disposed;

d.  The date of loss, destruction, discarding, or other disposition;

e.  The reason(s) for destruction, discarding, or other disposition;

f.  The Person(s) authorizing or carrying out such destruction, discarding, or other deposition; and

g.  The efforts made to locate lost or misplaced information or documents.

If there are no information responsive to a specific request, so state in writing.

If you know of any information responsive to a particular request but cannot produce them, so state, produce the information within your possession, custody or control on the subject matter sought, and identify each Person whom you believe has information responsive to the Interrogatory.

In accordance with Rule 9019-5d of the Local Rules for the Bankruptcy Court for the District of Delaware (the "Local Rules") and the *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* [D.I. 812] (the "Mediation Order"), which incorporates that rule (*see* Mediation Order ¶ 7), these Interrogatories are not

seeking, and the Insurers should not produce, any material that is covered by the mediation privilege pursuant to the Local Rules and the Mediation Order, including its exhibits.

In the event you seek to withhold any document, thing, or information on the basis that it is properly entitled to some privilege or other limitation of discovery, you shall produce as much of the document concerned as to which no claim of privilege or other limitation of discovery is made.  With respect to information, documents or portions of documents for which a claim of privilege or other limitation of discovery is made, you are instructed to provide a numeral list of the information, document(s) and thing(s) for which a privilege or limitation is claimed that (1) identifies the nature of the privilege or limitation (including work product) asserted and, if the privilege or limitation is governed by state law, indicate the state of the privilege rule or other limitation invoked; and (2) provides the following information in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged or otherwise protected information:  (i) the type of information or document; (ii) the name and capacity of each author and recipient of the information or document; (iii) the general subject matter of the information or document in a manner sufficient to support the privilege or other protection claimed; (iv) the date of the information or document; (v) such other information as is sufficient to identify the information or document for a subpoena *duces tecum*, including, where appropriate, the author(s) of the document, the addressee(s) of the document, and any other recipient(s) shown in the document, and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to each other; and (vi) the same information referenced in (i)-(v) above for each enclosure or attachment to each listed document if the enclosure or attachment is also withheld from production. Notwithstanding the assertion of any privilege or other protection, any requested information or document that contains responsive, non-privileged or protected information should be disclosed or

produced, but that portion of a document for which the privilege or other protection is asserted may be redacted, provided that the redacted portion is identified and described consistently according to the requirements listed herein.

Each Definition, Instruction, and Interrogatory herein shall be construed independently and not with reference to any other Definition, Instruction, or Interrogatory, for the purposes of limitation.

If any meaning of any term in any Interrogatory herein is unclear to you, without waiver of the right to seek a full and complete response to the Interrogatory, you shall assume a reasonable meaning, state what the assumed meaning is, and respond to the Interrogatory according to the assumed meaning.

In accordance with Rule 33 of the Federal Rules of Civil Procedure, as incorporated by Rules 7033 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, objections to any part of these Interrogatories shall be stated in full and with specificity.  In the event you interpose an objection to an Interrogatory, you must respond to each part of the Interrogatory which objection is not made or provide testimony or information not objected to, as the case may be.

If any part of the Interrogatories cannot be responded to in full, please respond to the extent possible, specifying the reason(s) for your inability to respond to the remainder and stating whatever information or knowledge you have concerning the portion to which you do not respond.

The fact that an investigation is continuing or that discovery is incomplete shall not be a justification for failing to respond to these Interrogatories based on the knowledge or information that you possess at the time you respond to these Interrogatories. If an investigation is continuing or discovery is not complete with respect to the matter inquired into by any Interrogatory, so state in your response to that Interrogatory.

Each Interrogatory shall be deemed continuing so as to require prompt supplementation if you obtain, generate, or discover additional documents or information.  If, after responding, you obtain or become aware of any additional documents or information responsive to these Interrogatories, production of such additional documents or information shall be made forthwith as required by Rule 26 of the Federal Rules of Civil Procedure, as incorporated by Rules 7026 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable.

"Including" shall not be construed to limit the scope of any Interrogatory.

Whenever necessary to bring within the scope of a Interrogatory information that might otherwise be construed to be outside its scope:

    a.    The use of a verb in any tense shall be construed as the use of that verb in all other tenses;

    b.    The use of a word in its singular form shall be deemed to include within its use the plural form, and vice versa;

    c.    The use of the masculine form of a noun or pronoun shall include the feminine form, and vice versa; and

    d.    The use of the conjunctive or disjunctive, respectively, shall be construed as necessary to be inclusive rather than exclusive.

Each paragraph, subparagraph, clause, and word therein should be construed independently and not by reference to any other paragraph, subparagraph, clause or word herein for purposes of limitation.

## **INTERROGATORIES**

1.    Identify the steps you took to determine the persons to whom to send the Kosnoff Letter.

2.      Identify all steps that You took to identify the clients of Kosnoff and/or Kosnoff Law.

3.      Identify all steps that You took to ensure that the Kosnoff Letter would be transmitted only to the clients of Kosnoff and/or Kosnoff Law.

4.      If you contend that the TCC did not intend to send the Kosnoff Letter to persons represented by other counsel, then identify when you determined that the Kosnoff Letter was being sent to persons represented by other counsel, who discovered that fact and how that fact was discovered.

5.      Identify all steps that You took to correct any alleged error regarding transmittal of the Kosnoff Letter, including, but not limited to, discussing or understanding any mistake in, or objection to, the transmittal of the Kosnoff Letter, and any efforts to stop the Kosnoff Letter from being sent to parties who are not clients of Kosnoff and/or Kosnoff Law after You were notified, or otherwise became aware, of the alleged error in transmittal.

6.      Identify (a) all individuals to whom you sent the Kosnoff Letter, (b) all individuals to whom you sent any subsequent email identifying Your alleged error in sending, or otherwise commenting about the transmittal or content of, the Kosnoff Letter, and (c) the email addresses of the individuals in both groups.

7.      Identify the list of "all of [Kosnoff's] clients" that You claim were the intended recipients of the Kosnoff Letter, including, in each case, the names and email addresses of such individuals.

8.      Identify each and every time You distributed communications from an individual attorney or law firm to abuse survivors in connection with these Chapter 11 Cases.

