# EXHIBIT 17

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3                                    .   Chapter 11
      IN RE:                          .
 4                                    .   Case No. 20-10343 (LSS)
      BOY SCOUTS OF AMERICA AND       .
 5    DELAWARE BSA, LLC,              .
                                      .   Courtroom No. 2
 6                                    .   824 North Market Street
                                      .   Wilmington, Delaware 19801
 7                                    .
                      Debtors.        .   Friday, November 12, 2021
 8    . . . . . . . . . . . . . . . .     10:00 A.M.

 9                   TRANSCRIPT OF OMNIBUS HEARING
           BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                 UNITED STATES BANKRUPTCY JUDGE

11    APPEARANCES:

12
      For the Debtor:           Derek Abbott, Esquire
13                              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                1201 North Market Street, 16th Floor
14                              Wilmington, Delaware 19899

15                              - and -

16                              Jessica C. Lauria, Esquire
                                Glenn Kurtz, Esquire
17                              WHITE & CASE LLP
                                1221 Avenue of the Americas
18                              New York, New York 10020

19
      Audio Operator:           LaCrisha Harden, ECRO
20
      Transcription Company:     Reliable
21                              1007 N. Orange Street
                                Wilmington, Delaware 19801
22                              (302)654-8080
                                Email:  gmatthews@reliable-co.com
23

24    Proceedings recorded by electronic sound recording; transcript
      produced by transcription service.
25
```

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For the Debtors:           Adrian Azer, Esquire
                               HAYNES & BOONE LLP
3                              800 17th Street NW, Suite 500
                               Washington, DC 20006
4

5   For Century:              Tancred Schiavoni, Esquire
                               O'MELVENY & MYERS LLP
6                              Times Square Tower
                               7 Times Square
7                              New York, New York 10036

8   For the FCR:              Robert Brady, Esquire
                               YOUNG CONAWAY STARGATT & TAYLOR LLP
9                              Rodney Square
                               1000 North King Street
10                             Wilmington, Delaware 19801

11
    For Tort Claimants:       James Stang, Esquire
12                             PACHULSKI STANG ZIEHL JONES LLP
                               10100 Santa Monica Blvd., 13th Floor
13                             Los Angeles, California 90067

14                             - and -

15                             Debra Grassgreen, Esquire
                               PACHULSKI STANG ZIEHL & JONES LLP
16                             One Market Plaza, Spear Tower
                               40th Floor
17                             San Francisco, California 94105

18
    For the Coalition of      David Molton, Esquire
19  Abused Scouts for         BROWN RUDNICK LLP
    Justice:                  7 Times Square
20                             New York, New York 10036

21  For the U.S. Trustee:     David Buchbinder, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
22                             OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
23                             Lockbox 35
                               Wilmington, Delaware 19801
24

25
```

```
 1    APPEARANCES (Cont'd):

 2    For Zalkin Law Firm:      Thomas Patterson, Esquire
                                KTBS LAW LLP
 3                              1801 Century Park East, 26th Floor
 4                              Los Angeles, California 90067

 5    For Guam Abuse            Delia Lujan Wolff, Esquire
      Survivors:                LUJAN & WOLFF LLP
 6                              238 Archbishop FC Flores
                                Suite 300
 7                              Hagatna, Guam 96910

 8
      For Survivor Creditors:   Andrew Goldfarb, Esquire
 9                              ZUCKERMAN SPAEDER LLP
                                1800 M Street NW, Suite 1000
10                              Washington, DC 20036

11    For Eisenberg            Daniel Hogan, Esquire
      Rothweiler, Winkler,     HOGAN MCDANIEL
12    Eisenberg & Jeck:        1311 Delaware Avenue
                               Wilmington, Delaware 19806
13
      For the AIG Companies:   Michael Rosenthal, Esquire
14                             GIBSON, DUNN & CRUTCHER LLP
                               200 Park Avenue
15                             New York, New York 10166

16

17

18

19

20

21

22

23

24

25
```

1  <u>MATTERS GOING FORWARD</u>:

2  Debtors' Emergency Motion for Entry of an Order (I) Enforcing
   the Solicitation Procedures Order, (II) Enforcing Section 1103
3  of the Bankruptcy Code Against the Tort Claimants' Committee,
   and (III) Granting Related Relief (D.I. 7118, filed
4  11/10/2021)

5       **Court's Ruling:  Matter Continued**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings commence at 10:04 a.m.)

 2              THE COURT:  Good morning.  This is Judge

 3  Silverstein.  We're here in the Boy Scouts of America

 4  bankruptcy, Case 20-10343.

 5              I received some emails this morning.  I want to

 6  make sure I understand what I have received.

 7              Mr. Abbott, can you tell me what I received this

 8  morning?

 9              MR. ABBOTT:  Your Honor, I'm sorry, we couldn't

10  hear anything you were saying on our end.

11              THE COURT:  Okay.  Thank you.

12              Can you hear me now?

13         (No verbal response)

14              THE COURT:  No.

15         (Pause)

16              THE COURT:  I'm going to try again.  Can anyone

17  hear me?

18         (No verbal response)