9.      Identify all fees and expenses You incurred in connection with the Kosnoff Letter, including in connection with any remedies concerning the distribution of the Kosnoff Letter.

10.     Identify each person (a) involved in the decision to send the Kosnoff Letter using the TCC Listserv even though many of those persons were represented by counsel other than Kosnoff, (b) that knew the Kosnoff Letter would be sent to persons represented by other counsel, (c) that became aware that the Kosnoff Letter was being sent to persons represented by other counsel, and (d) that was involved in determining how to address the objections to such transmittal.

Dated: November 8, 2021
      Wilmington, Delaware

**WHITE & CASE LLP**

Glenn M. Kurtz (admitted *pro hac vice*)
Jessica C. Lauria (admitted *pro hac vice*)
Andrew W. Hammond (admitted *pro hac vice*)
Robert E. Tiedemann (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email: gkurtz@whitecase.com
      jessica.lauria@whitecase.com
      ahammond@whitecase.com
      rtiedemann@whitecase.com
      sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**

Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
      mlinder@whitecase.com
      laura.baccash@whitecase.com
      blair.warner@whitecase.com

**ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION**

**MORRIS, NICHOLS, ARSHT &
TUNNELL LLP**

*/s/  Paige N. Topper*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email: dabbott@morrisnichols.com
      aremming@morrisnichols.com
      ptopper@morrisnichols.com

**EXHIBIT 23**

**Debtors' Requests for Production to the TCC**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

## DEBTORS' SECOND SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS TO THE OFFICIAL COMMITTEE OF TORT CLAIMANTS

Pursuant to Federal Rules of Civil Procedure 26 and 34, made applicable to this matter by Federal Rules of Bankruptcy Procedure 9014, 7026 and 7034, and pursuant to the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Boy Scouts of America ("BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 case (together, the "Debtors"), by and through their undersigned counsel, hereby request that the Official Committee of Tort Claimants (the "Tort Claimants' Committee" or "TCC"), produce the documents requested in this *Debtors' Second Set of Requests for the Production of Documents to the Tort Claimants' Committee* (the "Document Requests") with responses and objections to be served by November 9, 2021, and the attendant document production to be substantially completed by November 12, 2021.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

**DEFINITIONS**

For the purposes of these Document Requests, the following Definitions shall apply:

1.       "Any" or "each" should be understood to include and encompass "all;" "or" should be understood to include and encompass "and;" and "and" should be understood to include and encompass "or."

2.       "Communication" means any oral or written utterance, notation, or statement of any nature whatsoever between or among two or more persons, by or to whomsoever made, and including without limitation, correspondence, documents, conversations, dialogues, discussions, e-mail, interviews, consultations, agreements, and other understandings, including Bloomberg messages and text messages.

3.       "Concerning," "regarding," "in connection with," "relating to," and/or "referring to" shall be construed to mean, without limitation, relating to, referring to, describing, evidencing, constituting, discussing, supporting, pertaining to, containing, analyzing, evaluating, studying, recording, showing, memorializing, reporting on, commenting on, mentioning, reviewed in conjunction with, setting forth, contradicting, refuting, considering, or recommending, in whole or in part.

4.       "Document(s)" means any printed, written, typed, recorded, transcribed, taped, photographic, or graphic mater, however produced or reproduced, including, but not limited to: any letter, correspondence, or communication of any sort, including Bloomberg or text messages; film, print or negative of photograph; sound recording; video recording; note, notebook, diary, calendar, minutes, memorandum, contract, agreement, or any amendment thereto; telex, telegram, cable; summary, report or record of telephone conversation, voice mail or voice mail back-up, personal conversation, discussion, interview, meeting, conference, investigation,

negotiation, act or activity; projection, work paper, or draft; computer or compute network output or input, hard or floppy disc, e-mail, magnetic and/or optical medias, archived or back up data on any of these medias, and documents that have been deleted but are recoverable from any of these medias; opinion or report of consultant; request, order, invoice or bill of  lading; analysis, diagram, map, index, sketch, drawing, plan, chart, manual, brochure, pamphlet, advertisement, circular, newspaper or magazine clipping, press release; receipt, journal, ledger, schedule, bill, or voucher; financial statement, statement of account, bank statement, checkbook, stubs, or register, cancelled check, deposit slip, charge slip, tax return (income or other), requisition, file, study, graph, tabulation, and any and all other writings and recording of whatever nature, whether signed or unsigned or transcribed, and any other data compilation from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonable usable form; including, without limitation, all things meeting the definition of "Documents" or "electronically stored information" set forth in Rule 34 of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, or meeting the definition of "writings and recordings" set forth in Rule 1001 of the Federal Rules of Evidence.  Any document with any marks as initials, comments, or notations of any kind is deemed not to be identical to one without such marks and is a separate document within the meaning of this term.

5.      "Kosnoff" means Timothy D. Kosnoff.

6.      "Kosnoff Law" means Kosnoff Law PLLC, including all of its agents, employees, representatives and advisors.

7.      "Kosnoff Letter" means the letter dated October 18, 2021 from Timothy D. Kosnoff with the subject line "KOSNOFF LAW RECOMMENDS THAT ABUSED IN SCOUTING CLIENTS VOTE TO REJECT THE BOY SCOUT PLAN."

8.      "You," "Your," "TCC," and "Tort Claimants' Committee" shall mean the Official Committee of Tort Claimants, including all of its members and its and its members' respective agents, representatives and advisors, including, without limitation, Berkeley Research Group, LLC, CBRE, Inc., The Claro Group LLC, John R. Conte, Ph.D, Keen-Summit Capital Partners LLC, Pachulski Stang Ziehl & Jones LLP, Pasich LLP and Rock Creek Advisors LLC.

## INSTRUCTIONS

The preceding Definitions apply to each of these Instructions and for purposes of these Document Requests; the following Instructions shall be followed:

1.      In accordance with Rule 34(a) of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, the Document Requests shall be deemed to include any document now or at any time in your possession, custody, or control, including, but not limited to, documents in the possession, custody, or control of any of your current or former affiliates, subsidiaries, parent corporations, predecessors, or successor entitles and all of their respective current or former directors, officers, employees, agents, attorneys, advisors, and representatives, or other person acting or purporting to act on its or their behalf.  A document is deemed to be in your possession, custody, or control if it is in your physical custody, or if it is in the physical custody of any other person or entity and you: (i) own such document in whole or in part; (ii) have a right, by contract, statute, or otherwise, to use, inspect, examine, or copy such document on any terms; (iii) have an understanding, express or implied, that you may use, inspect, examine, or copy such document when you sought to do so,

or (iv) as a practical matter, have been able to use, inspect, examine or copy such document on any terms.  If any requested document was, but no longer is, in your control, state the disposition of each such document.