19              THE COURT:  No.

20              THE CLERK:  Good morning, counsel.  This is the

21  Delaware Bankruptcy Court.

22              Are you able to hear us on your end?

23              MR. ABBOTT:  We are now, yes.  Thank you.

24              THE COURT:  Thank you.  This is Judge Silverstein.

25  We're here in the Boy Scouts of America bankruptcy, Case 20-
```

1  10343, for a limited hearing in connection with matters

2  regarding the debtors' motion with respect to the email sent

3  out by the committee.

4          So I received two -- I guess drafts of two letters

5  this morning. I would like to understand what it is I have

6  received.

7          Mr. Abbott.

8          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

9  of Morris Nichols here for the debtors.

10          Your Honor, as the court directed, the parties met

11  and conferred to try to collectively come up with a single

12  communication as to which all parties could agree.

13  Unfortunately, they did not agree.  What Your Honor has two

14  letters; one that is proposed by the parties other than the

15  TCC, the other proposed by the TCC.

16          Your Honor, I'm happy to turn it over to Ms. Lauria

17  if you would like to hear discussion about those or ask

18  questions.  Obviously, all those folks are on the phone and

19  happy to try to answer the court's questions and explain why

20  they think that their particular letter is more appropriate.

21          THE COURT:  Yes.  Let me hear from Ms. Lauria, then

22  I will hear from Mr. Stang.  And I have some thoughts and

23  questions, quite frankly, about the way to proceed, but let me

24  hear from Ms. Lauria.

25          MS. LAURIA:  Sure, Your Honor.  Jessica Lauria,

1  White & Case, on behalf of the Boy Scouts.

2          Your Honor, Mr. Molton and others may have further

3  comments or points that they want to make with respect to the

4  letter, but from the debtors' perspective there are two points

5  of distinction between the two letters that are meaningful to

6  us.

7          I am looking at the TCC's letter, and the way you

8  can tell it's the TCC's, I'm not sure how they were labeled

9  when you received them, Your Honor, but if you see the bold

10 language in, sort of, I guess, the second paragraph of the

11 letter the first sentence of the bold language says,

12     "Our distribution of Mr. Kosnoff's email and letter to

13 the TCC email list was a mistake."

14         That is one instance where we have the first point

15 of disagreement.  The TCC would like to characterize it as a

16 mistake.  The plan -- the debtor and I believe the other plan

17 supporters want to characterize it as wrong and inappropriate,

18 and I can tell you why.

19         Just for sake of completeness I want to point you

20 to the second point of dispute, again, at least from the

21 debtors' perspective and that is at the end of -- after you

22 see the bold language there is one sentence called out not in

23 bold, the next paragraph the last sentence of that says

24 parties in the BSA bankruptcy case have asserted that Mr.

25 Kosnoff's email and letter contain false, misleading and

1  inaccurate statements that are inconsistent with the court

2  approved disclosure statement, and that the TCC's counsel

3  should not have used its email account to send Mr. Kosnoff's

4  letter.

5          The dispute is that this says parties in the BSA

6  bankruptcy case instead of just affirmatively saying it

7  contained false, misleading and inaccurate statements, and

8  that the TCC's counsel should not have sent the letter.  So,

9  again, from the debtors' perspective those are the two

10  principal points of contention between the two letters.

11          We believe, when I look at that first point of

12  contention, mistake v. wrong and inappropriate, as I

13  understand it the TCC believes that sending the email to Mr.

14  Kosnoff's purported clients was not a mistake, that they sent

15  that intentionally and that the only mistake that was made was

16  sending it to the broader TCC server.

17          We think they are still just missing the boat on

18  this point, Your Honor. We think there are four reasons why it

19  was, in fact, wrong and inappropriate.

20          Reason one is we don't think the official TCC email

21  address should ever be used to be sending a state court

22  counsel's communication to his clients, period, full stop.

23  That should not ever happen.  That should not be used for the

24  official email address.  And to make matters worse, a we

25  understand it, they relied on Mr. Kosnoff's representation

1  that the 12,000 individuals were his clients, but unlike Omni,

2  and I will turn to what Omni does in a moment, I don't believe

3  that there was any diligence done in terms of ascertaining

4  whether these individuals were, in fact, his clients.  Again,

5  even if they did we still think it's wrong.

6         We still think they should not be using the

7  official email address, but if they were going to even take

8  that positon, you know, Omni will only assume that an attorney

9  represents an individual if the survivor indicated on their

10  proof of claim form that they are represented by counsel and

11  identified the counsel, or if the attorney provides an actual

12  engagement letter or written verification that that attorney

13  represents each and every individual that they purport to

14  represent. As we understand it that didn't happen here.  So

15  that is issue one.

16         Issue two for why it was wrong and inappropriate is

17  they read the cover email that Mr. Kosnoff sent before they

18  sent it.  That cover email clearly contains derogatory and

19  defamatory remarks about another attorney in this case.  It is

20  wrong and inappropriate to utilize the official TCC email

21  address to make those remarks.  It was, essentially, an

22  endorsement of those remarks.  That was wrong and

23  inappropriate.

24         We also think it was wrong and inappropriate to use

25  an official TCC email address to point people to that twitter

1  feed.  I don't look at twitter, you don't look at twitter, but

2  there are derogatory and defamatory statements about the court

3  and individuals involved in the case on twitter.  We're not

4  trying to curtail Mr. Kosnoff's right to say what he wants to

5  say on twitter, but that should not be endorsed by an official

6  committee that was appointed by the United States Trustee in

7  this case.

8       Third, we believe that it was inappropriate to send

9  out something that does have false and misleading statements,

10 and I will come back to that in a moment, but at a minimum

11 there does not appear to be any evidence that the TCC reviewed

12 the letter that Mr. Kosnoff prepared and compared that letter

13 against the court approved disclosure statement or the TCC's

14 own communications which we spent five days reviewing.

15      Finally, Your Honor, we think it was wrong and

16 inappropriate because it simply wasn't a mistake.  We supplied

17 the emails to the court that during the course of Saturday,

18 the day that the email communication went out, and it went out

19 on a rolling basis over the course, it appears, of several

20 hours.  Mr. Molton reached out to the Pachulski Firm on at

21 least three occasions to say, guys, what are you doing.  I am

22 getting this email.  There are people getting this email that

23 are represented by other counsel and no action was taken until

24 Sunday to try to stop it.  That just doesn't feel like a

25 mistake to us.  We do think it was wrong and inappropriate.

1          As to the next point, Your Honor, again, just

2 simply asserting that parties in the bankruptcy case have

3 asserted Mr. Kosnoff's email and letter contained false,

4 misleading and inaccurate statements and that parties in the

5 case are saying the TCC shouldn't have done it we think the

6 court should say they shouldn't have done it, number one,

7 because they shouldn't have done it.  Two, and this will come

8 out maybe more fully on Wednesday, but we have identified nine

9 problems, and these were in our motion, with the statements

10 made in Mr. Kosnoff's email.

11          In addition to the defamatory remarks, which I

12 think are, in fact, false, misleading and inaccurate

13 statements, and I think we can all agree to that, not just

14 parties in the case, but all of us can agree to that.  In

15 addition to pointing to people to a twitter feed that contains

16 false, misleading and inaccurate statements there are seven

17 instances in the letter that Mr. Kosnoff sent that depart from

18 what the court approved in the disclosure statement and in the

19 TCC communication that is false, misleading and inaccurate.

20 It is not simply that parties in the case are saying it, the

21 email itself said it.

22          Your Honor, those are the two issues.  Beyond that

23 I would like to acknowledge, Your Honor, that the parties work

24 very hard yesterday to come to ground on this form of

25 communication.  I think when you look at the two forms of

1   letter they are actually substantially similar.  So we are

2   only before you on a couple of discreet points, but those are

3   the points.

4             THE COURT:  Thank you.

5             MR. BUCHBINDER:  Your Honor, this is Dave

6   Buchbinder.  I hate to interrupt, but apparently some

7   documents have been submitted to the court and they haven't

8   been submitted to the U.S. Trustee.  And I would like counsel

9   to send me copies of these letters immediately.

10            Thank you very much.

11            THE COURT:  Thank you.  Someone see that that is

12  done, please.

13            Mr. Molton.

14            MR. MOLTON:  I hope you can hear me, Your Honor.

15            THE COURT:  I can.

16            MR. MOLTON:  I am not going to repeat everything

17  that Ms. Lauria said.  Be advised that we support all of her

18  points.  I am going to just talk about what we consider to be

19  the differences and just add some further support for what Ms.

20  Lauria said.

21            Clearly the TCC wants to send out a letter with

22  court approval that characterizes what they did as an

23  unintended mistake against wrong and appropriate.  Your Honor

24  heard Ms. Lauria and I think we all agree the coalition, Ms.

25  Lauria and other parties that you heard from a couple days ago

1  that notwithstanding that whether or not the TCC intended the

2  email only to go to Mr. Kosnoff's clients to utilize a

3  fiduciaries creditor survivor facing email platform to send

4  out an inflammatory and, yes, defamatory email to those

5  clients without anything suggesting that the email had been

6  vetted and suggesting actually by the absence of any

7  qualification whatsoever, and I'm not even saying a

8  qualification would make it right, but the absence of anything

9  suggested to the reader that the TCC was endorsing what was

10  said.

11          We think that that was wrong, wrong in and of

12  itself.  We object to this letter trying to set the stage for

13  Wednesday's hearing in characterizing this as an unintended

14  mistake.  Discovery is ongoing.  We don't know whether it was

15  unintended or not.  That still has to be decided.  This letter

16  should not be used to put a thumb on the scale in connection

17  with that issue.

18          Ms. Boelter has stated why the Kosnoff email and

19  letter were misleading as opposed to be alleged to be

20  misleading. I think that that is not subject to discovery,

21  that is subject to taking a look at Your Honor's court

22  approved disclosures and comparing that to the letter.

23  Clearly what was contained in the letter was misleading.

24          Also, the proposed TCC email, Your Honor, is

25  absolutely silent as to what was contained in the Kosnoff

1   email and letter.  I think what they say, and this is the one,

2   two, third paragraph on the proposed TCC email, three lines

3   down, we acknowledge that the email and letter contain

4   language directed against another lawyer and his law firm.

5   What fluff, what cotton candy, what milquetoast.  That is not

6   an accurate depiction of what that email and corresponding

7   letter contained.  It contained inflammatory, and defamatory

8   and prejudicial language against another lawyer in this case.

9           Again, this letter, which will be court approved,

10  should not sanction, meaning approve, characterizing that

11  language in such a misleading way because what the TCC letter

12  does is, in effect, characterize that language in an

13  inaccurate way.  We think, you know, if it looks like a duck

14  and walks like a duck it should be called a duck.  It's a

15  duck.  Its inflammatory, it's defamatory.

16          Lastly, Your Honor, that goes to my final point, is

17  that, again, I viewed differences in the letter.  We tried

18  very hard in our letter to be factual, purely factual; factual

19  and nothing else.  We view the TCC's letter with respect to

20  the points that differ, and I think Ms. Boelter did a very

21  good job of articulating that and I have tried to emphasize

22  certain portions of that, as an attempt to preset, you know,

23  and put an imprimatur of approval by way of court approval of

24  this letter on the positions that, arguably or presumably,

25  they're going to take as we go forward.

1          We respectfully request that Your Honor not do that

2   and Your Honor put out an approved an appropriate email letter

3   from the TCC that is factual and isn't a preemptive litigation

4   piece.

5          Thank you, Your Honor.

6          THE COURT:  Thank you.

7          Ms. Grassgreen.

8          MS. GRASSGREEN:  Good morning, Your Honor.  Debra

9   Grassgreen of Pachulski Stang Ziehl & Jones on behalf of the

10  official tort claimants committee.

11         Your Honor, I want to just take you back to where

12  you started this hearing, I think the first words you said,

13  which today is a limited hearing.  The point of today is not

14  to litigate the motion, that is for Wednesday.  We haven't

15  even had an opportunity to fully respond to the motion. It's a

16  limited hearing about a communication that the parties have

17  asked that go out from the TCC, signed by the TCC.

18         So where I agree with Mr. Molton is that that

19  communication should not be any kind of finding of any of the

20  issues that you are going to determine on Wednesday.  What

21  they are asking you to do does; it determines legal issues, it

22  determines factual issues and it's signed by our firm.

23         So what I would like to do is just step back a

24  little bit, give a little bit of context about what happened

25  because I think the context is really important here, Your

1   Honor, about the two groups.  This is not about setting up

2   litigation strategy, this is about making sure that we are not

3   confusing survivors. I would just assume see a letter go out

4   that takes all of that out and is very basic.  Then once you

5   have a hearing and you make your findings then those findings

6   can be transmitted, but you haven't done that yet.  You

7   haven't had an opportunity to do that and we haven't had due

8   process on it.

9           Let me step back and give a little bit of context

10  because I have some real concerns about confusing survivors

11  further.  So if I could.

12          Your Honor, two things happened last week that are

13  the subject of the motion.  And I think we can't gloss over

14  them. I know Ms. Boelter just commented that there is a

15  difference in our letters where we're talking about the TCC

16  email list. I know we went through this with Mr. Stang.  You

17  didn't have the benefit of the letter in front of you or