2.      As the term "possession" pertains to e-mails, the term includes, but is not limited to, e-mails contained in your electronic e-mail directories containing (i) "deleted" e-mails which have not been permanently deleted, including all subdirectories irrespective of the title of such subdirectories; (ii) "sent" e-mails, including all subdirectories irrespective of the title of such subdirectories; and (iii) "received" e-mails, including all subdirectories irrespective of the title of such subdirectories.

3.      The word "all" shall also include "each of," and vice versa.  The word "any" shall be construed to mean "any and all" where the effect of such construction is to broaden the scope of the Document Requests.

4.      In responding to each Document Request, you are to review and search all relevant files of appropriate entities and persons.

5.      All Document Requests shall be deemed to include requests for any and all transmittal sheets, cover letters, enclosures, or any other annexes or attachments to the documents.

6.      You are to produce the original and all non-identical copies, including all drafts of each document requested.  If you are not able to produce the original of any document, please produce the best available copy and all non-identical copies, including drafts.  Any document that cannot be produced in full shall be produced to the fullest extent possible.

7.      In accordance with Rule 34(b) of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable,

documents shall be produced as they are kept in the ordinary course of business or shall be organized and labeled to correspond with the categories in each Document Request.

8.      For Documents maintained in paper format, the following specifications should be used for production:

a.      Scanned images should be produced as single-page black-and-white TIFF files in group IV format imaged at 300 dpi (or color JPEG).

b.      Each filename must be unique and match the Bates number of the page.  The filename should not contain any blank spaces and should be zero padded (for example ABC000000001).

c.      Each production volume should have its own unique name and a consistent naming convention (for example ZZZ001 or SMITH001).

d.      To the extent that Documents have been run through Optical Character Recognition ("OCR") software in the course of reviewing the Documents for production, full text should also be delivered for each Document.  Text should be delivered on a Document level and may be included in an appropriately formatted text file (".TXT") that is named to match the first Bates number of the Document.

9.      For documents that originated and are maintained in electronic format ("Electronically Stored Information"), the following specifications should be used for production:

a.      Documents should be produced in such fashion as to identify the location (i.e., the network file folder, hard drive, backup tape, or other location) where the Documents are stored and, where applicable, the natural person in whose possession they were found, or on whose hardware device they reside or are stored.

If the storage location was a file share or work group folder, that should be specified as well.

b.      Attachments, enclosures, and/or exhibits to any parent Documents should also be produced and proximately referenced to the respective parent Documents containing the attachments, enclosures, and/or exhibits.

c.      For standard Documents, emails, and presentations originating in electronic form, Documents should be produced as TIFF images using the same specifications as set forth above for paper Documents, with a delimited text file (using the delimiters detailed below) containing the following extracted metadata fields: (i) Beginning Production Number; (ii) Ending Production Number; (iii) Beginning Attachment Range; (iv) Ending Attachment Range; (v) Custodian; (vi) Original Location Path; (vii) Email Folder Path; (viii) Document Type; (ix) Author; (x) Title; (xi) File Name; (xii) File Ext; (xiii) File Size; (xiv) MD5 Hash; (xv) Date Last Modified; (xvi) Date Created; (xvii) Date Sent; (xviii) Time Sent [HH:MM:SS]; (xix) MessageID; (xx) Date Received; (xxi) From; (xxii) Recipients; (xxiii) Copyees; (xxiv) Blind Copyees; (xxv) Pages; (xxvi) Email Subject; (xxvii) Native link path; and (xxviii) Extracted Text (not OCR Text) produced as separate .TXT files.

10.     When converting Electronically Stored Information from its native format into its production format: (a) all tracked changes shall be retained in the manner in which they existed when the file was collected; (b) OLE Embedded files shall not be extracted as separate Documents; (c) author comments shall be retained in the manner in which they existed when the file was collected; (d) hidden columns and rows shall be retained in the manner in which they existed when

the file was collected; (e) presenter notes shall be retained in the manner in which they existed when the file was collected; and (f) auto-populated fields shall be replaced with descriptive text for the item.  For example, auto-populating "page number" fields shall be replaced with the text "PAGE #," auto-populating "date" fields shall be replaced with the text "DATE," and auto-populating "file path" fields shall be replaced with the text "PATH" (or other similar text).

11.    If any responsive document is known to have existed and cannot now be located, or has been destroyed, discarded, or otherwise disposed, set forth a complete statement of the circumstances surrounding such loss, destruction, discarding, or other disposition, including:

      a.    A description of the document, including the date, a summary of its contents and the identity of its author and the persons(s) to whom it was sent or shown:

      b.    The last known custodian;

      c.    Whether the document is missing or lost or was destroyed, discarded, or otherwise disposed;

      d.    The date of loss, destruction, discarding, or other disposition;

      e.    The reason(s) for destruction, discarding, or other disposition;

      f.    The person(s) authorizing or carrying out such destruction, discarding, or other deposition; and

      g.    The efforts made to locate lost or misplaced documents.

12.    If there are no Documents responsive to a specific request, so state in writing.

13.    If you know of any Documents responsive to a particular request but cannot produce them, so state, produce the Documents within your possession, custody or control on the subject matter sought, and identify each person whom you believe has Documents responsive to the request.

14.    In accordance with Rule 9019-5d of the Local Rules for the Bankruptcy Court for the District of Delaware (the "Local Rules") and the *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* [D.I. 812] (the "Mediation Order"), which incorporates that rule (*see* Mediation Order ¶ 7), these Document Requests are not seeking, and the TCC should not produce, any material that is covered by the mediation privilege pursuant to the Local Rules and the Mediation Order, including its exhibits.