18  having read the motion when he made his comments last week,

19  earlier in the week.  So I would just like to take a moment to

20  do that.

21          First -- two things happened.  First, our firm sent

22  Mr. Kosnoff's letter with his cover email signed by him with a

23  red line that said communication from Kosnoff to the client

24  list that he provided, an email list that was actually

25  provided by one of the other of the three that represent this

1 group of clients.  This letter and the cover email -- this

2 group of clients has three sets of lawyers already, three sets

3 of lawyers representing one client and they're getting

4 communications from those lawyers.  Two of the law firms, as I

5 understand it, are saying vote yes, vote yes, vote yes and one

6 is saying vote no.  That, in and of itself, is causing

7 confusion and I know that because I have been answering

8 questions that come on the town hall that --

9       THE COURT:  That is their confusion.  That is not

10 the committee's concern.

11       MS. GRASSGREEN:  Absolutely, but I don't was to

12 exacerbate it, Your Honor.  So if I could go through it. So

13 that letter and the covering email, the attached letter was

14 something that we understand they had already gotten, the

15 covering email they hadn't gotten. So one group of people got

16 a communication that included a letter saying vote no on the

17 plan.  It wasn't approved by the court, but, Your Honor,

18 solicitations don't have to be approved post-disclosure

19 statement.  They do have to be truthful, they do have to be

20 accurate, but they don't have to be approved once you approve

21 a disclosure statement.  We're not all limited to the

22 boundaries of the disclosure statement.  S that was one group.

23       There is a second group, which is what we call the

24 TCC email list, that is kind of a mish-mash email list that

25 our firm has just compiled over time of people that have

1  reached out to us.  That list was a mistake.  That was like on

2  a completely different scale, but that was like me hitting

3  reply all to an email that I didn't mean to send to someone.

4  That -- those are not clients of Mr. Kosnoff, maybe some of

5  them are.  We are checking the list against each other, but

6  that was never intended.  We are not walking back from that we

7  intended to do what we did which is send the cover email to

8  Mr. Kosnoff.

9         The reason why it's important is because if you

10  look at the language without you having determined that it was

11  false or misleading, and without you have determined that it

12  was defamatory, and Mr. Molton said this is just the facts,

13  well defamatory is not a fact, it's a legal conclusion.  And,

14  you know, false and misleading has to be based on some sort

15  of, you know, evidentiary showing and that is the hearing that

16  we are having on Wednesday.

17         So what I am concerned about for the Kosnoff group,

18  let's take that group first, is what does it do to send to a

19  client something signed by our law firm that says your client

20  is giving -- your lawyer is giving you false information. I am

21  sending that to somebody else's client.

22         THE COURT:  Well didn't you already do that when

23  you --

24         MS. GRASSGREEN:  No, we didn't.

25         THE COURT:  -- said that Rothweiler's information

1  was wrong.

2          MS. GRASSGREEN:  We didn't because the cover email

3  was signed by Kosnoff.

4          THE COURT:  Under the committee's --

5          MS. GRASSGREEN:  It wasn't signed by --

6          THE COURT:  -- email it was an endorsement. It had

7  to be an endorsement.  It was nothing but an endorsement.

8  It's really super unfortunate here what has happened, but I do

9  agree that in my concern, quite frankly, is the court

10 imprimatur on something that, quite frankly, the TCC is going

11 to sign that doesn't pre-judge things and that doesn't force

12 the committee's counsel to further, perhaps, breach their

13 professional responsibilities and obligations.  I am very

14 concerned about this.

15          What does Mr. Rothweiler want to go out?  Has

16 anyone spoken with him because to me, I will tell you and what

17 I believe a concern that no one has yet expressed, but

18 concerns me, is that the clients -- Mr. Kosnoff's clients were

19 represented by three firms.  The committee -- I don't know,

20 but I suspect the committee did not have permission from all

21 three firms to send a communication to their clients, their

22 collective clients.

23          MS. GRASSGREEN:  No, Your Honor, we did not.  We

24 had permission from Mr. Kosnoff and --

25          THE COURT:  I find that problematic.  I find that

1  problematic.  There are three law firms that represent those

2  clients and you only had permission from one.

3          MS. GRASSGREEN:  I understand that, Your Honor.  I

4  will tell you we did it on advice of ethics counsel.  We

5  previously (indiscernible) TCC notices.

6          THE COURT:  That is really interesting that you

7  felt the need to get advice of ethics counsel for that.  That

8  is very telling.  And I will be interested in hearing that

9  advice that the committee got because I find that very

10 problematic especially because the committee knows that the

11 lawyers disagree.  The lawyers disagree, the committee knows

12 it.

13         The committee turned a private attorney/client

14 communication that was not a solicitation into a solicitation

15 endorsed by the committee.  The question is what do I do about

16 it that doesn't create more confusion, that doesn't prejudge

17 issues that are in front of me, but you can hear my very

18 strong preliminary thoughts?

19         How do I, because I have the preliminary thoughts I

20 have, permit a letter to go to clients, forget for the moment

21 the non-clients, but the clients in what I think could be a

22 breach of professional ethics?

23         MS. GRASSGREEN:  Well, Your Honor, if I could, we

24 don't want to create more problems.  We are really, really

25 working hard, and we did work hard with the parties, to try to

1  come to a consensus on this and I think there are two

2  competing things going on here, right, which you have just hit

3  the nail on the head.

4          One is we don't want to create more confusion and

5  we don't want to prejudge issues.  So the other point that Mr.

6  Stang made is that an email has gone out to all of the

7  parties, right, saying this was sent to you in error. I

8  believe it went, and Mr. Lucas is on the phone I can confirm,

9  saying you shouldn't have gotten this email, we apologize.

10         It was initially our view that it be a very simple

11  letter.  We apologize for any confusion, we weren't meaning to

12  endorse it, and leaving all the other issues to Wednesday. I

13  guess the question is should we wait until Wednesday to send

14  something and then whatever you rule --

15         THE COURT:  I don't think we can.  I think the more

16  time that passes the more potential there is for taint of the

17  vote that the committee has caused.

18         MS. GRASSGREEN:  I mean the other alternative, Your

19  Honor, that I can suggest is that -- I mean for our firm to

20  sign something that this was defamatory when you haven't made

21  that ruling we're not comfortable with it, we don't think its

22  right to say it was inappropriate, false.  You haven't made

23  those findings.  I hear your preliminary comments.

24         THE COURT:  Does the committee have a view?

25         MS. GRASSGREEN:  Well we don't believe it was

1   defamatory as a legal matter, but we will brief it if it gets

2   raised.

3           THE COURT:  No.  I'm asking if the committee has a

4   view.  The committee has now had time to think about this.

5   Does the committee have a view?

6           MS. GRASSGREEN:  We -- I don't think everything in

7   -- I think Mr. Kosnoff's cover email was inflammatory.  I do

8   not disagree with that, Your Honor.  The letter -- many of the

9   points in the letter it was inconsistent with -- it was

10  perhaps inconsistent with disclosure, but I don't think there

11  is anything wrong with that.  It's his view to his clients.

12  It's a letter he had already sent.

13          I don't necessarily, Your Honor, but my suggestion

14  that I think might help with this is that if other -- we used

15  the PSZJ email address to send the letter from Mr. Kosnoff.

16  We're happy to use that same email address and send the letter

17  that the debtor wants sent, if you tell us to do it, that they

18  signed from the same email address; same exact level of

19  implied endorsement.  But for us to say it when you haven't

20  determined it yet and it hasn't been addressed is different.

21          I personally, in the discussions over the course of

22  the last day I thought that the two groups needed to be

23  treated differently, that it would be super confusing for

24  someone who is not a Kosnoff client to get something talking

25  about Kosnoff's clients, and his communications because

1    they're different.  One was it was never meant for you, but

2    still we didn't endorse it, and here is how you fix it, and

3    here is all the other things that we agreed to say about it.

4            The other is, and clearly the language was

5    disrespectful -- Mr. Stang said it the other day and I'm going

6    to say it again, we do not endorse the twitter feed.  We

7    didn't republish the twitter feed.  That was in the debtors'

8    motion.  None of us think that that is an appropriate

9    professional way to communicate.  I certainly don't.  Mr.

10   Stang doesn't.  He has devoted endless years of his life to

11   doing this work and that is not the way that he communicates.

12           So I am just going to put that aside.  But if the

13   alternative is so that the scales are exactly the way they

14   were we can use the PSZJ email address and if the debtor wants

15   to sign this and the coalition we will send it out.  But, you

16   know, as you said there is a lot of pre-judgment here. It is

17   not purely factual.  There are legal conclusions in this

18   letter and they have consequences.

19           THE COURT:  I think we can say in the letter the

20   court will be having a hearing on whether or not the language

21   was false, misleading, inaccurate, defamatory, et cetera, that

22   will be an accurate statement.

23           MS. GRASSGREEN:  That is accurate, Your Honor.  We

24   have no problem with that.

25           I don't know, Your Honor, if you have the redline

1  in front of you, but I can pull it up on my share screen if

2  you want to look at the comparison language or we can use our

3  letter.

4           THE COURT:  I found the redline to -- it's got too

5  much going on to be useful.

6           MS. GRASSGREEN:  I mean one of the fundamental

7  questions is whether or not the group that isn't his clients

8  should get an email that says -- should get a letter that has

9  a lot of the same stock and the court's holding a hearing on

10 all of this.  This wasn't meant for you, delete it, disregard

11 it, it wasn't meant for you.  We are not walking back on the

12 fact that the other group it was meant for.  And if that was

13 ill-advised or poor judgement we will address that with you on

14 Wednesday.

15          Again, we apologize for all the confusion that it

16 has caused, but we just don't want to exacerbate the problem.

17 These are survivors and, frankly, these legal nuances are not

18 going to be clear to them.  They are absolutely not.  There is

19 a wide range of understanding in this group.  You know, many

20 of them are elderly and, you know, it's just going to create

21 even more if we're not simple, direct, we try to keep it to

22 one page.  Parties did work hard together and, you know, this

23 was just really where we ended up at the point of contention.

24          THE COURT:  Thank you.

25          MS. GRASSGREEN:  Thank you, Your Honor.

1          THE COURT:  Mr. Hogan.

2          MR. HOGAN:  Good morning, Your Honor.  Daniel Hogan

3   of Hogan McDaniel on behalf of Eisenberg, Rothweiler, Winkler,

4   Eisenberg & Jeck.

5          Your Honor, I will be brief.  I will let the court

6   know that Mr. Rothweiler is attending the hearing listening in

7   and so he is aware of what is going on.  He and his firm are,

8   obviously, sick about what has happened.

9          Your Honor, I agree with counsel that the context

10  is important and the context of this entire controversy

11  relates to, really, what is an ill-conceived attempt to

12  influence the vote.  From the little I have seen, and I

13  haven't been involved in every bit of the discovery or any of

14  it, honestly, but it appears that this originated at the

15  Pachulski Stang Firm, this whole construct.

16         From our perspective it's problematic because,

17  number one, it impacts the voting process at a critical

18  juncture.  It damages the integrity of the ongoing mediation

19  process which is important to the hopeful resolution of this

20  case and equally important to both Eisenberg, Rothweiler, and

21  Ken Rothweiler personally.  These statements are clearly

22  detrimental to their reputation.

23         So they have got a great concern about what is

24  contained in the letter and how it's perceived by people.  The

25  perception in these cases is important particularly for the

1  survivors. And so we ask that our version, the debtors'

2  version of the letter be approved.

3          Thank you.

4          THE COURT:  Mr. Hogan, from that I take it that Mr.

5  Rothweiler is okay with a communication coming from the

6  official committee email to his clients, at least, at this

7  point if it's the debtors' letter.

8          MR. HOGAN:  Yes, Your Honor, that's correct.  If

9  it's the debtors' letter.  Obviously, without any endorsement

10 of the first letter that went out over the weekend, which it

11 had no knowledge of, and which, obviously, it was detrimental

12 to their interests.

13         THE COURT:  Do you also represent AVA law firm or

14 does somebody else represent them? I don't remember.  Are they

15 represented?

16         MR. HOGAN:  Your Honor, Joe Grey of Cross & Simon

17 now represents AVA Law.  Dave Wilkes had originally

18 represented both AVA Law and Mr. Kosnoff, but now they are

19 represented by Cross & Simon.

20         THE COURT:  Thank you.

21         Mr. Grey, are you on the -- at the hearing,

22 attending the hearing?

23      (No verbal response)

24         THE COURT:  Anyone from Cross & Simon?

25      (No verbal response)

1          THE COURT:  I don't hear anyone.

2          Mr. Brady.

3          MR. BRADY:  Thank you, Your Honor.  Robert Brady

4   for the FCR.

5          I won't belabor the record, Your Honor, but we do

6   find this a very troubling situation and we're still reviewing

7   the discovery responses that came in last night.  But for all

8   the reasons you've heard today, the FCR supports the debtors'

9   version of the letter as the more appropriate response to this

10  issue.

11         THE COURT:  Mr. Molton and then I'll go to

12  Ms. Lauria.

13         MR. MOLTON:  Yeah, Judge, I'm going to be very

14  brief.  I just want to note that I did receive -- this

15  morning, the TCC had a town hall last night, their normal

16  Thursday town hall.  The issue of confusion is manifest, Your

17  Honor, and critical.

18         My understanding is there was a question about this

19  letter raised during that town hall.  That's what I

20  understand, and I've had a busy morning, so just am telling

21  you what I understand to be the facts on the ground.  And,

22  accordingly, it's imperative, Your Honor, that this remedy get