15.    In the event you seek to withhold any document, thing, or information on the basis that it is properly entitled to some privilege or other limitation of discovery, you shall produce as much of the document concerned as to which no claim of privilege or other limitation of discovery is made.  With respect to documents or portions of documents for which a claim of privilege or other limitation of discovery is made, you are instructed to provide a numeral list of the document(s) and thing(s) for which a privilege or limitation is claimed that (1) identifies the nature of the privilege or limitation (including work product) asserted and, if the privilege or limitation is governed by state law, indicate the state of the privilege rule or other limitation invoked; and (2) provides the following information in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged or otherwise protected information:  (i) the type of document; (ii) the name and capacity of each author and recipient of the document; (iii) the general subject matter of the document in a manner sufficient to support the privilege or other protection claimed; (iv) the date of the document; (v) such other information as is sufficient to identify the document for a subpoena *duces tecum*, including, where appropriate, the author(s) of the document, the addressee(s) of the document, and any other recipient(s) shown in the document, and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to each other; and (vi) the same information referenced in (i)-(v) above for each enclosure or attachment

to each listed document if the enclosure or attachment is also withheld from production. Notwithstanding the assertion of any privilege or other protection, any requested document that contains responsive, non-privileged or protected information should be produced, but that portion of the document for which the privilege or other protection is asserted may be redacted, provided that the redacted portion is identified and described consistently according to the requirements listed herein.

16.    Each Definition, Instruction, and Document Request herein shall be construed independently and not with reference to any other Definition, Instruction, or Document Request, for the purposes of limitation.

17.    If any meaning of any term in any Document Request herein is unclear to you, without waiver of the right to seek a full and complete response to the Document Request, you shall assume a reasonable meaning, state what the assumed meaning is, and respond to the Document Request according to the assumed meaning.

18.    In accordance with Rule 34 of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, objections to any part of these Document Requests shall be stated in full and with specificity.  In the event you interpose an objection to a Document Request, you must produce the documents to which objection is not made or provide testimony or information not objected to, as the case may be.

19.    Each Document Request shall be deemed continuing so as to require prompt supplementation if you obtain, generate, or discover additional documents or information.  If, after responding, you obtain or become aware of any additional documents or information responsive to these Document Requests, production of such additional documents or information shall be

made forthwith as required by Rule 26 of the Federal Rules of Civil Procedure, as incorporated by Rules 7026 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable.

20. "Including" shall not be construed to limit the scope of any Document Request.

21. Whenever necessary to bring within the scope of a Document Request documents or information that might otherwise be construed to be outside its scope:

a. The use of a verb in any tense shall be construed as the use of that verb in all other tenses;

b. The use of a word in its singular form shall be deemed to include within its use the plural form, and vice versa;

c. The use of the masculine form of a noun or pronoun shall include the feminine form, and vice versa; and

d. The use of the conjunctive or disjunctive, respectively, shall be construed as necessary to be inclusive rather than exclusive.

22. Each paragraph, subparagraph, clause, and word therein should be construed independently and not by reference to any other paragraph, subparagraph, clause or word herein for purposes of limitation.

## DOCUMENT REQUESTS

1. All Documents and Communications exchanged between You and Kosnoff and/or Kosnoff Law, including all Documents and Communications relating to the Kosnoff Letter.

2. All Documents and Communications concerning Your agreement or determination to transmit the Kosnoff Letter.

3. All Documents and Communications concerning transmittal of the Kosnoff Letter, including but not limited to the method, timing and any instructions regarding distribution.

4.      All Documents and Communications concerning your decision to use (i) Your email address and/or (ii) Your listserve to distribute information from Kosnoff and/or Kosnoff Law to abuse survivors.

5.      All Documents and Communications concerning Your determination of who was a client of Kosnoff and/or Kosnoff Law.

6.      Documents sufficient to identify (i) all individuals to whom you sent the Kosnoff Letter, (ii) all individuals to whom you sent any subsequent email identifying Your alleged error in sending, or otherwise commenting about the transmittal or content of, the Kosnoff Letter and (iii) the email addresses of the individuals in both groups.

7.      Documents sufficient to identify the list of "all of [Kosnoff's] clients" that You claim were the intended recipients of the Kosnoff Letter.

8.      All Documents and Communications concerning any steps that You took to correct any alleged error regarding service of the Kosnoff Letter, including, but not limited to, discussing or understanding any mistake in, or objection to, the transmittal of the Kosnoff Letter, and any efforts to stop the Kosnoff Letter from being sent to parties who are not clients of Kosnoff and/or Kosnoff Law after You were notified of the error in transmitting it.

9.      All Documents and Communications concerning any time You distributed communications from an individual attorney or law firm to abuse survivors in connection with these Chapter 11 Cases.

10.      Documents sufficient to identify all fees and expenses You incurred in connection with the Kosnoff Letter, including in connection with any remedies concerning the distribution of the Kosnoff Letter.

Dated: November 8, 2021
       Wilmington, Delaware

**WHITE & CASE LLP**
Glenn M. Kurtz (admitted *pro hac vice*)
Jessica C. Lauria (admitted *pro hac vice*)
Andrew W. Hammond (admitted *pro hac vice*)
Robert E. Tiedemann (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email: gkurtz@whitecase.com
      jessica.lauria@whitecase.com
      ahammond@whitecase.com
      rtiedemann@whitecase.com
      sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
      mlinder@whitecase.com
      laura.baccash@whitecase.com
      blair.warner@whitecase.com

**ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION**

**MORRIS, NICHOLS, ARSHT &
TUNNELL LLP**

*/s/   Paige N. Topper*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email: dabbott@morrisnichols.com
      aremming@morrisnichols.com
      ptopper@morrisnichols.com

## **EXHIBIT 24**

**Debtors' Requests for Production to Kosnoff Law**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

**DEBTORS' FIRST SET OF REQUESTS FOR THE PRODUCTION OF**
**DOCUMENTS TO KOSNOFF LAW PLLC**

Pursuant to Federal Rules of Civil Procedure 26 and 34, made applicable to this matter by Federal Rules of Bankruptcy Procedure 9014, 7026 and 7034, and pursuant to the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Boy Scouts of America ("BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 case (together, the "Debtors"), by and through their undersigned counsel, hereby request that Kosnoff Law PLLC produce the documents requested in this *Debtors' First Set of Requests for the Production of Documents to Kosnoff Law PLLC* (the "Document Requests") with responses and objections to be served by November 9, 2021, and the attendant document production to be substantially completed by November 12, 2021.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## **DEFINITIONS**

For the purposes of these Document Requests, the following Definitions shall apply:

1.      "Any" or "each" should be understood to include and encompass "all;" "or" should be understood to include and encompass "and;" and "and" should be understood to include and encompass "or."