23  out as soon as possible.  And it's not a distinction between

24  those it was intended to and not.

25         The TCC has to disavow themselves from what was,

1  clearly, as Your Honor suggested, an endorsement of

2  Mr. Kosnoff's letter and email.  They've got to do that to

3  everybody.  They have to distance themselves and acknowledge

4  what I think counsel for the TCC acknowledged was, it's not

5  defamatory -- she wouldn't use that term -- but inflammatory

6  language.  And this has got to get out soon.

7           I hear that Mr. Rothweiler's counsel has consented

8  to that.  Needless to say, they may be asking for other

9  remedies next week.

10          But, clearly, the most immediate need is for a

11  remedial email, clearly, unequivocally to the point that does

12  all the things that I think Ms. Lauria mentioned, that I've

13  already stated, and that is within the debtor-proposed letter,

14  that every other party that you've heard from on this, other

15  the TCC, support.

16          Thank you, Judge.

17          THE COURT:  Thank you.

18          Ms. Lauria?

19          MS. LAURIA:  Thank you, Your Honor.

20          Again, Jessica Lauria, White & Case, on behalf of

21  the debtors.  I'll be brief, because I think Mr. Molton

22  actually addressed my point.

23          We think there should only be one letter and that

24  one letter should come from the TCC and it should go to all of

25  the individuals that received the initial communication.  That

1  is the appropriate remedial relief at this point in this

2  proceeding before we get to Wednesday.  That letter is not an

3  attorney-client communication between Rothweiler and the

4  clients or Mr. Kosnoff and the clients; it's an official

5  communication from the TCC, from their official email address

6  conveying the message in the letter that we submitted to the

7  Court.

8               Thank you, Your Honor.

9               THE COURT:  Thank you.

10              Ms. Grassgreen?

11          (No verbal response)

12              THE COURT:  You're muted, Ms. Grassgreen.

13              MS. GRASSGREEN:  Thank you.  I'm sorry, Your Honor.

14  It's still early here on the West Coast.

15              Your Honor, just briefly, we did absolutely say in

16  the letter and we -- and wanted to (indiscernible) up front

17  and we're happy to move that up front that the forwarding --

18  the distribution of the letter was not an endorsement by the

19  TCC of the contents of those documents.  I think that is the

20  point that we just heard Mr. Molton say.  That's the point

21  that you brought up.  And I think that is the central point.

22              The other conclusions that are going to be for

23  another day -- and, again, we've heard your preliminary views

24  on it and we know what we're facing -- that's different to

25  raise those issues.  And we're not suggesting that anyone get

1    two letters, right; we're just suggesting that the clients of

2    Mr. Kosnoff's letter might be tailored a little different than

3    the non-clients because for them, it was never -- I'm a little

4    uncomfortable telling a client of a lawyer to delete a

5    communication from their lawyer, right, without -- if you tell

6    us to do it, we'll do it, but it made me a little

7    uncomfortable, which is why I was thinking, as I was thinking,

8    (indiscernible) from the survivors' standpoint, that everybody

9    should get one letter.

10          And I've asked our office to do the work, to

11   compare the two lists and make sure there's not anybody on

12   both so we don't get people getting multiple communications.

13   And so, that is being done right now and will be done before

14   any communication goes out.

15          But, you know, somebody who's his client is

16   different than somebody who is not his client.

17          THE COURT:  The communication came from the

18   Committee, not from him.  So, you're asking them to delete

19   your communication.  I'm not sure how different that is than

20   sending a communication in the first instance.

21          MS. GRASSGREEN:  Well, it was forwarded from our

22   email address, but it was not signed by us or purported to be

23   signed by us.

24          THE COURT:  And what does that mean to you?  What

25   does that mean to you, that it was forwarded from your email,

1  but it wasn't signed by us, what does that mean to you?

2          MS. GRASSGREEN:  Well, the re line said, see

3  attached communication from Kosnoff, right; it didn't say --

4  so, it was a transmission and I think there's a difference

5  between us transmitting someone else's statement.  If one says

6  to me, would you forward the email that so and so sent you,

7  doesn't mean that I've adopted or endorsed what's in the

8  email; it means that I've forwarded it.

9          THE COURT:  And what does that mean?

10         That's sort of like the people who say, oh, I

11  didn't view the whole tweet to see what it says; I just re-

12  tweeted it.

13         MS. GRASSGREEN:  Well, I -- your question was, is

14  it our communication and we don't think it was.

15         THE COURT:  I guess I would -- you should be

16  prepared --

17         MS. GRASSGREEN:  A consequence of us forwarding it

18  are clear -- are becoming clearer and, again -- but that's for

19  Wednesday.  And if there's needs to be an order saying, we did

20  all these wrong things -- we're not asking you to find that it

21  was not false today.  We're not asking you to find that it was

22  not misleading.  We are not asking you to find that it was not

23  defamatory.

24         But we're not asking you to find that it -- they're

25  asking you to say that it is by asking us to admit it and

1  something signed by our firm.  So, you know, and until you've

2  done that, it's going to create more confusion for the

3  survivors.  So, I think the appropriate communication is we

4  didn't endorse it.  We're sorry for the confusion.  Here's how

5  you fixed it.  We do not support the personal comments.  Mr.

6  Rothweiler deserves to be treated with respect to.

7          All of that is there, Your Honor.  I think the only

8  points of contention are -- and we apologized.  That's all

9  there, everything.  It was their initial words and we've

10  adopted it.  I think the points of contention are the

11  statements:  it's false; it's misleading; we shouldn't have

12  done it; it's defamatory.

13          You know, I don't mind saying that the letter

14  contains inflammatory language.  That's fine.  I'm happy --

15  you can add that back in.  But it is the other language that

16  is troubling.

17          And, you know, I think your suggestion the Court is

18  going to consider at a hearing whether it's false or

19  misleading is fine.  I mean, we put the language in that that

20  was the debtors' position because we were trying to make sure

21  that their views were provided, that it wasn't one-sided.

22          So, you know, I think that is where we are.

23          THE COURT:  Thank you.

24          Mr. Goldfarb?

25          MR. GOLDFARB:  Good morning, Your Honor.

1          Andrew Goldfarb of the Zuckerman Spaeder firm.  We

2    represent about 1800 survivor claimants in the bankruptcy.

3    I'm at a little bit of a disadvantage because I haven't seen

4    the dueling letters that were submitted to Your Honor this

5    morning.

6          Our firm is a little bit, has been sort of

7    particularly beset by unauthorized communications.  Omni, the

8    BSA sent out direct ballots to all of our claimants in late

9    October, notwithstanding the fact that we had selected the

10   master ballot option, then there were these unauthorized

11   emails.

12         We have been communicating and had to communicate

13   several times with our clients to try to contain the situation

14   and we've tried to be transparent and tried to be clear to

15   maintain the integrity of the voting process and to make sure

16   that our clients understand what is going on and minimize

17   confusion.  We have gotten lots of contact from clients about,

18   both about the Omni direct ballots that were sent, as well as

19   the recent emails from last weekend.

20

21         And so, we have tried to respond responsibly to all

22   of these unauthorized communications we've received.  I don't

23   know the contents of what's before Your Honor in terms of

24   being sent out in the near term, but we did have some

25   substantial concerns about the proposal that was in the BSA's

1    corrective email, in their motion, and so I just don't know if

2    a lot of that content has gone out and it's a much cleaner

3    letter, then I might not have concerns about it, but I just

4    don't know what the contents are.

5         THE COURT:  Mr. Goldfarb, two questions.  One,

6    what's your concern, and, two -- because I would like to hear

7    it -- and, two, would you like the option of whether a further

8    email goes to your clients or not?

9         MR. GOLDFARB:  From our perspective, yes.  I mean,

10   we have -- in addition, Your Honor, we had, you know, we had

11   several hundred, probably almost half of our clients had voted

12   before the email went out, and so to the extent that there's,

13   you know, sort of overlap between what went to our clients and

14   those who had already voted, I don't -- again, there were

15   suggestions in the BSA's email communication about re-voting

16   and if you want to change your vote.  Like, that should not go

17   to clients of ours who voted, you know, so consistent with the

18   information we sent to them and our recommendations and, you

19   know, had fully considered in advance.  So, we have problems

20   with those types of, some of those types of suggestions.

21        And so, whatever goes should be tailored.  There

22   were -- you know, we were not comfortable with the statement

23   in the BSA's proposed email that's in the motion referring to

24   the number of law firms or whose clients support the plan and

25   are urging support of the plan, because that, in our view,

1  changes the focus on the voting claimants to the lawyers and

2  we didn't think that was appropriate because it could, in our

3  view, it could at any time the way our clients perceive the

4  course of the bankruptcy and whether it is advantageous or

5  disadvantageous for them to vote a certain way.

6          And you know, we also, because we have already

7  supplied the solicitation materials, including all of the

8  letters, we don't think that those need to be resent and we

9  didn't that that was an appropriate suggested remedy either.

10         Coming back to Your Honor's basic question, yes, we

11 would prefer to regain control over the communications that we

12 have with our clients and we feel like our clients, in

13 particular, have been subject to unauthorized communications

14 from, you know, sort of going in both directions and it is

15 just creating a morass.  They are caught in the middle of an

16 fortunate situation and we continue to have a concern that

17 additional communications is not consistent with the way that

18 we want to represent our clients and we continue to have

19 concern and frustration over having lost the ability to

20 communicate clearly and in a way that we think is most

21 appropriate for our clients, so thank you.

22         THE COURT:  Thank you.  Very helpful.

23         Ms. Grassgreen, has committee counsel, has

24 Pachulski made any efforts to reach out to counsel who

25 represent recipients of the emails to ask them what they want,

1   whether they want further communications or not?  What

2   communications has Pachulski had with counsel for represented

3   recipients?

4            MS. GRASSGREEN:  Your Honor, for that, I think I

5   need to pass it over to Mr. Stang.  I will say my

6   understanding is that a number of folks, such as Mr. Goldfarb,

7   such as lawyers representing, I think, others that are on the

8   phone have reached out to us.  And I know we have taken those

9   inbound communications, but whether we have affirmatively

10  reached out to others, beyond the initial outreach that Mr.

11  Stang made right when asked to by Mr. Molton to say that it

12  had gone out in error, I don't know.  So, if you don't mind, I

13  could ask that Mr. Stang respond to that.

14            THE COURT:  Yes, Mr. Stang?

15            MR. STANG:  Good morning.

16            THE COURT:  Good morning.

17            MR. STANG:  Thank you, good morning, Your Honor.

18            I do not believe that the firm has initiated any

19  communications with any counsel or survivors, other than the

20  email that was sent out that went out on Sunday.  And because

21  of the volume of emails, Your Honor, we push a "send" button,

22  but it goes out in batches.  We don't send it in batches, in a

23  sense of pushing the button, the go-button more than once, but

24  the technology does not instantly and simultaneously send them

25  all out.

1          So, Mr. Goldfarb contacted Mr. Lucas, who's on the

2   call -- he's one of our partners -- they discussed the fact

3   that this communication had gone out.  Mr. Goldfarb asked us

4   to remove his clients from what I'd refer to as the "TCC

5   list."  I don't know if we have yet identified all of

6   Mr. Goldfarb's clients from the TCC list, but that was, to the

7   best of my knowledge, the only communication that we've had;

8   we didn't initiate anything.

9          And in terms of the material, the lawyer

10  representing the material number of people, because I don't

11  know every single communication that Mr. Lucas may have

12  received, we did hear from Mr. Goldfarb.  I also -- I'm sorry,

13  Your Honor, one other.

14          Paul Mones, who is an attorney who represents a

15  committee member, contacted me on Sunday, I believe it was

16  Sunday morning, which is how I came to the full realization of

17  what had happened and he told me that a couple of his clients

18  had received the emails and asked me, what's going on?

19          So, those are the two that I am aware of.

20          THE COURT:  Thank you.

21          Okay.  Ms. Lauria?

22          MR. STANG:  Your Honor, may I say one other thing,

23  please?

24          THE COURT:  Yes.

25          MR. STANG:  I heard Mr. Goldfarb's comments about

1  his view of what the debtor had proposed in the order, which,

2  obviously, is on the docket (indiscernible).  Our letter, and

3  I believe the letter from the debtor, does make reference to

4  changing a vote.  We were trying to accommodate as much as we

5  could what the debtor was saying, but I also hear what Mr.

6  Goldfarb is saying.

7          I can tell you that I am -- we get voting reports

8  from the debtor, as do other parties in the case.  There have

9  been votes submitted.  We're waiting for a report today, but

10 my understanding is from the last voting report, about 1200

11 votes had come into Omni.  And I think that lags a week for

12 the report, so it wasn't as of the date of the report.  So,

13 there's votes coming in.

14         And the reference to attorneys representing a

15 majority of the survivors urging clients to vote yes, I think

16 that's true.  I mean, based on the communications I have seen

17 both, those filed in the court -- obviously, the Coalition

18 supports the fifth amended plan -- but also, and I made

19 reference to this when I spoke to you last, there are dueling

20 videos out there.  One of those videos is from

21 Mr. Rothweiler.  One of those videos is from our committee co-

22 chairs, Mr. Hump Humphrey and Mr. Kennedy.  Theirs came after

23 Mr. Rothweiler's.

24         And just as an aside, Your Honor -- you know what?

25 I'm not going to go there.