2.      "Communication" means any oral or written utterance, notation, or statement of any nature whatsoever between or among two or more persons, by or to whomsoever made, and including without limitation, correspondence, documents, conversations, dialogues, discussions, e-mail, interviews, consultations, agreements, and other understandings, including Bloomberg messages and text messages.

3.      "Concerning," "regarding," "in connection with," "relating to," and/or "referring to" shall be construed to mean, without limitation, relating to, referring to, describing, evidencing, constituting, discussing, supporting, pertaining to, containing, analyzing, evaluating, studying, recording, showing, memorializing, reporting on, commenting on, mentioning, reviewed in conjunction with, setting forth, contradicting, refuting, considering, or recommending, in whole or in part.

4.      "Document(s)" means any printed, written, typed, recorded, transcribed, taped, photographic, or graphic mater, however produced or reproduced, including, but not limited to: any letter, correspondence, or communication of any sort, including Bloomberg or text messages; film, print or negative of photograph; sound recording; video recording; note, notebook, diary, calendar, minutes, memorandum, contract, agreement, or any amendment thereto; telex, telegram, cable; summary, report or record of telephone conversation, voice mail or voice mail back-up, personal conversation, discussion, interview, meeting, conference, investigation,

2

negotiation, act or activity; projection, work paper, or draft; computer or compute network output or input, hard or floppy disc, e-mail, magnetic and/or optical medias, archived or back up data on any of these medias, and documents that have been deleted but are recoverable from any of these medias; opinion or report of consultant; request, order, invoice or bill of  lading; analysis, diagram, map, index, sketch, drawing, plan, chart, manual, brochure, pamphlet, advertisement, circular, newspaper or magazine clipping, press release; receipt, journal, ledger, schedule, bill, or voucher; financial statement, statement of account, bank statement, checkbook, stubs, or register, cancelled check, deposit slip, charge slip, tax return (income or other), requisition, file, study, graph, tabulation, and any and all other writings and recording of whatever nature, whether signed or unsigned or transcribed, and any other data compilation from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonable usable form; including, without limitation, all things meeting the definition of "Documents" or "electronically stored information" set forth in Rule 34 of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, or meeting the definition of "writings and recordings" set forth in Rule 1001 of the Federal Rules of Evidence.  Any document with any marks as initials, comments, or notations of any kind is deemed not to be identical to one without such marks and is a separate document within the meaning of this term.

5.     "Kosnoff" means Timothy D. Kosnoff.

6.     "Kosnoff Law," "You," and "Your," means Kosnoff Law PLLC, including all of its agents, employees, representatives and advisors.

7.     "Kosnoff Letter" means the letter dated October 18, 2021 from Timothy D. Kosnoff with the subject line "KOSNOFF LAW RECOMMENDS THAT ABUSED IN SCOUTING CLIENTS VOTE TO REJECT THE BOY SCOUT PLAN."

8.     "TCC," and "Tort Claimants' Committee" shall mean the Official Committee of Tort Claimants, including all of its members and its and its members' respective agents, representatives and advisors, including, without limitation, Berkeley Research Group, LLC, CBRE, Inc., The Claro Group LLC, John R. Conte, Ph.D, Keen-Summit Capital Partners LLC, Pachulski Stang Ziehl & Jones LLP, Pasich LLP and Rock Creek Advisors LLC.

## INSTRUCTIONS

The preceding Definitions apply to each of these Instructions and for purposes of these Document Requests; the following Instructions shall be followed:

1.     In accordance with Rule 34(a) of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, the Document Requests shall be deemed to include any document now or at any time in your possession, custody, or control, including, but not limited to, documents in the possession, custody, or control of any of your current or former affiliates, subsidiaries, parent corporations, predecessors, or successor entitles and all of their respective current or former directors, officers, employees, agents, attorneys, advisors, and representatives, or other person acting or purporting to act on its or their behalf.  A document is deemed to be in your possession, custody, or control if it is in your physical custody, or if it is in the physical custody of any other person or entity and you: (i) own such document in whole or in part; (ii) have a right, by contract, statute, or otherwise, to use, inspect, examine, or copy such document on any terms; (iii) have an understanding, express or implied, that you may use, inspect, examine, or copy such document when you sought to do so,

4

or (iv) as a practical matter, have been able to use, inspect, examine or copy such document on any terms.  If any requested document was, but no longer is, in your control, state the disposition of each such document.

2.     As the term "possession" pertains to e-mails, the term includes, but is not limited to, e-mails contained in your electronic e-mail directories containing (i) "deleted" e-mails which have not been permanently deleted, including all subdirectories irrespective of the title of such subdirectories; (ii) "sent" e-mails, including all subdirectories irrespective of the title of such subdirectories; and (iii) "received" e-mails, including all subdirectories irrespective of the title of such subdirectories.

3.     The word "all" shall also include "each of," and vice versa.  The word "any" shall be construed to mean "any and all" where the effect of such construction is to broaden the scope of the Document Requests.

4.     In responding to each Document Request, you are to review and search all relevant files of appropriate entities and persons.

5.     All Document Requests shall be deemed to include requests for any and all transmittal sheets, cover letters, enclosures, or any other annexes or attachments to the documents.

6.     You are to produce the original and all non-identical copies, including all drafts of each document requested.  If you are not able to produce the original of any document, please produce the best available copy and all non-identical copies, including drafts.  Any document that cannot be produced in full shall be produced to the fullest extent possible.

7.     In accordance with Rule 34(b) of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable,

documents shall be produced as they are kept in the ordinary course of business or shall be organized and labeled to correspond with the categories in each Document Request.