```
 1            So, we do think that the majority of the attorneys

 2    representing an overwhelming majority of the survivors are

 3    supporting the plan, but I also hear Mr. Goldfarb's concern,

 4    because he's not going to tell us what his recommendation was,

 5    and he shouldn't, that, you know, that his clients may say,

 6    Wow, if everyone else -- if an overwhelming majority of people

 7    are doing it and supporting it, maybe we should.  And so I

 8    understand his concerns that wanted you to know where this

 9    language came from in terms of the letter that we were

10    proposing.

11            THE COURT:  Thank you.

12            MS. LAURIA:  Your Honor, this is Jessica Lauria, if

13    I just may respond briefly?

14            And I understand Mr. Goldfarb did not have the

15    letter in front of him that was submitted to the Court this

16    morning.  The language in the letter pertaining to changing

17    the votes, it now actually, I believe, says, "Please consult

18    with your counsel if you wish to change your vote."

19            I think that's very important.  We understand that

20    there are a number of parties that would have already advised

21    their client on how to vote.

22            But I do think that his remarks really put a fine

23    point on why this communication that the TCC sent out over the

24    last weekend -- and I know that we're not here on the broader

25    point -- was so problematic to begin with.  And I think you'll
```

1  hear from Mr. Molton that there are a number of state court

2  counsel affiliated with the Coalition, including, my guess is

3  Mr. Rothweiler, that very much disagree with the

4  recommendation from Mr. Kosnoff that was sent by the TCC and

5  the statements therewith, and we are trying to remedy those,

6  as well.

7          I would also just say that I wasn't aware that Mr.

8  Goldfarb had asked his clients to be backed out of that TCC

9  list served and, obviously, subject to guidance from the

10 Court, we will honor whatever the Court would like us to do in

11 terms of who any communications should go to, but we take Mr.

12 Goldfarb's point in that regard.

13         Your Honor, I guess my final point is -- and I

14 don't think it's an issue for today -- but there were multiple

15 references in Mr. Goldfarb's statements to "inappropriate

16 communications" from BSA and Omni to his clients.  We disagree

17 with that.  We filed at docket notice 6821, Omni,

18 inadvertently sent direct ballots to the clients of three law

19 firms that had elected the master ballot.  We worked with

20 those three law firms in terms of whatever remedy they wanted,

21 we were willing to do, and I think we've resolved all of those

22 issues, as reflected in Docket Number 6821.

23         Thank you, Your Honor.

24         THE COURT:  Thank you.

25         MR. MOLTON:  Your Honor, if I could just add a few

1    points to conclude?

2            THE COURT:  Mr. Molton?

3            MR. MOLTON:  Thank you, Judge.

4            First of all, I just want to make sure Your Honor

5    understands that not just the Coalition supports the debtor

6    letter, but I can affirmatively say that all the Coalition-

7    affiliated law firms, which represents, as Your Honor knows,

8    approximately 60,000-plus unique proof of claim survivors,

9    supports the debtors' letter.  I think the debtor has

10   accurately accepted the language and has agreed to put in its

11   letter regarding that an overwhelming majority of the --

12   attorneys representing an overwhelming majority of the

13   survivors in these cases support the plan and are urging their

14   clients to vote yes on the plan.  We didn't think that, in

15   light of their agreement, that that was an issue.  That's a

16   fact.

17           Second of all, Your Honor, I just want to reiterate

18   something that Ms. Lauria mentioned earlier.  There are

19   important mediations next week; accordingly, why discovery on

20   this matter is going forward.  We will be mediating in New

21   York, you know, regarding very important issues with important

22   remaining unsettled insurers and chartered organizations.

23   And, accordingly, getting a remedy out to the survivors

24   forthwith, as I like to say, is crucial.

25           Lastly, one of the things that is going to be

1  clearly a subject of discovery next week is did the Committee,

2  itself, authorize this or was this just the Committee's

3  counsel?

4          I note that we have the two co-chairs on the Zoom

5  screen here, Mr. Kennedy and Mr. Humphrey.  That is going to

6  be an important subject of the discovery that's going to go

7  forward over the weekend, Your Honor.

8          THE COURT:  Mr. Stang, I see your hand.

9          MR. STANG:  Thank you, Your Honor.

10          I was going to say that it's clear from this

11  hearing that within a certain -- within the AIS, Abused in

12  Scouting client base, they are getting conflicting messages.

13  And it's not the message -- and as to conflict, these

14  conflicting messages were communicated to them long before,

15  and regularly, before our email went out, starting on last

16  Friday.

17          Mr. Kosnoff has, for a long time, opposed the

18  recommendations that his two other co-counsel have submitted.

19  I just want to --

20          THE COURT:  Right.  So, why did you weigh in?  So,

21  why did you weigh in between that conflicting view that was

22  happening among co-counsel or affiliated counsel or a movement

23  or whatever they want to call themselves?

24          MR. STANG:  Your Honor, we --

25          THE COURT:  You're not making it better.  This

1   doesn't give me -- I understand fully what's going on.

2          MR. STANG:  Okay.  Well, you asked me a question.

3   I'll answer it.

4          The Committee opposes confirmation of the plan.

5          THE COURT:  Uh-huh.  I understand that, too.

6          MR. STANG:  Well, and the Committee regularly

7   communicates that to its constituency, including through these

8   town halls.

9          You asked me a question and I wanted you to know

10  that we agree with Mr. Kosnoff on that principle.  You know,

11  we don't agree with what he says in the Twitter account.  I

12  said that last -- earlier, and I reiterate it.

13         But I just wanted you to -- since we're talking

14  about confusion, I wanted you to know that the messages that

15  these folks, these AIS clients are getting --

16         THE COURT:  Why do you think I don't know that?  Do

17  you think I'm sleeping during the hearings?

18         MR. STANG:  No, Your Honor, I don't think

19  you're --

20         THE COURT:  Why do you think I don't know that?

21         MR. STANG:  Well, because there is -- well, Your

22  Honor, then I take back what I just said to you as

23  unnecessary.

24         THE COURT:  Yeah.  It's been quite clear for some

25  time that that's the case.

1          MR. STANG:  Okay.

2          THE COURT:  Quite clear.  Okay.

3          MS. GRASSGREEN:  Your Honor, could I suggest maybe

4    we look at the text of the letter; would that be a productive

5    way to proceed at this point?

6          THE COURT:  I'm looking at the text of the letters.

7    I've been thinking about the text of the letters.  Yes, Ms.

8    Grassgreen, I think that is the most important thing.

9          But I also hear that Mr. Goldfarb does not want a

10   communication with his client.  He thinks that's further

11   confusing for his clients and, therefore, I think his clients

12   need to be taken off any communications.  I would also like

13   the Committee today, forthwith, to communicate with counsel or

14   other represented recipients to find out whether they want a

15   further communication to their client or not, and those

16   requests need to be honored.

17          I said at the beginning or somewhere near the

18   beginning that I am concerned with communications to

19   represented parties.  I am concerned to unrepresented, too.  I

20   don't know quite what to do with that, but I am concerned with

21   communications to represented parties who have their own

22   counsel who should be communicating with them and may be

23   trying, themselves, to clear up the confusion, and another

24   email may just be more confusion.

25          So, the Committee, today, forthwith, is to figure

1 | out who on their list is represented by counsel and reach out

2 | to them to find out what they want.

3 |         MS. GRASSGREEN:  Absolutely, Your Honor.

4 |         MR. STANG:  Your Honor, just to make --

5 |         MS. GRASSGREEN:  Absolutely.  Mr. Stang --

6 | absolutely, Your Honor.  We will take care of it.  I'm

7 | actually going to ask --

8 |         MR. STANG:  Your Honor, no -- this is a fact that

9 | Ms. Grassgreen isn't aware of.  Mr. Goldfarb's firm, at one

10 | time, was parking lot of AIS and I would appreciate if he

11 | could communicate to us because the Coalition, or AIS -- AIS,

12 | I'm sorry -- AIS may ultimately say to us, send out the -- or

13 | you will say, send out the letter that includes AIS people,

14 | but Mr. Goldfarb's client --

15 |         THE COURT:  AIS isn't going to say that.  As you

16 | pointed out, they're not going to agree.

17 |         MR. STANG:  Okay.  Well, anyway, I just wanted to

18 | alert you to the fact that Mr. Goldfarb has some of his own

19 | clients and some of his clients are part of AIS; that's all I

20 | wanted to tell you.  And we'll have to work that out with

21 | Mr. Goldfarb, I guess.

22 |         THE COURT:  Yes.

23 |         MR. STANG:  I'm sorry, I know Ms. Grassgreen

24 | doesn't want me to handle this hearing, and I didn't want to,

25 | but there are some additional things that I know because of

1  the history that she doesn't know.

2          MS. GRASSGREEN:  I apologize for cutting him off,

3  Your Honor, and double-attempting you.

4          THE COURT:  Okay.

5          MS. GRASSGREEN:  We're trying to keep -- the reason

6  why I'm here, Your Honor, is we're trying to be as objective

7  as possible.  I wasn't involved so I don't have the same

8  personal stake, although, I have a personal interest, so it's

9  different.  So, we were just trying to keep it at that level

10 of, what do we do now?  Let's be constructive in a  very --

11         THE COURT:  I understood --

12         MS. GRASSGREEN:  -- (indiscernible) situation.

13         THE COURT:  I understood that even without your

14 saying that.

15         MS. GRASSGREEN:  Thank you.

16         THE COURT:  The letter.  So, I think my reaction

17 when I read the two letters, and, actually, I was informed --

18 what I was informed of was who wrote what -- which one -- I

19 said, No, that can't be.  So, but my overall impression was

20 they're not that different and Ms. Lauria has pointed out, I

21 think, the two areas where there is some difference and that

22 is the use of the words "mistake" versus "wrong" and

23 "inappropriate"; quite frankly, maybe from what I'm hearing,

24 it was all three.

25         I am troubled -- well, these are my preliminary

1  views about whether it was wrong or inappropriate, but this is

2  coming under the signature from Pachulski Stang, not from me,

3  and I'm not sure, quite frankly, that the nuance of the

4  different between "mistake," "wrong," and "inappropriate" is

5  going to be an issue for people reading this letter.

6         It is not going to prejudge what I determine on

7  Wednesday.  Nobody has to worry about that.  I'm not going to

8  make the Committee counsel use words that they disagree with

9  in their letter.  So, I'm going to -- I'm not going to make

10 them change it.

11        And as for the statement about Mr. Kosnoff's letter

12 containing false, misleading, and inaccurate statements,

13 inconsistent with the Court-approved disclosure statement, I

14 think we ought to say that the Court will be having a hearing

15 on whether -- I think that's factual.  It doesn't prejudge the

16 contents of the letter, and we'll deal with it.

17        Again, maybe even saying the Court is having a

18 hearing on it is a stronger statement than somebody's view,

19 but I think it's accurate.  Ms. Grassgreen has already

20 indicated that she would state that statements in the, I

21 believe in the email were inflammatory and I will let her add

22 that to the letter.

23        I hear Mr. Goldfarb's concern about people changing

24 votes and causing more confusion.  I do think, however, that

25 probably needs to go out in the letter, and that was in both

1  of the letters.  I think the "you should contact your

2  attorney" needs to be bolded and emphasized and maybe in caps,

3  if you have one.

4         And the sentence that says in the second-to-last

5  paragraph, "If you have questions to vote on the plan, we

6  strongly encourage you to seek advice from your attorney," I

7  want that bolded, as well.  It actually seems to be maybe a

8  little duplicative there in that sentence, but -- that

9  paragraph.

10        MS. GRASSGREEN:  Your Honor, I think it is in both

11 letters (indiscernible), at least in the redline that I'm

12 looking at.  So, we will bold it and we will say it once,

13 unless you would like us to say it --

14        THE COURT:  I think say it once --

15        MS. GRASSGREEN:  The attorney, "reach out to your

16 attorney," we could also say that right up front in bold, if

17 you'd like.

18        THE COURT:  Let's say it once and, also, let's

19 emphasize that we are not trying to interfere with the advice

20 that you may be receiving from your own attorney, if

21 represented.

22        MS. GRASSGREEN:  Okay.  We'll do that, Your Honor.

23        THE COURT:  I would also like Committee counsel, or

24 this may be -- Mr. Hogan, you could reach out to Mr. Gray to

25 let him know how the communications we've had and         Ms.

1    Grassgreen and her group are going to be busy today.   Mr.

2    Hogan, maybe you can reach out to Mr. Gray and see if he has

3    an issue with the communication going to the joint clients.

4              MR. HOGAN:  Your Honor, I'd be glad to do that.  I

5    would ask that the debtor send me both versions of the letter

6    so that I have the most current version when I send those to

7    Mr. Gray, and I'd be happy to that.

8              THE COURT:  Well, hopefully, we're going to come up

9    with one here, but yes.

10             MR. HOGAN:  You would -- yeah, thank you.

11             THE COURT:  Yes, thank you.

12             Okay.  Let me ask if there are questions.  I think

13   I've covered and given guidance on what needs to happen here

14   so we can --

15             MR. PATTERSON:  Your Honor -- one question, Your

16   Honor?

17             THE COURT:  I'm sorry.  Mr. Patterson?

18             MR. PATTERSON:  Yes, Your Honor.  One question, if

19   I might -- thank you, Your Honor.  I know there's -- I don't

20   know where I was in the queue, but I sort of lost touch with

21   this issue, but I know Your Honor said in response to one

22   counsel that if state court counsel do not want a further

23   communication to go to their clients, we can make a

24   communication to TCC counsel and instruct them as to that?

25             THE COURT:  Yes.

1          MR. PATTERSON:  And will that also be in the

2    Court's order today or is this just an informal bench order

3    that is going with to approve the form of letter?

4          THE COURT:  Yeah, you know, this whole approval of

5    the form of letter is really interesting.  It's something now

6    that I've been thinking about, why people want it, why courts

7    give it, why it's appropriate or not.

8          But I'm viewing today as permitting a letter to go

9    out.  I'm not micromanaging every word in this letter.  I am