8.      For Documents maintained in paper format, the following specifications should be used for production:

a.      Scanned images should be produced as single-page black-and-white TIFF files in group IV format imaged at 300 dpi (or color JPEG).

b.      Each filename must be unique and match the Bates number of the page.  The filename should not contain any blank spaces and should be zero padded (for example ABC000000001).

c.      Each production volume should have its own unique name and a consistent naming convention (for example ZZZ001 or SMITH001).

d.      To the extent that Documents have been run through Optical Character Recognition ("OCR") software in the course of reviewing the Documents for production, full text should also be delivered for each Document.  Text should be delivered on a Document level and may be included in an appropriately formatted text file (".TXT") that is named to match the first Bates number of the Document.

9.      For documents that originated and are maintained in electronic format ("Electronically Stored Information"), the following specifications should be used for production:

a.      Documents should be produced in such fashion as to identify the location (i.e., the network file folder, hard drive, backup tape, or other location) where the Documents are stored and, where applicable, the natural person in whose possession they were found, or on whose hardware device they reside or are stored.

If the storage location was a file share or work group folder, that should be specified as well.

b.      Attachments, enclosures, and/or exhibits to any parent Documents should also be produced and proximately referenced to the respective parent Documents containing the attachments, enclosures, and/or exhibits.

c.      For standard Documents, emails, and presentations originating in electronic form, Documents should be produced as TIFF images using the same specifications as set forth above for paper Documents, with a delimited text file (using the delimiters detailed below) containing the following extracted metadata fields: (i) Beginning Production Number; (ii) Ending Production Number; (iii) Beginning Attachment Range; (iv) Ending Attachment Range; (v) Custodian; (vi) Original Location Path; (vii) Email Folder Path; (viii) Document Type; (ix) Author; (x) Title; (xi) File Name; (xii) File Ext; (xiii) File Size; (xiv) MD5 Hash; (xv) Date Last Modified; (xvi) Date Created; (xvii) Date Sent; (xviii) Time Sent [HH:MM:SS]; (xix) MessageID; (xx) Date Received; (xxi) From; (xxii) Recipients; (xxiii) Copyees; (xxiv) Blind Copyees; (xxv) Pages; (xxvi) Email Subject; (xxvii) Native link path; and (xxviii) Extracted Text (not OCR Text) produced as separate .TXT files.

10.   When converting Electronically Stored Information from its native format into its production format: (a) all tracked changes shall be retained in the manner in which they existed when the file was collected; (b) OLE Embedded files shall not be extracted as separate Documents; (c) author comments shall be retained in the manner in which they existed when the file was collected; (d) hidden columns and rows shall be retained in the manner in which they existed when

the file was collected; (e) presenter notes shall be retained in the manner in which they existed when the file was collected; and (f) auto-populated fields shall be replaced with descriptive text for the item.  For example, auto-populating "page number" fields shall be replaced with the text "PAGE #," auto-populating "date" fields shall be replaced with the text "DATE," and auto-populating "file path" fields shall be replaced with the text "PATH" (or other similar text).

11.     If any responsive document is known to have existed and cannot now be located, or has been destroyed, discarded, or otherwise disposed, set forth a complete statement of the circumstances surrounding such loss, destruction, discarding, or other disposition, including:

       a.     A description of the document, including the date, a summary of its contents and the identity of its author and the persons(s) to whom it was sent or shown:

       b.     The last known custodian;

       c.     Whether the document is missing or lost or was destroyed, discarded, or otherwise disposed;

       d.     The date of loss, destruction, discarding, or other disposition;

       e.     The reason(s) for destruction, discarding, or other disposition;

       f.     The person(s) authorizing or carrying out such destruction, discarding, or other deposition; and

       g.     The efforts made to locate lost or misplaced documents.

12.     If there are no Documents responsive to a specific request, so state in writing.

13.     If you know of any Documents responsive to a particular request but cannot produce them, so state, produce the Documents within your possession, custody or control on the subject matter sought, and identify each person whom you believe has Documents responsive to the request.

14.     In accordance with Rule 9019-5d of the Local Rules for the Bankruptcy Court for the District of Delaware (the "Local Rules") and the *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* [D.I. 812] (the "Mediation Order"), which incorporates that rule (*see* Mediation Order ¶ 7), these Document Requests are not seeking, and You should not produce, any material that is covered by the mediation privilege pursuant to the Local Rules and the Mediation Order, including its exhibits.

15.     In the event you seek to withhold any document, thing, or information on the basis that it is properly entitled to some privilege or other limitation of discovery, you shall produce as much of the document concerned as to which no claim of privilege or other limitation of discovery is made.  With respect to documents or portions of documents for which a claim of privilege or other limitation of discovery is made, you are instructed to provide a numeral list of the document(s) and thing(s) for which a privilege or limitation is claimed that (1) identifies the nature of the privilege or limitation (including work product) asserted and, if the privilege or limitation is governed by state law, indicate the state of the privilege rule or other limitation invoked; and (2) provides the following information in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged or otherwise protected information:  (i) the type of document; (ii) the name and capacity of each author and recipient of the document; (iii) the general subject matter of the document in a manner sufficient to support the privilege or other protection claimed; (iv) the date of the document; (v) such other information as is sufficient to identify the document for a subpoena *duces tecum*, including, where appropriate, the author(s) of the document, the addressee(s) of the document, and any other recipient(s) shown in the document, and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to each other; and (vi) the same information referenced in (i)-(v) above for each enclosure or attachment

9

to each listed document if the enclosure or attachment is also withheld from production. Notwithstanding the assertion of any privilege or other protection, any requested document that contains responsive, non-privileged or protected information should be produced, but that portion of the document for which the privilege or other protection is asserted may be redacted, provided that the redacted portion is identified and described consistently according to the requirements listed herein.

16.     Each Definition, Instruction, and Document Request herein shall be construed independently and not with reference to any other Definition, Instruction, or Document Request, for the purposes of limitation.

17.     If any meaning of any term in any Document Request herein is unclear to you, without waiver of the right to seek a full and complete response to the Document Request, you shall assume a reasonable meaning, state what the assumed meaning is, and respond to the Document Request according to the assumed meaning.

18.     In accordance with Rule 34 of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, objections to any part of these Document Requests shall be stated in full and with specificity.  In the event you interpose an objection to a Document Request, you must produce the documents to which objection is not made or provide testimony or information not objected to, as the case may be.

19.     Each Document Request shall be deemed continuing so as to require prompt supplementation if you obtain, generate, or discover additional documents or information.  If, after responding, you obtain or become aware of any additional documents or information responsive to these Document Requests, production of such additional documents or information shall be

made forthwith as required by Rule 26 of the Federal Rules of Civil Procedure, as incorporated by Rules 7026 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable.