10   letting you know I am making balls-and-strikes calls on a

11   couple of issues that I think are really important.

12         As I said, I'm not going to force the Committee to

13   sign a letter that is not their view.  So, in terms of

14   approving it, I don't know exactly what that is, to be honest.

15         MR. PATTERSON:  I guess that's authorizing it, Your

16   Honor.

17         THE COURT:  I'm permitting it to happen.  I'm

18   authorizing it.  I'm not approving every word of it.  It's a

19   remedial situation I'm finding myself in, but absolutely I've

20   given clear directive and to the extent there needs to be

21   order from the bench, so ordered that Committee is to reach

22   out to counsel who have clients who are -- were recipients of

23   their previous email and if those counsel do not want their

24   clients to receive anything else, they should not receive

25   anything else.

1          MR. PATTERSON:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MS. GRASSGREEN:  Your Honor, with respect to that

4   direction, I just want to clarify that that applies other than

5   the Kosnoff list, right, because, certainly, we don't want a

6   situation where Mr. Kosnoff says, no, I don't want it going to

7   my clients and Mr. Rothweiler says, I want it going to my

8   clients, and it's the same people and now we have problems.

9   So, I think you mean that with respect to the TCC email list,

10  the non-AIS clients, but I'd like to confirm because it's a

11  complex issue.

12         THE COURT:  Yes, I will overrule any objection Mr.

13  Kosnoff has to this going to AIS clients, which is why I asked

14  what Mr. Rothweiler wanted and why I asked Mr. Hogan to reach

15  out to Mr. Grey.  If AVA Law firm doesn't want that to happen,

16  then people are going to have to get me back on the phone and

17  we'll have a hearing.

18         MS. GRASSGREEN:  Okay.  Thank you, Your Honor.  I

19  just wanted to clarify because there's some overlap.  And,

20  unfortunately, we've gotten some communications from people

21  that say I was with Abused in Scouting and I'm not anymore and

22  now I'm with someone else.  And we'll work through those

23  issues as best as we can, that's all I can commit -- I'll

24  commit to do that with every resource we have, but there are a

25  lot of very complicated issues around the counsel

1  representation in this case, unfortunately, but we will put

2  everything we have into it to try to do it as carefully and

3  appropriately as possible.

4          If we're done with the letter, I thought that

5  perhaps, given everything that's going on next week, we should

6  talk about what the expectation is for Wednesday in light of

7  this and --

8          MR. MOLTON:  Your Honor, can I ask for

9  clarification?  I'm sorry to interrupt counsel, but before we

10  leave the subject I've got a few questions and clarifications

11  that I'm going to -- okay, thank you.

12          Number one, I know that you've allowed the TCC

13  counsel to communicate with counsel other than Mr. -- the AIS

14  counsel, asking them whether they should receive further

15  communication.  I just want to be clear, Your Honor, that,

16  from my perspective, it can't be that milk toast.  It's got to

17  be advising them what happened, advising them of the hearing

18  today, advising them that the TCC is going to be sending out

19  the letter that we're coming to terms on, giving them an

20  ability to read that letter, and then asking if they want that

21  letter sent to their clients.

22          As I said, from the Coalition's perspective, we

23  understand that every one of our law firms will agree to that

24  under the circumstances of how the letter is being composed

25  right now.

 1                Number two -- so I think that needs to be --

 2                THE COURT:  So, yes, let me -- let's stop there.

 3  Yes, I expect there to be a fulsome communication and, yes, I

 4  think it would be appropriate and probably necessary to send

 5  the letter, so counsel can see it and make a decision.

 6                MR. MOLTON:  Yes.  Thank you.

 7                MS. GRASSGREEN:  Your Honor, we don't disagree with

 8  that at all.

 9                MR. MOLTON:  Second of all --

10                MS. GRASSGREEN:  We (indiscernible) --

11                MR. MOLTON:  -- Judge, we would -- we think it

12  would be --

13                MS. GRASSGREEN:  -- (indiscernible) --

14                MR. MOLTON:  I'm sorry.

15                MS. GRASSGREEN:  It's okay.

16                MR. MOLTON:  Number two, Judge, we think it would

17  be helpful, if not essential, that the TCC produce and file a

18  declaration or affidavit stating all of the attorneys they

19  contacted, who they were, and what the answer was accordingly,

20  so that we all can -- so there's transparency to that process

21  on this very, very important topic.  So I would ask that as

22  well, Your Honor.

23                THE COURT:  Ms. Grassgreen, do you see an issue

24  with that?

25                MS. GRASSGREEN:  No issue, Your Honor.

1              THE COURT:  Thank you.

2              MR. MOLTON:  Okay.  Lastly, Judge, we have the

3    issue that we raised, I think, two days ago -- and, again,

4    it's confounding -- is we have no idea, you know, how many --

5    who forwarded the Kosnoff, you know, missive sent by the TCC

6    over its forward-looking -- creditor forward-looking email to

7    other survivors.  And I don't have a solution to that, Judge;

8    there may not be a solution to that.  The letter itself tries

9    to some extent address that.  But, from my perspective, that's

10   an important point that should not be lost as we go forward

11   into next week, looking at the conduct that happened, how it

12   happened, and the confusion and taint that it's caused.

13             THE COURT:  Okay.  Thank you.

14             MR. MOLTON:  Thank you.

15             THE COURT:  I don't think that requires a response.

16             Ms. Lauria?

17             MS. LAURIA:  Thank you, Your Honor.  I believe Ms.

18   Grassgreen was about to go to logistics for next week and I

19   did want to address that from the debtors' perspective as

20   well.

21             I see Mr. Schiavoni maybe would like to be heard.

22   I don't know if you want me to go forward with logistics or

23   hear from Mr. Schiavoni first.

24             THE COURT:  Is Mr. Schiavoni --

25             MS. LAURIA:  I'll go ahead -- oh, okay.

1          THE COURT:  -- yeah, we lost him.

2       (Pause)

3          MR. SCHIAVONI:  I'm sorry, is Mr. Lauria --

4          THE COURT:  Oh, there you are.

5          MR. SCHIAVONI:  -- going to go forward?  I'm fine -

6  -

7          THE COURT:  I just lost you and everything shifted.

8  Okay, Mr. Schiavoni.

9          MR. SCHIAVONI:  Oh, Your Honor, we have an

10 application, a motion before Your Honor to depose Mr. Kosnoff,

11 who's under subpoena, has been served, and who has taken the

12 position he's not subject to the jurisdiction of the Court.  I

13 think that deposition is going to take place eventually no

14 matter what, but if it's going to take place, it just seems to

15 me it makes a huge amount of sense for it to take place

16 Monday/Tuesday or, in any event, before the hearing.

17          If you have a hearing on Wednesday about this

18 event, not having the deposition of Mr. Kosnoff, it's sort of

19 like having like a Shakespeare play without Shakespeare.  I

20 mean, he's at the center of this, the center of the issues

21 about it, and, you know, his -- the issues about this AIS, how

22 it's -- and the various issues that swirl around it and who

23 he's communicated with here, it all is relevant to the

24 hearing.  This should take place at some point no matter what.

25 There's a host of 100-percent purely factual issues.

1           You know, we don't want to depose Mr. Kosnoff about

2   his communications with his clients or his opinions or things

3   like this.  But, you know, statements like the ones he made in

4   his verified 2019 statement that he submitted to this Court

5   about his signature page being attached to other proofs of

6   claim without disclosing who or when, that's a purely factual

7   issue, as are, you know, who he -- who -- you know, some

8   issues directly going to this hearing.

9           And I could go on, but I think Your Honor has not

10  been asleep during these hearings and knows exactly, like, the

11  range of issues that are covered by him.  And, you know, it's

12  like we'd be looking to do this deposition any day between now

13  and Wednesday that is of convenience to Mr. Kosnoff.  He's --

14  Mr. Kosnoff was, I believe, if I read the Zoom thing

15  correctly, he was on the last hearing on Wednesday, so he knew

16  about our application.  We spoke to his lawyer about it; his

17  lawyer submitted a letter about it.  His lawyer's main

18  contention in the letter was that a subpoena hadn't been

19  served, but we've submitted copies of the subpoena, so -- and

20  with the declaration of service, et cetera.

21          I don't know at this point whether we even, in a

22  sense, need a subpoena given -- it's like the Court, you know,

23  has the facts before it, you know, concerning this hearing

24  about things that are directly important him.

25          I thought I saw Mr. Kosnoff appear on the Zoom bar

1  above, so I think he may actually be on the line right now.

2  It is true Mr. Wilks told us he would not attend today, his

3  lawyer, he said he was driving somewhere.

4         So, you know, we'd be prepared to have the

5  application decided just on the papers.

6         THE COURT:  Well, let me say this -- and I wish I

7  knew my Shakespeare better --

8         MR. WILKS:  Your Honor --

9         THE COURT:  -- but --

10        MR. WILKS:  -- Your Honor?

11        THE COURT:  I'm hearing some --

12        MR. WILKS:  Your Honor, David Wilks.  I'm sorry --

13        THE COURT:  Mr. Wilks.

14        MR. WILKS:  Your Honor, can you hear me?

15        THE COURT:  Yes.

16        MR. WILKS:  Thank you, Your Honor.  I have deep

17  apologies to the Court for participating in this way.  I am

18  actually in the car.  I have a family commitment that is

19  absolutely unavoidable.  And so I hope Your Honor can hear me

20  and I hope Your Honor will forgive me for not appearing more

21  appropriately.

22        But, if you can hear me, I would say, Your Honor,

23  that there's just -- there's just an awful lot of reasons why

24  it's inappropriate for Mr. Schiavoni's motion to be presented

25  this morning.  First of all, it was never noticed, there was

1   never a motion to shorten notice, it's not on the agenda, and

2   so forth.  This is, you know, one more attempt that Mr.

3   Schiavoni has made to depose Mr. Kosnoff and, you know, he

4   never sort of lets a good crisis go to waste.

5           The main thrust our motion was really two or

6   threefold.  One -- or our opposition -- one, yes, there was no

7   subpoena served, and I can speak to what was submitted last

8   night in reply for the first time in a moment, but really,

9   Your Honor -- and I say this with all respect to Your Honor

10  and this Court and this district, because this is where I've

11  practiced my whole career -- this is the wrong court for Mr.

12  Schiavoni to seek to enforce any subpoena that he has served,

13  whether it's been served or not, because the subpoena that he

14  claims to have served and the one that he actually did serve

15  for the record was issued out of the Central District of

16  California.

17          And so, under the rules -- and we put this in our

18  letter and Your Honor -- Your Honor has been getting a lot of

19  stuff, so I wouldn't be surprised if Your Honor wasn't able to

20  get to my letter -- but the fact is Your Honor, frankly, just

21  doesn't have jurisdiction over this application.

22          Now, there's also been an enormous failure of meet-

23  and-confer on this because I asked Mr. Schiavoni -- he told me

24  about three weeks ago that there's a notice of deposition and

25  I asked him to send it to me, I hadn't seen it.  I never heard

1  from him again.  The next thing I heard about any deposition

2  subpoena was the motion.

3            So, for that reason alone, the motion needs to be

4  denied because they never met and conferred on it.  I asked

5  him for it three weeks ago, he never sent it to me; it was not

6  attached to the motion.  And, if he had met and conferred with

7  me, I would have asked him, would you please show me the

8  subpoena that you're talking about, but I never had that

9  chance.  He filed a motion without attaching the discovery at

10 issue, that's a violation of the rules too, and he saved it up

11 for a reply.  And, candidly, Your Honor -- I don't want to get

12 into this because I'm going to raise questions that I don't

13 like in court without a lot of consideration, a lot of

14 evaluation, but what was submitted last night, Your Honor,

15 raises an awful lot of questions that do bear analysis and do

16 bear careful evaluation before Your Honor goes and orders a

17 deposition on such extremely short notice.

18            So I'll stop talking now, Your Honor.  Thank you.

19            THE COURT:  Okay, thank you.

20            I -- as I --

21            MR. SCHIAVONI:  Your Honor, they do -- Mr. Kosnoff

22 -- sorry, Your Honor, my apologies.

23            THE COURT:  I don't need anything further on this.

24 As I said, I wish I knew my Shakespeare better.

25            I don't view the hearing on Wednesday as centrally

1    focused on Mr. Kosnoff, although he's a player and his letter

2    is there and, if he wants to participate, he should.  But I

3    think the question is about solicitation and what happened and

4    the committee's participation, the use of the official

5    committee email, whether this is an improper solicitation or

6    not, whether it's perfectly acceptable, that's what I consider

7    the hearing on Wednesday to be about and any further steps

8    that we may need to take to remediate any harm that may have

9    happened.

10              I will say this, however, that I do view Mr.

11   Kosnoff as a participant in the solicitation communication

12   that went out from the committee and, as a participant in a

13   solicitation, I think he's squarely in front of me for

14   jurisdiction, so -- for jurisdiction purposes.  He has now

15   injected himself into this case in a way he may not have done

16   before.

17              But I haven't seen the subpoena that went out.  If

18   it went out from the court in California, then I think Mr.

19   Wilks is right, under Rule 45, as I recall it, about how one

20   enforces it, and you can get the court in California to refer

21   it to me.  They may not want to get mixed up in this mess.  So

22   I think that's the rule on Rule 45, and I have on every

23   occasion Rule 45 has been put in front of me said that

24   compliance with the rule is what has to happen because that's

25   the rule.

1          So I'll look at those papers, but in terms of

2    whether that subpoena is the appropriate subpoena and whether

3    I can have the jurisdiction at this point with that subpoena,

4    from what I'm hearing, that may not be the case, but I'll look

5    at it.

6          Ms. Lauria?

7          MS. LAURIA:  Thank you, Your Honor.  Going back to

8    logistics for next week.  And, obviously, we're still wading

9    through the discovery that we received last night, there may

10   be -- there likely will be in response to some of the

11   statements made today in court by Ms. Grassgreen some follow-

12   up discovery we're going to need and potentially depositions.