20.     "Including" shall not be construed to limit the scope of any Document Request.

21.     Whenever necessary to bring within the scope of a Document Request documents or information that might otherwise be construed to be outside its scope:

      a.     The use of a verb in any tense shall be construed as the use of that verb in all other tenses;

      b.     The use of a word in its singular form shall be deemed to include within its use the plural form, and vice versa;

      c.     The use of the masculine form of a noun or pronoun shall include the feminine form, and vice versa; and

      d.     The use of the conjunctive or disjunctive, respectively, shall be construed as necessary to be inclusive rather than exclusive.

22.     Each paragraph, subparagraph, clause, and word therein should be construed independently and not by reference to any other paragraph, subparagraph, clause or word herein for purposes of limitation.

## DOCUMENT REQUESTS

1.     All Documents and Communications exchanged between You and the TCC, including all Documents and Communications relating to the Kosnoff Letter.

2.     All Documents and Communications concerning the TCC's agreement to transmit the Kosnoff Letter.

3.      All Documents and Communications concerning transmittal of the Kosnoff Letter by the TCC, including but not limited to the method, timing and any instructions regarding transmittal.

4.      All Documents and Communications concerning the decision to use (i) a TCC email address and/or (ii) a TCC listserv to transmit the Kosnoff Letter to clients of Kosnoff and/or Kosnoff Law.

5.      All Documents and Communications concerning the intended recipients of the email from the TCC attaching the Kosnoff Letter.

6.      All Documents and Communications exchanged between You and the TCC concerning the identities of the clients of Kosnoff and/or Kosnoff Law.

7.      All Documents and Communications concerning (a) Your knowledge or awareness that the TCC would send the Kosnoff Letter to persons represented by other counsel, (b) Your knowledge or awareness that other counsel had given contrary advice to the advice provided in the Kosnoff Letter, and (c) any analysis concerning sending the letter to those persons under those circumstances.

Dated: November 8, 2021
       Wilmington, Delaware

**WHITE & CASE LLP**
Glenn M. Kurtz (admitted *pro hac vice*)
Jessica C. Lauria (admitted *pro hac vice*)
Andrew W. Hammond (admitted *pro hac vice*)
Robert E. Tiedemann (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email: gkurtz@whitecase.com
       jessica.lauria@whitecase.com
       ahammond@whitecase.com
       rtiedemann@whitecase.com
       sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
       mlinder@whitecase.com
       laura.baccash@whitecase.com
       blair.warner@whitecase.com

**ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION**

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/  Paige N. Topper*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email: dabbott@morrisnichols.com
       aremming@morrisnichols.com
       ptopper@morrisnichols.com

## EXHIBIT 25

**TCC's Third Response Letter**



James I. Stang

November 8, 2021

310.772.2354
jstang@pszjlaw.com

L A W   O F F I C E S
LIMITED LIABILITY PARTNERSHIP

L O S   A N G E L E S ,   C A
S A N   F R A N C I S C O ,   C A
W I L M I N G T O N ,   D E
N E W   Y O R K ,   N Y
H O U S T O N ,   T X

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067-4003

**TELEPHONE: 310.277.6910**
FACSIMILE: 310.201.0760

**SAN FRANCISCO**
1 MARKET PLAZA SPEAR TOWER 40th
SUITE 4000
SAN FRANCISCO
CALIFORNIA 94105-1020

**TELEPHONE: 415.263.7000**
FACSIMILE: 415.263.7010

**DELAWARE**
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302.652.4100**
FACSIMILE: 302.652.4400

**NEW YORK**
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212.561.7700**
FACSIMILE: 212.561.7777

**TEXAS**
440 LOUISIANA STREET
SUITE 900
HOUSTON
TEXAS 77002-1062

**TELEPHONE: 713.691.9385**
FACSIMILE: 713.691.9407

**VIA E-MAIL**

Jessica C. Lauria
White & Case
1221 Avenue of the Americas
New York, NY  10020
Email:  jessica.lauria@whitecase.com

> **Re:**   **In re Boy Scouts of America and Delaware BSA LLC,**
> **Case No. 20-10343 (LSS) (the "Chapter 11 Case")**

Dear Jessica:

I am writing in response to your November 8, 2021 letter in response to my email to you on November 7, 2021 regarding my firm's distribution of an email communication on behalf of Tim Kosnoff. As I previously stated, on November 5 and 6, 2021 my firm, using its BSASurvivors@pszjlaw.com email, sent a message on behalf of Mr. Kosnoff to approximately 12,895 of his clients. Mr. Kosnoff provided my firm with the names and email addresses of approximately 12,895 clients of Mr. Kosnoff (the "Kosnoff List"), who authorized my firm to send the communication to his clients on his behalf. I have attached the Kosnoff List. The message was intended exclusively for Mr. Kosnoff's clients and it was received by them.

In addition, my firm inadvertently sent the same communication to approximately 7,572 email addresses (the "TCC List"), which consisted of unrepresented survivors, attorneys or law firms that represent survivors, and survivors that might be represented. The TCC List is attached. On November 7, 2021, a follow up email was sent to the TCC List notifying the recipients that the communication sent on behalf of Mr. Kosnoff was sent in error and should be disregarded. A copy of that email is attached.

The TCC List originated at the outset of the TCC's appointment and my firm's engagement by the TCC. On behalf the TCC and pursuant to

WEB: www.pszjlaw.com



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Jessica C. Lauria
November 8, 2021
Page 2

sections 1102(b) and 1103(c) of the Bankruptcy Code, my firm
periodically sends updates to survivors and counsel about the status of
the Debtors' bankruptcy case. Initially and throughout the case,
attorneys, law firms, and survivors asked to be added to the TCC List so
that they would receive the periodic updates. My firm also added to the
TCC List the email addresses of unrepresented survivors.