13   But, in any event, Your Honor, we would ask that the committee

14   file response papers -- which we have not seen their response

15   yet -- by Monday, so that we could potentially put in

16   something supplemental on Tuesday and be prepared and ready to

17   go on Wednesday.

18          I know the Court indicated last week that you would

19   be open to potentially considering an in-person hearing.  I'm

20   not sure if that's still your perspective, Your Honor, but

21   certainly the debtors are willing and able to appear in

22   person, if that's the direction the Court would like to go.

23   We do think this is a very serious matter and one that does

24   rise to the level of deserving an in-person hearing, if that's

25   where you want to go.

1              Thank you, Your Honor.

2              THE COURT:   Thank you.

3              Ms. Grassgreen?

4              MS. GRASSGREEN:   Thank you, Your Honor.  I think

5    that the timing of a response is fine, first of all, but what

6    I wanted to address with Your Honor was the scope of the

7    hearing on Wednesday and what we are and what we aren't

8    considering, because I went back and I pulled up the motion

9    and the order and the relief that was requested -- and there's

10   been a lot of other things that have been thrown out since the

11   motion was filed -- one of the drafts of the letter that was

12   provided to us wanted us to say we understand we might be

13   subject to sanctions.  There's no sanctions motion in front of

14   you; that may happen.  There's no designation motion in front

15   of you; that may happen.

16             I think those are the topics, but the relief that

17   was requested in the motion -- I'm looking at the order now  -

18   - was a couple of things that, frankly, we've already agreed

19   to.  And so I just -- I want to understand what we're talking

20   about so that we can make sure we tailor our response to this

21   motion, understanding that there's lots of other issues that

22   we know are going to come up and we'll deal with them when

23   they come up and if we need to.  For example, vote designation

24   may or may not ever be an issue depending on the voting here.

25             But the order and the motion asks that we refrain

1    from distributing for the entirety of the case any

2    communications on behalf of any state court counsel through

3    our official Listserv, which that term, I'm not sure exactly

4    what that means, but, in any event, we agreed to that, we're

5    willing to do that, and we're willing to agree to their second

6    request that it only be used for official business.  We're

7    willing to give them notice of any substantive communication

8    and we had some language that we've sent them, but they

9    haven't had a chance to respond to, about what they mean by

10   substantive.  For example, can we send a town hall notice.

11   And the last thing was to send this email, the corrected

12   email, which we've just been talking about.

13          So I guess where I am, Your Honor, is I'm trying to

14   understand what it is that you would like for us to address on

15   Wednesday because there isn't a sanctions motion pending,

16   there isn't relief pending related to that, there's no -- and

17   so -- and there's not a designation motion pending, because I

18   think that frames what we do.  And I'm not trying to downplay

19   it, I'm not trying to say that it's not important, it

20   absolutely is, but I just think given everything that's going

21   on, mediation happening, the goal is to not have this impact

22   confirmation.  I just thought we should understand what it is

23   that you're going to be asked to decide on Wednesday and what

24   it is that we're going to address substantively at a later

25   hearing.

1          THE COURT:  Okay.  So, Ms. Grassgreen, you're

2  telling me, as I'm looking at the order, that the committee

3  has agreed to each one of the requests for relief --

4          MS. GRASSGREEN:  We agreed --

5          THE COURT:  -- for each one of the ordering

6  paragraphs?

7          MS. GRASSGREEN:  On paragraph 3(a), we agreed;

8  3(b), we agreed; 3(c), we agreed, but we had a "provided that"

9  that said things like the town hall, it doesn't apply to the

10  town hall or it doesn't apply to committee members

11  communicating.  We just wanted to clarify because

12  "substantive" is not a term.  And then on paragraph 4, you

13  just addressed it.

14          So we did send a markup of an order along this to

15  the debtor and the other parties and they have had it, and

16  they advised us that they weren't prepared to engage with us

17  about it until they saw the discovery, which we understand.

18  But, in light of today with the email -- I mean, we could have

19  a hearing on Wednesday on short notice on what is clearly a

20  critical issue to talk about whether a further communication

21  has to go out, if that's productive, but I'm just trying to

22  understand what it is that we're going to do on Wednesday.  I

23  think, you know, you're busy as well and that makes sense, in

24  light of our position on the order.

25          THE COURT:  Thank you.

1          Ms. Lauria, so Ms. Grassgreen raises a good

2  question.

3          MS. LAURIA:  Your Honor, thank you, two responses.

4          First, with respect to 3(c) -- and I apologize, I

5  don't have their markup in front of me, but I believe that's

6  the section referring to the use of the Listserv for further

7  communications.  As I indicated on -- I guess our hearing was

8  on Wednesday -- after we see the discovery, we may be seeking

9  further relief and that relief may certainly impact 3(c).  I

10  know they would like to continue to use the Listserv for

11  further communications.  We may be encouraging the Court that

12  they can't be using that Listserv at all.

13          We've already heard from Mr. Goldfarb today that he

14  wants his clients -- he contacted Mr. Lucas and asked his

15  clients to be completely taken off the Listserv, and I think

16  that may be a very necessary form of relief that we are

17  seeking next week.

18          With respect to greater forms of relief, you'll see

19  in the proposed form of order -- and I did indicate this on

20  Wednesday -- we do reserve our rights.  I don't believe that

21  Wednesday is going to be a vote designation hearing.  I do not

22  think we will be in a position where the dust will have

23  settled enough on what has happened vis-a-vis this

24  communication to make that determination, so we're certainly

25  not going to ask for that.

1          With respect to sanctions, I do expect, Your Honor,

2     that we will be seeking significant relief with respect to

3     legal fees that have been incurred in prosecuting this action.

4     At this point, I can't tell you that's before the Court on

5     Wednesday.  I recognize that that may not be emergency relief

6     that needs to be heard, but I do want to highlight that for

7     the Court.

8          And then, you know, we also -- candidly, Your

9     Honor, we just need to see the discovery because, if the

10    discovery comes out -- and I'm going to choose my words

11    carefully in a particular way -- we may need to seek urgent

12    relief with respect to what the committee is able to do in

13    terms of communications going forward and I just -- I don't

14    have the answer to that today.

15          THE COURT:  Okay.

16          MS. GRASSGREEN:  Your Honor, may I just briefly

17    respond?

18          We get all of the reservation of rights, we have no

19    issue with that, we just can't respond to what they haven't

20    brought forward.  So it seems like the only thing that they --

21    that is a question is the use of the Listserv, at this moment,

22    acknowledging that after discovery it might, but I think that

23    bears on what are we doing Wednesday because, if there is

24    other relief, I think you would agree that we would need to be

25    provided notice of it and an opportunity to respond.

1          THE COURT:  I do agree with that.  So I guess what

2    I would like to know is -- but I -- well, the debtors need to

3    have an opportunity to take a look at the discovery responses.

4          MS. GRASSGREEN:  Agreed.

5          THE COURT:  So I would like to know, once you've

6    done that, whether the committee's exculpation of substantive

7    communications has -- if there's any disagreement there.  If

8    there's not, then I'm not sure I see the need for a hearing on

9    Wednesday.  If there is and there's something we need to

10   address, we can address that on Wednesday.

11          I do want to make certain that the parties' time is

12   focused on where it needs to be focused.  This is -- as you

13   can tell, I think it's an immensely important issue that needs

14   to be addressed, we've started addressing it.  If there's

15   anything further on the remediation issue or any of the relief

16   sought by way of this motion, then I'm available Wednesday,

17   but I'd like the parties to have discussion about what is

18   necessary to have.  Sanctions can wait, designation is

19   premature.  Maybe we'll be lucky and any harm to the voting

20   process is minimal, if any, to the extent we can know, and

21   we'll have to deal with that as that comes up.

22          So I'd like the parties to talk and, actually, I'd

23   like to have a -- I'd like to know where parties are by, say,

24   noon on Monday as to what issues are open or not.

25          MS. GRASSGREEN:  Thank you, Your Honor.

1          MS. LAURIA:  Very good, Your Honor.  We will confer

2   with Ms. Grassgreen after we review the discovery.  Thank you.

3          THE COURT:  Thank you.

4          Mr. Goldfarb, I see your hand.

5          MR. GOLDFARB:  Yes, Your Honor.  Thank you.  I just

6   wanted to correct the record.  Ms. Lauria's comment about what

7   our preference is as to the communications for our client

8   wasn't quite accurate.  I'm working with the TCC about which

9   communications should receive.  Many of our clients find the

10  TCC communications enormously valuable and helpful.  And so I

11  just -- the representation that we sort of want to be

12  absolutely scrubbed from the TCC distribution list just wasn't

13  accurate because the TCC's communications in general have been

14  super helpful for our clients.

15          Thank you.

16          THE COURT:  Thank you.  And, Mr. Goldfarb, I think

17  the point is that counsel for these individual survivors

18  should be the ones to be making those kinds of determinations.

19          Mr. Abbott?

20          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott,

21  again, of Morris Nichols for the debtors.

22          Your Honor, we have all had a long weekend and

23  couple of days, but there is one matter that's off-agenda,

24  Your Honor, that was tangentially raised at the hearing last

25  week that -- just to hasten our discovery and focus on, as

1  Your Honor said, where we need to be, getting ready for the

2  hearing December -- or -- I wonder -- or, excuse me, January,

3  Your Honor -- I wonder if I might raise one issue that I

4  believe is resolved, but that will allow the debtors to get

5  out that last bit of discovery that they have been holding

6  based on our letter that appears at Docket Item 7031.

7           Your Honor, that letter asked for relief on two

8  points, the production of certain communications between the

9  debtors and the insurers that were related to the TDPs and the

10  production of documents containing the names of alleged

11  survivors.  The deadline for the response to that letter was

12  last evening, Your Honor; we did not get any responses.  So we

13  believe that it's uncontested and, to that end, would ask if

14  we could submit an order to the Court.  Obviously, we didn't

15  want to do that without making sure that the Court didn't have

16  further questions.

17           And I apologize sort of burdening this already

18  difficult hearing with this matter, but it will facilitate

19  discovery, I think, and help the parties get ready more

20  quickly for the confirmation hearing, Your Honor.

21           THE COURT:  So I don't have that in front of me,

22  but my recollection -- well, remind me of the two forms.  One

23  it was communications between the debtor and insurer.  I don't

24  recall that there was any privilege raised and I think my

25  question after reading that letter was what do you need from

1  me, because I don't think there was any controversy.

2          Then the second part of it -- but I may be wrong on

3  that -- the second part of it was permitting sensitive

4  information, names and et cetera, to go out to certain people

5  or not be redacted from the discovery, survivor names'

6  information not to be redacted from discovery.  And I guess

7  the question I had there was, we have a protective order in

8  place, does this not fall under the protective order?

9          MR. ABBOTT:  Well, Your Honor, that's part of the

10  relief we sought.  Maybe I should turn it over to Mr. Azer,

11  who has been closer to this issue, to give you the absolute

12  specifics there, if I may?

13          THE COURT:  Okay.

14          MR. AZER:  Good morning, Your Honor, Adrian Azer

15  from Haynes and Boone on behalf of the debtors.  Can you hear

16  me?

17          THE COURT:  I can.

18          MR. AZER:  Great.  So, on the first issue, Your

19  Honor, the reason we raised it with the Court is initially we

20  had framed those communications with the insurers as common

21  interest privilege, and we obviously inquired with the

22  insurers if they had any issue with it.  Given the time

23  constraints, we had not heard back from all the insurers and

24  to date we still haven't, but no insurers have objected.  So

25  the reason we brought it before Your Honor was just to make

 1  sure there was no issue, that no one had an issue with it, but

 2  given that we don't, I don't think there is an issue that now

 3  needs to be resolved by the Court.  I think we can produce it

 4  without any concerns on the first topic.

 5          THE COURT:  Okay.

 6          MR. AZER:  Does that address your question?

 7          Now, the second question, Your Honor, I'm actually

 8  going to defer to one of my colleagues at White & Case because

 9  they're closest to that issue on the redaction of the names.

10          MR. KURTS:  Good morning, Your Honor, Glenn Kurts

11  from White & Case on behalf of the debtors.

12          Your Honor has it exactly right that there is a

13  protective order that protects misinformation.  What we have

14  proposed to do, given how sensitive it is, is to designate the

15  information as highly confidential, produce it, and then if

16  anyone wants to make use of that either in the deposition

17  testimony with respect to a pleading or anything else, that

18  they can then redact the names.

19          So it seemed a little outside maybe normal

20  parameters, but it was our effort -- we would normally redact,

21  but it's really impossible to do so, there's tens of thousands

22  of pages.  Their litigation documents, so the name is all over

23  the place.  Even if we did go through the exercise, which

24  would take more time than I think would be appropriate and

25  would burden the estates, it would be all but certain that

1  there would be certain times that something was missed, which

2  is often the case with redactions.

3          So our proposal is merely to designate it as highly

4  confidential.  Everybody who wants to see it, of course, just

5  has to be party to the protective order if they do want to use

6  it.  Then, as I mentioned, they can redact the name or file