Notably, the TCC List contains the emails of all the firms claiming
affiliation of the "Coalition." That list consists of sixty-three different
emails to the following law firms:

- Brown Rudnick
- Slater Slater & Schulman
- Andrews & Thornton
- Eisenberg, Rothweiler Winker, Eisenberg & Jeck
- ASK LLP
- Junell & Associates
- Reich & Binstock
- Krause & Kinsman Law Firm
- Bailey Cowan Heckman
- Motley Rice
- Weller Green Toups & Terrell
- Colter Legal
- Forman Law Offices
- Danziger & De Llano
- Christina Pendleton & Associates
- Swenson & Shelley
- Cohen Hirsch
- Damon J. Baldone, Cutter Law
- The Robert Pahlke Law Group
- Napoli Shkolnik
- Porter & Malouf
- The Moody Law Firm
- Levin Papantonoio Thomas Mitchell Rafferty & Procter
- Marc J. Bern & Partners
- Jason J. Joy & Assocs.
- Babin Law

In addition to the communication sent on behalf of Mr. Kosnoff, my firm
has sent numerous communications to the emails addresses on the TCC



Jessica C. Lauria
November 8, 2021
Page 3

List that included notice of every "town hall" meeting hosted by the TCC for all survivors and their counsel. In addition, all of the information that is provided to survivors and their counsel is available on my firm's website (www.tccbsa.com), including the dates, times, and zoom instructions for every town hall, which we assume that you or others at your firm regularly attend. Prior to sending the communication on behalf of Mr. Kosnoff, my firm has never received a single complaint from any addressee on the TCC List, including not a single complaint from any of the sixty-three email addresses of the "coalition" related firms on the TCC List.

As counsel to the TCC, my firm receives thousands of emails from survivors that are seeking specific information about their claim. As part of the requests to my firm, survivors complain that their counsel fails to return their calls and emails or refuses to answer the questions submitted to them. A substantial number of the survivors that are on the TCC List have repeatedly emailed my firm for assistance including, but not limited to, information about the case, their claim, or the plan and voting. For example, survivors routinely ask for their claim number, a copy of their proof of claim, a copy of the plan and disclosure statement, or a copy of their ballot.

In response to your letter:

- I have attached the Kosnoff List, TCC List, and described who received the follow-up corrective email after the original communication was sent on behalf of Mr. Kosnoff.

- The TCC already sent a corrective communication and will not send another to the parties on the TCC List. All of the coalition related law firms that are likely complaining about the communication also received the original and corrective communications. If they find it necessary to reach out to any of their clients they can search the TCC List and take whatever actions they find necessary.

- The TCC will not send the Debtors', FCR's, or coalition's solicitation letter to the parties on the TCC List. Now that you have the TCC List, nothing is preventing any of you from sending your plan solicitation letters to the extent you find it necessary.

- I received your discovery requests and I will discuss them with the TCC and respond in due time.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Jessica C. Lauria
November 8, 2021
Page 4

- The TCC will not agree to refrain from distributing communications on behalf of state court counsel or any other party for the duration of the case. Nothing prevents the TCC from distributing communications on behalf of others and your demand is nothing more than an attempt to silence the TCC who has a fiduciary responsibility to keep its constituency informed and work with those who have similar goals and objectives for the outcome of the case.

- Lastly, the TCC will not agree to preview its communications with its constituency with you or any other party.

As counsel to the TCC, my firm endeavors to provide survivors with the information they are entitled pursuant to sections 1102(b) and 1103(c) and as a creditor and party in interest in a case that is about the abuse they suffered.  I regret that Mr. Kosnoff's communication was sent to the entire TCC List. As I previously stated, that was unintentional and resulted from a miscommunication between my partner, John Lucas, and a person on our staff.

Very truly yours,

*/s/ James I. Stang*

James I. Stang

Cc: John W. Lucas (via email)

## EXHIBIT 26

**September 22, 2021 Hearing Transcript Excerpt**

Case 20-10343-LSS   Doc 7119-26   Filed 11/10/21   Page 2 of 3
Case 1:21-mc-00011-SPW-TJC   Document 10-3   Filed 11/15/21   Page 187 of 188

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

                                          .   Chapter 11

IN RE:                         .

                                          .   Case No. 20-10343 (LSS)

BOY SCOUTS OF AMERICA AND    .

DELAWARE BSA, LLC,           .

                                          .   Courtroom No. 2

                                        .   824 North Market Street

                                        .   Wilmington, Delaware 19801

                                        .

                   Debtors.    .   September 22, 2021

. . . . . . . . . . . . . . . .   10:00 A.M.

     TRANSCRIPT OF TELEPHONIC DISCLOSURE STATEMENT HEARING
       BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
            UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:       Derek Abbott, Esquire
                  MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                  1201 North Market Street, 16th Floor
                  Wilmington, Delaware 19899

                  - and -

                  Jessica C. Lauria, Esquire
                  WHITE & CASE LLP
                  1221 Avenue of the Americas
                  New York, New York 10020

Audio Operator:      Brandon J. McCarthy, ECRO

Transcription Company:   Reliable
                  1007 N. Orange Street
                  Wilmington, Delaware 19801
                  (302)654-8080
                  Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

Case 20-10343-LSS   Doc 7119-26   Filed 11/10/21   Page 3 of 3
Case 1:21-mc-00011-SPW-TJC   Document 10-3   Filed 11/15/21   Page 188 of 188

107

1          THE COURT: So let's put it in.

2          MR. HARRON:  Will do, your Honor.

3          MR. LINDER:  May we move to the next topic, Your

4   Honor.

5          THE COURT: Yes.

6          MR. LINDER:  The next one, I believe we skipped

7   ahead previously and addressed it, it was about allowing

8   creditors to have notice and an opportunity to be heard with

9   respect to claims objections.

10          THE COURT: Yes.

11          MR. LINDER:  So we'll skip ahead then to number 19

12   which is attorneys' fees.  The objection, Your Honor, is that

13   there is not clarity in the disclosure statement with  respect

14   to the potential dissolution of distributions to holders of

15   claims by amounts paid to counsel.

16          I think this objection, Your Honor, is really split

17   into two subcomponents.  The first of those is that there are

18   claims of -- there are attorneys' fees that will be payable by

19   individual abuse claimants to their own, what we refer to as

20   state court counsel. The debtors are not privy to those

21   contractual arrangements so we don't have a basis to estimate

22   what those might be so we don't have any disclosure on that

23   point in he disclosure statement.

24          When we say that there's a range of values, that is

25   -- that is the aggregate recoveries claimants can expect to