7  under seal, and we think that's the best way to minimize

8  burden and to protect the identifiers of these victims and

9  also accuseds.

10          THE COURT:  Okay, that makes sense to me and --

11          MR. SCHIAVONI:  Judge, could I be heard before you

12  rule?

13          THE COURT:  Yes.  Are you concerned about the

14  protective order or the first issue?

15          MR. SCHIAVONI:  This issue of releasing common

16  interest information.

17          THE COURT:  Okay, then give me a second.

18          So on the protective order and the -- I guess the

19  request not to have to redact before discovery, I think, under

20  the circumstances, that's fine.  When you're producing the

21  documents, obviously, you'll designate them.  Please remind

22  everybody of the sensitivity and the protective order.  And,

23  yes, if anybody is going to want to use anything, we can deal

24  with that, but it does seem to be appropriate that it should

25  be redacted at that time.  Okay.

1          MR. KURTS:  Thank you very much, Your Honor, we

2    will do that.

3          THE COURT:  Thank you.

4          Mr. Schiavoni, on the first, the common interest

5    issue.

6          MR. SCHIAVONI:  Yeah, Your Honor, I'm now a little

7    nervous about what they -- if the only issue here was if

8    there's a non -- completely non-privileged document, a

9    pleading or such that has the name of a claimant on it and

10   they want to operate under the protective order in that

11   regard, that seems to me totally fine, but I'm a little

12   worried that this is sort of being used as a Trojan horse,

13   because we were asked what our position was on releasing

14   common interest privileged material and we made it clear that

15   that material should not be released.

16          It's like we're in a case here where none, not a

17   single charter organization associated with the Boy Scouts is

18   going to receive protection under this plan.  They're all

19   being sent back in the tort system for litigation, and we're

20   being faced with ongoing litigation, in essence, with this

21   trustee over claims involving the local councils to turn over

22   privileged information that's essential to the ongoing defense

23   of claims -- first of all, it would vitiate coverage, I think,

24   if they did that intentionally over our objection -- and, to

25   be clear, we object to that -- but it also would create

1  immense harm, you know, to these charities and whatnot that

2  are in the case.

3        So that, yes, we object to the release of any

4  common interest material.  If they're -- and, you know, to be

5  clear, what they -- you know, what they have sort of hinted at

6  in the past is like material that derives from underlying

7  defense counsel and involves statements and recommendations on

8  cases and whatnot, you know, that material should just not be

9  released.  I mean, if they have pleadings where they have

10  somebody's name in it, it seems to me that's one thing, but if

11  this is something else, there is not consensus on it and there

12  ought to be briefing before it's released wholesale.

13        THE COURT:  Okay.  Well, I --

14        MR. AZER:  Your Honor, may I address that?

15        THE COURT:  -- I didn't have this on my radar

16  screen.  So, Mr. Azer, are you going to tell me it's not

17  common interest privilege?

18        MR. AZER:  It's not -- no, it's not the documents

19  that Mr. Schiavoni is talking about.  The only documents we

20  are -- we filed -- and, by the way, the objection deadline has

21  passed -- Mr. Schiavoni, the only communications we're talking

22  about are Haynes and Boone's communications with insurers'

23  counsel related to the TDPs.  You're talking about a

24  completely different set of documents that is not at issue in

25  the letter.  What you're talking about is apples and oranges.

1   We're talking about only the communications between Haynes and

2   Boone and the insurers related to the TDPs.

3              THE COURT:  Okay.

4              MR. SCHIAVONI:  Well, I just -- you know, there are

5   some of those that embed underlying defense materials, you

6   know, that I think you ought to show them to us first --

7              MR. AZER:  No, they don't.

8              MR. SCHIAVONI:  -- I think you ought to show them

9   to us first and then we can tell you if there's an issue about

10  common interest material or not.

11             THE COURT:  Okay.  So let me say this again, then.

12  I think my recollection -- thank you for that -- is right.

13             My question after I read that letter, albeit

14  quickly, was what are you asking me for.  They're either

15  privileged and you should not produce them or they're not

16  privileged and you should produce them.  If there's a

17  privilege concern or you're not sure, or there's an issue why

18  any privilege that is available to those documents should be

19  overridden, then you need to bring that to me.  But my

20  recollection now from reading the letter is, they're

21  privileged or they're not, and I don't think privilege was

22  raised.

23             So I'll go back and look at it too, but you guys

24  need to talk.  Let me know if there's an issue, we'll get it

25  on quickly.

 1           MR. AZER:  Yes.  Yes, Your Honor.

 2           THE COURT:  Mr. Hogan?

 3           MS. GRASSGREEN:  Your Honor --

 4           MR. HOGAN:  Thank you, Your Honor, just briefly.

 5  Your instruction for me to reach out to Cross & Simon and Mr.

 6  Grey with regard to AVA Law, I just wanted to understand the

 7  mechanism in the event that they have an issue with the

 8  dissemination of the letter.

 9           THE COURT:  Contact chambers and we'll set up a

10  continued hearing on it.

11           MR. HOGAN:  Right, and so that 12 o'clock deadline

12  on Monday doesn't apply to that.  If I find out sooner, I'll

13  let you know right away.

14           THE COURT:  Yes, please let me know as soon as you

15  know.

16           MR. HOGAN:  Okay.  Thank you.

17           THE COURT:  Thank you.  I see Ms. Wolff.

18           MS. GRASSGREEN:  Your Honor, just to understand

19  that point then, we should wait to hear from Mr. Hogan before

20  sending the communication rather than sending it today?  I'm

21  just going to --

22           THE COURT:  I would like to know if he's got an

23  issue.  I think you all should reach out to him too, but I

24  think we need to try to get to him as soon as possible.

25           MS. GRASSGREEN:  Okay.  So just we will not send

1   anything until we confirm that.

2          THE COURT:  As I said from the beginning, I'm

3   concerned with sending communications to represented parties

4   from a law firm.

5          Okay.  Ms. Wolff?

6          MS. WOLFF:  Yes.  Thank you, Your Honor.  And I

7   apologize that my video is not on.  It's about 3:00 a.m. over

8   here in Guam and this matter was not on the agenda, so I

9   wasn't prepared to be visible.

10         THE COURT:  It's okay.

11         MS. WOLFF:  Just going back to, Your Honor, the

12  protective order issue.

13         THE COURT:  Yes.

14         MS. WOLFF:  I did intend to file a responsive

15  letter today.  I guess it's maybe my mistake in calculating

16  the deadline; I didn't count Veterans Day in the three-day

17  timing.  And so, Your Honor, I was going to file something

18  that is not necessarily oppose the relief that's requested by

19  the Boy Scouts, but to point out that I do find it problematic

20  for the Boy Scouts to produce documents, including deposition

21  transcripts, that many of which are from my clients and which

22  with some of them do include Social Security numbers, whole

23  Social Security numbers.

24         And so in the Boy Scouts' letter they did indicate,

25  I think it was in one of their last sentences of the letter,

1    that they are prepared to -- at the request of a party or

2    counsel, they are prepared to go through a reasonable number

3    of documents and to redact the names and other personal

4    identifying information.  And so that's what I intended to do

5    was to tell them that I believe that my clients -- I

6    understand names are already a part of the proofs of claim,

7    but not their full Social Security numbers.  And although some

8    of them may have it, this is going to a broader audience than

9    people under the protective order or the bar date order who

10   are permitted to look at proofs of claim.

11        I mean, right now I am not -- as counsel for

12   certain survivors I'm not allowed to see any other survivors

13   who's not a client's proof of claim numbers.  And this

14   document production would go to a broader audience, it would

15   go to other survivors' counsel, it would go to insurers and

16   chartered organizations who have nothing to do with my

17   clients' claims, and so they wouldn't see our proofs of claim

18   and the sensitive information there.

19        And so I just wanted to state that I do think that

20   the Boy Scouts should make every effort to redact Social

21   Security numbers.  I understand that the names, you know,

22   that's going to be in a lot, you know, more places and

23   transcripts and that would be difficult, but it's not

24   difficult to pinpoint where in the transcripts, the one time

25   that the Social Security number is mentioned.  And so I just

1    wanted to state that, Your Honor.  Thank you.

2              THE COURT:  Thank you, Ms. Wolff.

3              Mr. Kurts?

4              MR. KURTS:  Your Honor, just briefly.  We're not

5    producing to anybody who's not party to a protective order and

6    Social Security information is confidential, but that's why we

7    have protective orders and that will be protected.  It is

8    certainly not easy for us to identify ten digits in tens of

9    thousands of pages when we don't even know what they are.  I

10   just don't think it's a burden that's required and I don't

11   think anybody would be in a position to misuse, but -- and

12   they couldn't do that without violating the protective order.

13             And certainly, if counsel, Ms. Wolff, wants to

14   identify the Social Security numbers for her clients, we'd be

15   happy to replace our production, which we would like to get

16   out right away so people have it, with her production.  And

17   everybody can otherwise destroy what we produce with respect

18   to her clients or any other counsel who wants to undertake the

19   burden themselves to protect their clients Social Security

20   numbers somehow beyond that protection that's afforded by a

21   protective order.

22             THE COURT:  Okay.  Thank you.

23             MS. WOLFF:  And, Your Honor, if I can just respond

24   briefly?  I suspect that this protective order issue may have

25   been brought about when I reached out to debtors' counsel and

1   raised the issue, and it's because I reached out to them.  And

2   so I doubt that other survivors' counsel even have the ability

3   or the notice that they would need in order to say, hey, Boy

4   Scouts, I have a problem with you releasing my Social Security

5   information.  It's because I reached out to them that this --

6   that -- it's because I noticed it, Your Honor, because I'm a

7   participating parties, my clients are participating parties

8   that I'm aware of this.  But people who haven't yet filed, you

9   know, their notice that they're going to be participating

10  parties, they don't necessarily have the notice, they don't

11  have the discovery requests and so far their responses and

12  objections from the debtors, and so they may not know that the

13  Boy Scouts are willing to work with them or that there's even

14  a possibility that their client's sensitive information is

15  going to be distributed to a wider audience.

16          And that's just a concern that I have is because

17  the Boy Scouts were saying that they're going to do this,

18  they're willing to do this, but then they're not telling

19  people that there's even a risk that their client's

20  information is going to be produced.

21          So, thank you.

22          THE COURT:  Thank you.  I appreciate the

23  sensitivity of the information, but I think that is why we

24  have protective orders.  It's going to be designated highly

25  confidential.  People have to be -- have to sign off on their

1   -- to be a party to it or an expert who's signed off, I'm

2   assuming there's a page for that.  So I think that's what can

3   be done under the circumstances.

4           Okay.

5           MR. HOGAN:  Your Honor, Dan Hogan again.  I hate to

6   belabor the point, Your Honor, but what I heard Ms. Grassgreen

7   indicate was that until I hear back from AVA Law and Joe Grey,

8   that they're not going to send out a letter, and I'm concerned

9   if I don't hear back from Joe Grey that this thing could

10  derail and get pushed into next week.

11          THE COURT:  Well, I'm hoping that Mr. Grey or

12  someone in his office is around and we can have an indication

13  today.

14          MR. HOGAN:  I've already sent an email to Mr. Grey

15  during the pendency of this hearing, Your Honor, so --

16          THE COURT:  Thank you.

17          MR. HOGAN:  -- I'm trying to move the ball forward.

18          THE COURT:  I appreciate that.

19          Okay, I think that concludes this hearing.  My

20  chambers can be reached, if we hear from Mr. Grey and there's

21  a no, and then I'll make some decisions, but in the first

22  instance I'm going to give him an opportunity.  I know Ms.

23  Lauria and Ms. Grassgreen will be speaking with respect to

24  next week's hearing.

25          And, in the meantime, if there are other discovery

1  disputes, let's -- we have next Friday already set aside for

2  discovery disputes.  Please, when you file something, contact

3  chambers to let us know, so that we have it on the list.

4  Okay?

5           MR. SCHIAVONI:  And, Judge --

6           THE COURT:  Yes.

7           MR. SCHIAVONI:  -- just to try -- just in the

8  interest of trying to avoid a discovery dispute, okay?  I

9  heard you loud and clear and I'm not arguing anything about

10 the ruling that you made sort of in connection with the

11 Kosnoff deposition, but I can go out and file a motion to

12 transfer and generate lots of activity that way.  I thought

13 Your Honor indicated that Mr. Kosnoff, to the extent he

14 injected himself in solicitation, was subject to the

15 jurisdiction of the Court.  So, alternatively, I could just

16 issue a notice and work with Mr. Wilks on an appropriate day.

17 And if the Court was of the view that a notice would be

18 adequate, I can avoid, you know, having to go through three

19 weeks of back and forth on the transfer.

20           So, I'm sorry if I asked for like a view on that if

21 it's not appropriate, it's just meant to speed things along,

22 but would a notice work here?

23           THE COURT:  I think a notice works.

24           MR. SCHIAVONI:  Okay.  Thank you, Your Honor.

25           THE COURT:  Okay.  Thank you very much then,

1    counsel.  We are adjourned.

2              COUNSEL:  Thank you, Your Honor.

3         (Proceedings concluded at 12:09 p.m.)

4

5

6

7

8                        CERTIFICATE

9

10        We certify that the foregoing is a correct transcript

11   from the electronic sound recording of the proceedings in the

12   above-entitled matter.

13
     /s/Mary Zajaczkowski_____        November 12, 2021
14   Mary Zajaczkowski, CET**D-531

15
     /s/William J. Garling_____         November 12, 2021
16   William J. Garling, CE/T 543

17
     /s/ Tracey J. Williams_____         November 12, 2021
18   Tracey J. Williams, CET-914

19

20

21

22

23

24

25